John A. Yanchunis (*pro hac vice pending*)
jyanchunis@forthepeople.com
Patrick Barthle (*pro hac vice pending*)
Pbarthle@forthepeople.com
Morgan & Morgan Complex Litigation Group
201 North Franklin Street 7th Floor
Tampa, Florida 33602
(813) 223-5505 (tel)
*(813) 223-5402 (fax)*

Clayeo C. Arnold (CSBN 65070)
JOSHUA H. WATSON (CSBN 238058)
jwatson@justice4you.com
CLAYEO C. ARNOLD, APC
865 Howe Ave
Sacramento, CA 95825
(916) 777-7777 (tel)
(916) 924-1829 (fax)

*Counsel for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RICHARDS, RUBA AYOUB, BRANDY TERBAY AND TRACY CUMMINGS, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>vs.<br><br>CHIME FINANCIAL, INC., GALILEO FINANCIAL TECHNOLOGIES, INC., and THE BANCORP INC.,<br><br>          Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Ryan Richards, Ruba Ayoub, Brandy Terbay and Tracy Cummings ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their counsel, bring this action against Chime Financial Inc. ("Chime"), Galileo Financial Technologies, Inc. ("Galileo") and The Bancorp, Inc.("Bancorp) (collectively "Defendants") allege as follows:

## NATURE OF THE ACTION

1.      This action is brought by Plaintiffs, individually and on behalf of a class of similarly situated customers of Chime arising from a service disruption that occurred on October 16, 2019 and continues in part to this day (hereafter, the "Service Disruption").

2.      As a result of Defendants' negligence and other violations of law, Plaintiffs and Class members were prevented from accessing their Chime accounts for several days – denying access to the only source of money for many. During the Service Disruption, Plaintiffs and Class members were unable to spend or withdraw their funds from their accounts needed for the basic necessities of life, such as food, clothing, shelter, and medicine.

3.       Plaintiffs and Class Members seek damages and injunctive relief based upon Defendants' unlawful conduct denying Plaintiffs and Class Members (defined below) the ability to access and use funds in their accounts.

## JURISDICTION AND VENUE

4.      This Court has subject matter over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregate claims of the individual Class Members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members defined below; and there are numerous members of the proposed class who are citizens of a state different from Defendants.

5.      This Court has personal jurisdiction over Defendants. Chime is headquartered in San Francisco, California. This Court has personal jurisdiction over all Defendants because Defendants conduct substantial business in this District and because a substantial part of the acts and omissions complained of occurred in this District.

6.      Venue as to Defendants is proper in this District under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, Chime maintains its principal place of business in this District. All Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District.

## **PARTIES**

7.      Plaintiff Ryan Richards is a resident and citizen of Florida and a Chime customer.

8.      Plaintiff Ruba Ayoub is a resident and citizen of Texas and a Chime customer.

9.      Plaintiff Brandy Terbay is a resident and citizen of Texas and a Chime customer.

10.     Plaintiff Tracy Cummings is a resident and citizen of Illinois and a Chime customer.

11.     Defendant Chime Financial Inc., is a Delaware corporation headquartered at 77 Maiden Lane, Fl 6, San Francisco CA 94108. Chime is an online-only bank started in 2013 which offers a no fee alternative to traditional brick and mortar banks.  It has more than 5 million customers, the majority of whom are millennials and those living paycheck to paycheck.

12.     Defendant Galileo Financial Technologies, Inc.is a Utah corporation headquartered at 6510 S Millrock Ste 300 Salt Lake City, UT 84121. Galileo makes the

Application Programming Interfaces ("API") which Chime uses to offer credit cards, debit cards, banking and money transfer services.

13.     The Bancorp Inc. is a financial holding company which, through its wholly owned subsidiary The Bancorp Bank, provides licensed banking services for Chime including the Chime Visa® Debit Card.  Bancorp is a Delaware corporation headquartered at 409 Silverside Road, Wilmington, Delaware, 19809.

## GENERAL ALLEGATIONS

14.     Chime is an online-only bank started in 2013 as an alternative to traditional brick and mortar banks. Since its inception, Chime has attracted more than five million new account holders, giving it the largest customer base of any digital challenger bank in the U.S.[1]

15.     Chime markets primarily to millennials and others who make $35,000 to $70,000 a year – the segment of the population that relies heavily on debit cards to pay for everyday expenses while attempting to stay within budget.[2]

16.     "With a mission to deliver 'financial peace of mind,' Chime has developed a mobile [] checking account…. with a range of features to make banking simpler, cheaper and more transparent for the 160 million Americans it says live paycheck to paycheck."[3]

17.     One of Chime's biggest selling points to cost sensitive customers has been its "no hidden fees" approach to creating a transaction account – meaning no

---

[1] *Chime now has 5 million customers and introduces overdraft alternative*, Tech Crunch, September 4, 2019, https://techcrunch.com/2019/09/04/chime-now-has-5-million-customers-and-introduces-overdraft-alternative/

[2] *This branchless bank quadrupled its customer base to 4 million in a single year*, CNBC, June 17, 2019 https://www.cnbc.com/2019/06/12/chime-has-quadrupled-its-customer-base-to-4-million-in-a-single-year.html

[3] *Shining a spotlight on Chime: The fastest-growing mobile banking challenger in the U.S.*, NS Banking, June 6, 2019, https://www.nsbanking.com/analysis/chime-mobile-banking/

overdraft fees, no monthly maintenance or service fees, no minimum balance, and no charges on foreign transactions.[4] Another innovative feature of Chime's offering is its "get paid early" tool, which enables people to receive their regular salary up to two days earlier than normal.

18.     Critical to Chime's success is providing customers immediate access to their funds with minimal cost, implicitly acknowledging the fact that "when you live paycheck to paycheck, the tiniest hiccup could throw you for a financial loop. And that's a pretty stressful way to live. Unfortunately, it's also a practice that 59% of Americans uphold…."[5]

19.     For many customers, Chime is their only account, where they keep all their money.

20.     Chime customers receive a debit card, a Spending Account (aka checking account), a Savings Account, and a phone App that is iPhone and Android compatible.

21.     Chime provides the banking services through its licensed banking partner, Bancorp and the underlying infrastructure to perform banking services and facilitate customer transactions through its technical partner Galileo.

## SERVICE DISTRUPTION

22.     Without warning, on October 16, 2019, Chime suffered a system wide service outage leaving its 5 million customers without access to their accounts for 72 hours. As a result, Chime customers suffered an array of harms and indignities, finding themselves without money to pay for gas, food, and medicine.[6]

---

[4] *Chime Bank disrupting the banking industry with fintech*, MarketWatch, January 31, 2019, https://www.marketwatch.com/press-release/chime-bank-disrupting-the-banking-industry-with-fintech-2019-01-31

[5] *More Than Half of Americans Live Paycheck to Paycheck. Here's How to Break That Cycle*, The Motley Fool, May 19, 2019 https://www.fool.com/retirement/2019/05/19/more-than-half-of-americans-live-paycheck-to-paych.aspx

[6] Mobile bank Chime goes dark for millions of customers as it seeks $5 billion

23.     During the time the system was down, Chime customers did not have access to their funds, causing immense hardship, including the inability to pay for basic necessities such as food, rent, electricity, gas, and medicine. Customers were unable to pay their household bills, resulting in the assessment of late fees.

24.     The outage is Chime's third since July, the last being in September over a weekend that prevented customers from making card purchases or withdrawing money from ATMs.[7]

25.     Rather than contacting its customers directly via e-mail, telephone or the Chime App, Chime took to social media, specifically Twitter, to communicate the outage. On October 16, 2019, at 10:41, Chime tweeted "Our processor is experiencing issues, resulting in our app + website being down. We're aware and are working with them to get it up and running ASAP. We apologize for the inconvenience."[8]

26.     Chime's decision to initially communicate only through a particular social media outlet left millions of its customers unaware of the system-wide outage and unable to mitigate the harm. Customers that were aware of the tweets expressed their outrage in the thousands highlighting the harm that the Service Disruption caused. A small sampling of the approximately 4,000 customer tweets are included below.[9]

**A▮▮▮ P▮▮▮ @▮▮▮▮▮▮** Oct 16

Are we all going to get compensated for this mess or what?I literally had to leave groceries at the store because I couldn't get my card to work. Then to top all of that off, I have to come here to Twitter to find out if you guys are down or something because Chime can't email?

---

valuation, CNBC, October 17, 2019, https://www.cnbc.com/2019/10/17/digital-bank-chime-goes-dark-for-millions-of-customers.html

[7] Chime Suffers Outage That Prevents Customers From Making Purchases, Accessing Cash, Forbes, https://www.forbes.com/sites/donnafuscaldo/2019/10/17/chime-suffers-outage-that-prevents-customers-from-making-purchases-accessing-cash/#1d5ded78ca3a

[8] https://twitter.com/Chime/status/1184524678016188416

[9] https://twitter.com/Chime/status/1185013216008536064 [redactions for privacy]

**B**▮ @▮▮▮ Oct 16

A traditional bank employs people with telephones who answer them and tell you they are having issues instead of looking on social media for answers

**Bl**▮ @▮▮▮ Oct 16

Replying to @Chime

I feel like we should get something for this inconvenience. I can understand the app having issues. But not being able to use our money is freaking ridiculous!!!

**H**▮▮**D**▮ @▮▮▮▮ Oct 16

Replying to @Chime

How can y'all still roll out emails but not notify anyone that the app is down as well as card use. Twitter shouldn't be the first place I should hear about this.

**Br**▮▮ @▮▮▮▮ Oct 16

Replying to @Chime

Dude it was so embarrassing getting declined for 4.63 cents for a Red Bull and chips and standing in line knowing I have money that was not cool at all

**Chime**

We're aware that card transactions are down, and are working on bringing it back up as soon as possible. We sincerely apologize for the inconvenience. For real-time updates, please refer to our status page: http://status.chimebank.com.

7:02 PM - 17 Oct 2019

**J**▮▮ **Y**▮▮ @▮▮▮▮ Oct 17

Replying to @Chime

This outage is beginning to get annoying! I have bills to pay and can't transfer money where it's need cause I have no access to balance or anything! Get this fixed all ready!

**Chime** Verified account @Chime Oct 17

Jessica - We want to apologize for the inconvenience that you are experiencing at this time. We are experiencing issues with our payment processor. Please be assured that the Chime team is working tirelessly to remedy this issue.

**F**▮▮ @▮▮▮ Oct 17

This apology at this point is aggravating and feels like a copy and paste reply JUST GET IT FIXED!!!!

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**T█O█A█O█M█** @███████ Oct 17

It can't be intermittent issues when we are going on 2 days now. Instead of saying "issues" how about a real explanation for why we can't access our money? Some of us live paycheck to paycheck and this stretches us all too far.

**M████ S██████** @██████████ Oct 17

Replying to @Chime

Got an email saying my card is working again, run to the gas station just to have it declined again!

**S█████ C███████** @█████████ Oct 17

Replying to @Chime

Yikes. Just as I parked at Target with my daughters, I saw the outage update. had to explain to the kids why we can't shop and finish errands. Good thing we didn't get out of the car. Eek! Hope this gets worked out by tomorrow. Thank you!

**T██████ W██████** @██████████ Oct 17

Haven't been able to feed my 3 kids either for the last 48 hours and my husband is stuck in a semi with no access at all to our money. Im stressed and this is fucking ridiculous

**I█████ G████ a█C█████** @████████ Oct 17

Replying to @Chime

Notice how "direct deposit" is the only service up and running? They can still get our money, but we can't do anything with it. Interesting.



| iOS ⑦ | Major Outage |
| Android ⑦ | Major Outage |
| Web | Major Outage |
| Card Purchases | Partial Outage |
| Direct Deposit | Operational |
| Mobile Check Deposit | Major Outage |
| ATMs | Partial Outage |
| Transfers | Partial Outage |
| Chime Checkbook | Major Outage |
| Connected Accounts | Major Outage |
| Automatic Savings | Major Outage |
| Notifications | Partial Outage |
| Phone Support | Partial Outage |
| In-app Support | Major Outage |

**T▊▊ K▊▊▊ M▊▊** ▊▊▊▊▊▊▊▊▊▊▊ @▊▊▊▊▊▊ Oct 17

Replying to @Chime

This is my first paycheck direct deposit with @Chime . I just got my account almost 2 weeks ago. I now have ZERO access to my paycheck that was deposited today. I work hard to earn my pay, and now I have no access to it. As a new Chime member, this sure is not a good impression.

**S▊▊▊ R▊▊▊▊** @▊▊▊▊▊▊ Oct 17

Yep just tried using mine..... familiar declined message! This is beyond ridiculous. @Chime what's the friggin issue, 2 days with this bs is unacceptable. Will you pay late charges we get because we can't pay bills with our money in your possession?

27.     On Friday October 18, 2019, 72 hours after first denying customer's access to their money and the ability to make purchases, ATM withdrawals, direct deposits, or transfers, Chime purportedly reestablished basic functions although were still experiencing "technical issues" with the phone app.

> *"Thanks for calling Chime. Card purchases, ATM withdrawals and direct deposits are all working as expected, however, we are currently experiencing technical issues with the Chime app. Also, you can receive your balance over the phone system. We are working to restore full app functionality as quickly as possible and are deeply sorry for the inconvenience. We are experiencing high call volumes and hold times are over 40 minutes."[10]*

28.     Unfortunately, even after basic banking functions were reestablished and customers regained access to their accounts, many have reporting missing money and incorrect balances, despite not having had access to the account for days. *Id.*

---

[10] Popular mobile banking app Chime suffers outage, customers' money hangs in the balance, ABC News 5 Cleveland, October 18, 2019, https://www.news5cleveland.com/news/national/popular-mobile-banking-app-chime-suffers-outage-customers-money-hangs-in-the-balance

**Chime** Verified account @Chime Oct 18

We've received questions regarding account balances. We take this very seriously and are investigating with our processor. Balance information has been temporarily removed from the app until we can provide the most up to date balance. Thanks for your patience, your money is safe.

**j█████ D█** @████████████ Oct 18

You guys doubled a few of my transactions and now I'm -$73.00 when will this be fixed?

**L█M████ E███████** @████████ Oct 18

Replying to @Chime

Just when I thought all was well balances are not accurate

**Chime** Verified account @Chime Oct 18

We've received questions regarding account balances. We take this very seriously and are investigating with our processor. Balance information has been temporarily removed from the app until we can provide the most up to date balance. Thanks for your patience, your money is safe.

**T██ ████** @███████████ Oct 18

I checked my account, had the money to get food and gas, go to get food 15 minutes later and all of a sudden my account is negative... a lot others have it so much worse but all in all it's our money wrongfully leaving our accounts which makes it gone to us until it's back..

29.    Customer ire and frustration was summed up succinctly in a petition on Change.org that has garnered 5,807 signatures and counting.

> Yesterday around 3PM Chime Bank went down preventing people from accessing any services to their accounts, INCLUDING card purchases and ATM withdraws. People were forced to put back groceries, not fill up their car, miss work and even be late on bills. This is not acceptable, and Chime Bank should have to compensate its users.[11]

---

[11] https://www.change.org/p/chime-bank-chime-needs-to-compensate-for-damages-while-their-banking-system-was-down-61ee0c25-fc40-4d5e-8b93-0aabd9127cce

30.     As a direct and proximate result of the actions described above, Plaintiffs and Members of the Class have been damaged.

## PLAINTIFF SPECIFIC FACTS

31.     Plaintiff Ryan Richards is a Chime customer. On the morning of October 16, 2019, Mr. Richards learned that his Chime account was not accessible when his debit card was declined at a gas station. Thereafter, Mr. Richards attempted to determine why his debit card did not work although he had money in his account. He emailed Chime repeatedly with no answer and ultimately learned of the Service Disruption through social media.

32.     The Service Disruption caused Mr. Richards to be late on his rent and incur a $40 late fee as well as being late to pay his electric bill. Without access to his account, Mr. Richards was also unable to take his wife out to their weekly dinner.

33.     When Chime reestablished access to his account, Mr. Richards noticed the following:  two ATM withdrawals that purportedly occurred during the Service Disruption, which he did not perform or otherwise authorize;  a $43 charge during the Service Disruption which he did not make; $443 was missing and unaccounted for; and his account was $800 overdrawn.

34.     At present Mr. Richards is still working with Chime to get these fraudulent charges and discrepancies resolved and his account balance properly credited.

35.     In addition to causing hardship and financial damage, the Service Disruption required Mr. Richards to spend valuable time dealing with the myriad of issues caused by not having access to his account – time which he would not have otherwise had to spend but for the Service Disruption.

36.     Plaintiff Ruba Ayoub is a Chime customer. She learned of the Service Disruption when her debit card was declined at a gas station.  As a result, she was unable to take her children to school and was also forced to miss a day of work.

37.     Ms. Ayoub attempted to contact Chime via the Chime App and emails, but either received no response or incorrect information regarding the accessibility of her account.

38.     Ms. Ayoub is a heart patient and had a scheduled visit with her cardiologist. She informed them that due to the Service Disruption she was unable to make the co-pay. Her Doctor kindly agreed to render medical services and bill Ms. Ayoub the $50.00 co-pay.

39.     During the Service Disruption Ms. Ayoub was also unable to purchase groceries for her family.

40.     Once Ms. Ayoub obtained access to her account, she noticed an Uber Eats charge on October 18, 2019 for $33 which she did not make, did not authorize and was made at a time that she did not have access to her account. As a result, her account also showed a negative balance.

41.     In addition to causing hardship and financial damage, the Service Disruption required Ms. Ayoub to spend valuable time dealing with the myriad of issues caused by not having access to her account – time which she would not have otherwise had to spend but for the Service Disruption.

42.     Plaintiff Brandy Terbay is a Chime customer. She receives social security and disability.

43.     On October 16, 2019 Ms. Terbay learned that the money in her Chime account was inaccessible as she tried to purchase her diabetes and anxiety medications from her pharmacy. Because of the Service Disruption, Ms. Terbay did not have a working debit card and her attempt to purchase medication was declined. The medication Ms. Terbay was attempting to purchase was not volitional, but a life sustaining necessity.

44.     Ms. Terbay attempted to call and send messages to Chime through the phone app without response.

45.    Ms. Terbay's Doctor's office contacted her after they did not receive notification that her medication had been picked up.  Once Ms. Terbay explained that she did not have access to her account through no fault of her own, her Doctor's office provided her with a gift card so that she could purchase medication.

46.    In addition to being unable to purchase medication, the Service Disruption prevented Ms. Terbay from grocery shopping and feeding her children. She was subsequently forced to borrow money from her father in order to do so.

47.    In addition to causing hardship and financial damage, the Service Disruption required Ms. Terbay to spend valuable time dealing with the myriad of issues caused by not having access to her account – time which she would not have otherwise had to spend but for the Service Disruption.

48.    Ms. Terbay has opened up a new account at another bank and is in the process of closing her Chime account.

49.    Plaintiff Tracy Cummings is a Chime customer. On Wednesday October 16, 2019 at approximately 10:00 a.m., Ms. Cummings attempted to access her Chime account without success. She repeatedly attempted to do so throughout the day without success. She subsequently visited Chime's website and emailed them, but ultimately learned of the Service Disruption through social media.

50.    Ms. Cummings agreed to pay her rent the morning of 16th, which she could not do because she had no access to her bank account. As a result, her rent was 72 hours late for which she will be assessed a fee.

51.    The Service Disruption also prevented Ms. Cummings from: (1) purchasing groceries, (2) paying a friend to whom she owed money, (3) putting gas in her car; and (4) having dinner out with her friends.

52.    In addition to causing hardship and financial damage, the Service Disruption required Ms. Cummings to spend valuable time dealing with the myriad of

issues caused by not having access to her account – time which she would not have otherwise had to spend but for the Service Disruption.

**INAPPLICABLE OR UNENFORCEABLE ARBITRATION CLAUSE**

53. Section 16 of Chime's Deposit Account Agreement purports to require that certain disputes be individually arbitrated. Section 16 is unenforceable because it is substantively and procedurally unconscionable and/or is against public policy.[12]

54. To the extent that Defendant asserts that the claims of Plaintiffs and Class members are subject to an arbitration agreement or a class action waiver, Plaintiffs and the Class seek declaratory relief in the form of a finding that such a purported arbitration agreement is void and unenforceable.

55. Plaintiffs and Class Members were fraudulently induced into banking with Chime because they were led to believe their funds would be protected and they would have unhindered access to these monies.

56. The terms of Chime's arbitration provision, waiver of class action rights and right to trial by jury are unconscionable and Plaintiffs and Class Members would not have agreed to those terms or deposited any money with Chime had they known about the fraudulent, unlawful and unfair activity and misrepresentations as described in this Complaint.[13]

## **CLASS ACTION ALLEGATIONS**

57. Plaintiffs bring this suit as a class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure. Plaintiffs seek certification of a Nationwide and state Sub classes defined as follows:

---

[12] https://www.chimebank.com/policies/bancorp/deposit-account-agreement/

[13] Plaintiff reserves the right to assert this claim as to any of Defendants' terms of service which contain an arbitration clause and/or class action waiver provision.

> All Chime consumers in the United States who were denied access to their accounts and funds beginning October 16, 2019.
>
> All Chime consumers residing in the state of Florida who were denied access to their accounts and funds beginning October 16, 2019.
>
> All Chime consumers residing in the state of Texas who were denied access to their accounts and funds beginning October 16, 2019.
>
> All Chime consumers residing in the state of Illinois who were denied access to their accounts and funds beginning October 16, 2019.
>
> All Chime consumers residing in the state of Georgia who were denied access to their accounts and funds beginning October 16, 2019.

58.    Excluded from the Classes are the officers, directors, and legal representatives of Defendants, and the judges and court personnel in this case and any Members of their immediate families.

59.    <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all Members is impractical. While the exact number of Class Members is unknown to Plaintiff at this time, upon information and belief, the Service Disruption affected all approximately five million Chime customers.

60.    <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    whether Defendants owed duties to Plaintiffs and the proposed classes, the scope of those duties and if they breached those duties;

b.    whether Defendants' conduct was unfair or unlawful;

c.    whether Defendants breached their contracts with Plaintiffs and the proposed classes;

d.   whether the arbitration and class action waiver provisions of the Chime Deposit Agreement are unconscionable, illusory, fraudulent or otherwise invalid;

e.   whether Plaintiffs, the Class and the Subclasses have sustained damages as a result of Defendants' conduct alleged herein and, if so, what is the proper measure of such damages; and

f.   whether Plaintiffs, the Class and the Subclasses are entitled to declaratory and injunctive relief.

61.   <u>Typicality</u>. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because Plaintiffs lost access to their Chime accounts like every other Class Member. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Members of the Class were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

62.   <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

63.   <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). The class litigation is an appropriate method for the fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class

Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

64.     The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

65.     The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

66.     Adequate notice can be given to Class Members directly using information maintained in Defendant' records.

67.     Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard

to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

68.     Unless a Class-wide injunction is issued, Defendant may continue to act unlawfully as set forth in this Complaint.

69.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## COUNT I – NEGLIGENCE

### (By All Plaintiffs Against All Defendants)

70.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

71.     Defendants owed duties to Plaintiffs and the proposed Class as Chime account holders and paying customers to use reasonable care to protect and secure customer funds and provide access to those monies.

72.     Defendants had full knowledge of the types of harm that Plaintiffs and Class Members could and would suffer if they were denied access to the monies in their account.

73.     Defendants breached their duties to Plaintiffs and Class Members by failing to provide customers access to their funds for a prolonged period of time causing hardship to the Plaintiffs and the proposed classes.

74.     Defendants breached their duties to Plaintiffs and Class Members by failing to maintain the integrity of customer accounts during the Service Disruption resulting in fraudulent charges and inaccurate balance statements.

75.     Defendants failed to use reasonable care in communicating information about the Service Disruption and the security and integrity of account funds.

76.     Plaintiffs and the proposed Class justifiably relied upon the information supplied and representations made by Defendants, and, as a result, engaged in business

1   with Defendants suffered damages and lost money.

2       77.     As a direct and proximate result of Defendants' negligence, Plaintiffs and

3   the proposed Class were damaged in an amount to be proven at trial.

4               **COUNT II – UNJUST ENRICHMENT**

5               **(By All Plaintiffs Against All Defendants)**

6       78.     Plaintiffs repeat, reallege, and incorporate by reference each of the

7   foregoing allegations as though fully set forth herein.

8       79.     Plaintiffs and the proposed Class have conferred a benefit upon Defendants

9   by depositing monies into a Chime account, which, by being inaccessible, did not perform

10  as promised and/or did not have the attributes and benefits promised by Defendants.

11      80.     By their unfair, misleading and unlawful conduct alleged herein,

12  Defendants have unjustly received and retained benefits at the expense of Plaintiffs and

13  the proposed Class, including funds that Plaintiffs and the proposed Class paid to

14  Defendants and funds deposited to Chime accounts.

15      81.     Under principles of equity and good conscience, Defendants should not be

16  permitted to retain money belonging to Plaintiffs and the proposed Class that they unjustly

17  received as result of its unfair, misleading and unlawful conduct alleged herein without

18  providing compensation to Plaintiffs and the proposed Class.

19      82.     Plaintiffs and the proposed Class have suffered financial loss as a direct

20  result of Defendant's conduct.

21      83.     Plaintiffs and Class Members are entitled to restitution of, disgorgement

22  of, and/or the imposition of a constructive trust upon all profits, benefits and other

23  compensation obtained by Defendants, and for such other relief that this Court deems

24  proper, as a result of their unfair, misleading and unlawful conduct.

25  //

26  //

27  //

28

Case No.                        19                      CLASS ACTION COMPLAINT

## COUNT III – BREACH OF CONTRACT

### (By All Plaintiffs Against All Defendants)

84.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

85.     Plaintiffs, and each member of the proposed Class, formed a contract with Defendants at the time they deposited monies with Chime.  The terms of that contract include the promises and affirmations of fact made by Defendants through their marketing materials and statements which constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiffs and the members of the proposed Class on the one hand, and Defendants on the other.

86.     In exchange for Defendants' assurance to Plaintiff and Class Members that they would have access to their financial accounts which would be maintained securely and accurately Plaintiffs and Class Members funded their accounts and utilized banking services which generated revenue for Defendants.

87.     Plaintiffs and Class members gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed.

88.     Defendants breached the terms of this contract, including the express warranties, with Plaintiffs and the proposed Class by denying customers access to their funds and, thus, not providing a product and service which provided the promised benefits as described above.

89.     As a result of Defendant's breach of its contract and warranties, Plaintiffs and the proposed Class have been damaged in an amount to be proven at trial.

## COUNT IV – CONVERSION

### (By All Plaintiffs Against All Defendants)

90.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

91.     Plaintiffs, and each member of the Class, deposited money into their Chime accounts.

92.     Defendants knowingly and intentionally exercised control over the monies belonging to Plaintiffs and Class members, retraining funds and denying Plaintiffs and Class members access to their funds.

93.     Because of the unlawful restraint imposed by Defendants, the rights of Plaintiffs and the Class members in their funds were interfered with and their funds could not be used in the matter in which they desired.

94.     Defendants also unlawfully imposed fees upon Plaintiffs and the Class members in connection with these restraints, depriving them of the use and control over their property.

95.     As a result of the foregoing actions of Defendants, Plaintiffs and the proposed Class have been damaged in an amount to be proven at trial.

## COUNT V – BREACH OF FIDUCIARY DUTY

### (By All Plaintiffs Against All Defendants)

96.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

97.     Defendants owed a fiduciary duty to Plaintiffs and Class members to protect, secure and retain all monies that lawfully belonged to them.

98.     As alleged herein, Defendants breached those fiduciary duties by restraining funds that they had no right to restrain.

99.     Defendants breached those fiduciary duties by denying Plaintiffs and Class members access to the funds that lawfully belonged to them.

100.     Defendants breached those fiduciary duties by failing to secure and protect all of the funds Plaintiffs and Class members had in their Chime accounts.

101.     As a result of the foregoing actions of Defendants, Plaintiffs and the

proposed Class have been damaged in an amount to be proven at trial.

## COUNT VI – VIOLATION OF THE FLORIDA DECEPTIVE

## AND UNFAIR TRADE PRACTICES ACT (FDUTPA)

### Fla. Stat. §501.201

(On behalf of the Florida Subclass)

102.      Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

103.      Plaintiff Ryan Richards (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the Florida Subclass.

104.      At all times relevant hereto, the FDUTPA was in full force and effect. Section  501.202 Fla. Stat. of FDUTPA provides in relevant part as follows:

> The provisions of this part shall be construed liberally to promote the following policies:
>
> (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.
>
> (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.
>
> (3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

105.      Plaintiff and other members of the proposed subclass, as defined above, are "consumers" as defined by Florida Statute §501.203(7) and the subject transactions are "trade or commerce" as defined by Florida Statute §501.203(8).

106.      Section 501.204 renders unlawful the "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

107.      FDUPTA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or

unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

108.    For the reasons discussed herein, Defendants violated and continue to violate FDUPTA by engaging in the herein describe unconscionable, deceptive, unfair acts or practices proscribed by Florida Statute §501.201 *et. seq.*  Defendants' affirmative misrepresentations and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

109.    Defendants represented that Chime customers would have full access to the funds in their accounts.

110.    Plaintiff and the proposed subclass deposited money into their Chime accounts that they would not have deposited had they known they would subsequently be denied access to their accounts.

111.    Plaintiff and the proposed subclass members justifiably relied on the misrepresentations of Defendants to their detriment as described herein by depositing money into their Chime accounts.

112.    The above-described deceptive and unfair acts offend public policy and cause substantial injury to consumers.

113.    Plaintiff and the proposed subclass reserve the right to allege other violations of FDUPTA as Defendants' conduct is ongoing.

114.    As a direct and proximate result of the foregoing, the Plaintiff and the proposed subclass have been damaged in an amount to be determined at trial, including compensatory damages and other miscellaneous incidental and consequential damages.

115.    Plaintiff and the proposed subclass seek damages, together with appropriate punitive damages, attorneys' fees, and costs of suit pursuant to the FDUTPA as well as any equitable relief to enjoin Defendants from engaging in the wrongdoing described herein.

**COUNT VII – VIOLATION OF ILLINOIS CONSUMER FRAUD ACT, 815 Ill.**

**Comp. Stat. §§ 505/1, et seq.**

(On behalf of the Illinois Subclass)

116.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

117.    Plaintiff Tracy Cummings (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the Illinois Subclass.

118.    Defendants operating in Illinois engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 815 Ill. Comp. Stat. § 505/2, including but not limited to the engaging in deceptive, unfair, and unlawful trade acts or by failing to maintain the accessibility, security and integrity of Subclass Members' Chime accounts.

119.    As a direct and proximate result of Defendants' deceptive trade practices, Illinois Subclass Members suffered injuries and damages as described above.

120.    The unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

121.    Defendants actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Illinois Subclass.

**COUNT VIII – VIOLATION TWENTY-FIRST CAUSE OF ACTION**

**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT,**

**815 Ill. Comp. Stat. §§ 510/2, *et seq.***

(On behalf of the Illinois Subclass)

122.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

123.    Plaintiff Tracy Cummings (hereinafter "Plaintiff" for this Count) brings this claim individually and on behalf of the Illinois Subclass.

124.    Under the DTPA A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

125.    While in the course of its businesses, Defendants operating in Illinois engaged in deceptive trade practices by making false representations about the accessibility, security and integrity of Subclass Members Chime accounts in violation of 815 Ill. Comp. Stat. §§ 510/2(a)(5).

126.    Illinois Subclass Members have and are likely to continue to be damaged by Defendants' deceptive trade practices.

127.    Plaintiff and Illinois Subclass Members seek relief under 815 Ill. Comp. Stat. § 510, including, but not limited to, injunctive relief and attorney's fees.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

a.  For an Order certifying the Class as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

b.  For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein;

c.  For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

d.  For an award of punitive damages;

e.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.  For prejudgment interest on all amounts awarded; and

g.  Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

October 22, 2019.

Respectfully submitted,

_____
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis*
Florida Bar No. 324681
201 North Franklin Street 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505
Email:  jyanchunis@forthepeople.com

*Counsel for Plaintiffs and the Putative Classes*

*\* Pro Hac Vice application to be submitted*

/s/ Joshua H. Watson
_____
CLAYEO C. ARNOLD, APC
Joshua H. Watson
Cal. Bar No. 238058
865 Howe Ave
Sacramento, CA 95825
(916) 777-7777 (tel)
(916) 924-1829 (fax)
jwatson@justice4you.com

*Counsel for Plaintiffs and the Putative Classes*