UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RICHARDS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CHIME FINANCIAL, INC., et al.,<br><br>Defendants. | Case No. 19-cv-06864-HSG<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL**<br><br>Re: Dkt. No. 40 |

Pending before the Court is the unopposed motion for preliminary approval of class action settlement filed by Plaintiffs Ryan Richards, Ruba Ayoub, Brandy Terbay, and Tracy Cummings. Dkt. No. 40. The parties have reached a settlement regarding Plaintiffs' claims and now seek the required court approval. The Court held a hearing on September 24, 2020. *See* Dkt. No. 44. For the reasons detailed below, the Court **GRANTS** Plaintiffs' motion for preliminary approval of class action settlement.

I.  **BACKGROUND**

   A.  **Factual Background**

Plaintiffs filed this putative class action against Defendant Chime Financial, Inc., The Bancorp Inc., and Galileo Financial Technologies, LLC based on a disruption in Defendant Chime's online-only banking services.[1] *See* Dkt. No. 1. ("Compl."). Plaintiffs allege that on October 16, 2019, Chime had a system-wide service outage (the "Service Disruption") that lasted approximately 72 hours. *See id.* at ¶ 22. During this Service Disruption, Chime's customers,

---

[1] Plaintiffs allege that Chime is an online-only bank; Galileo makes the Application Programming Interfaces that Chime uses to offer credit and debit cards, as well as banking and money transfer services; and Bancorp is a financial holding company whose wholly owned subsidiary, The Bancorp Bank, provides licensed banking services for Chime. *See id.* at ¶¶ 11–14.

1    approximately 5 million people, could not access their accounts.  *Id.*  During this time, customers
2    could not access their funds, including through card purchases and ATM withdrawals.  *See id.* at
3    ¶¶ 23, 31, 36, 43, 50–51.  Following the Service Disruption, some customers reported incorrect
4    account balances and unauthorized charges.  *See id.* at ¶¶ 28, 33, 40.

5          Plaintiffs bring this action on behalf of a putative nationwide class of Chime customers
6    who were denied access to their accounts beginning on October 16, 2019, as well as subclasses of
7    customers denied access to their accounts who reside in Florida, Texas, Illinois, and Georgia.  *See*
8    *id.* at ¶ 57.  And on the basis of the above facts, Plaintiffs allege causes of action for negligence;
9    unjust enrichment; breach of contract; conversion; breach of fiduciary duty; violation of the
10   Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201; violation of the Illinois
11   Consumer Fraud Act, 815 Ill. Comp. Stat. §§ 505/1 *et seq.*; and violation of the Illinois Uniform
12   Deceptive Trade Practices Act, 815 Ill. Comp. Stat. §§ 510/2 *et seq.*  *See* Compl. at ¶¶ 70–127.

13       **B.**    **Procedural History**
14         Plaintiffs initially filed this action on November 22, 2019.  *See* Dkt. No. 1.  The parties did
15   not engage in motions practice.  Instead, the parties engaged in settlement conferences with
16   Magistrate Judge Laurel Beeler.  *See* Dkt. No. 28.  On February 6, 2020, the parties attended an
17   initial settlement conference with Judge Beeler.  *See id.*  Following the conference, the parties
18   exchanged settlement proposals and discussed resolution of this action.  *See* Dkt. No. 40-8, Ex. B
19   at ¶¶ 18–19.  On March 20, 2020, the Court granted the parties' request to stay the matter while
20   they continued their settlement negotiations.  *See* Dkt. No. 31.  On May 7, 2020, the parties
21   attended an additional settlement conference before Judge Beeler.  *See* Dkt. No. 35.  On May 12,
22   2020, with Judge Beeler's assistance, the parties reached an agreement in principle.  *See* Dkt. No.
23   40-8, Ex. B at ¶ 19.  The parties entered into a written settlement agreement in early August 2020.
24   *See* Dkt. No. 40-1, Ex. A.  Plaintiffs then filed the unopposed motion for preliminary settlement
25   approval on August 7, 2020.  *See* Dkt. No. 40.

26         During the hearing on the motion for preliminary approval, the Court raised concerns with
27   the scope of the release, as well as the process for any objectors to object to the proposed
28   settlement.  *See* Dkt. No. 44.  The Court directed the parties to meet and confer and file a status

report regarding any revised settlement agreement in light of these concerns. *Id.* In response, the parties submitted a revised settlement agreement on October 8, 2020, with minor modifications. *See* Dkt. No. 45-1, Ex. A ("SA"). The amended settlement agreement (1) simplifies the process for objecting to the proposed settlement; and (2) clarifies the release language. *See id.*

### i. Settlement Agreement

The key terms of the parties' settlement are as follows:

<u>Class Definition</u>:  The Settlement Class is defined as:

> All consumers who attempted to and were unable to access or utilize the functions of their accounts with Chime, as confirmed by a failed transaction or a locked card as recorded in Chime's business records, beginning on October 16, 2019 through October 19, 2019, as a result of the Service Disruption.

SA at ¶ III.1.

<u>Settlement Benefits</u>:

The parties have agreed to monetary relief that incorporates an offset for credits that Chime already provided to the accounts of active customers because of the outage:

- Approximately a month after the outage, Chime credited $10 to the accounts of all active customers as a "courtesy payment" because of the outage. SA at ¶ IV.1.a.
- Chime also credited the accounts of those customers who incurred "certain transaction fees" during the outage to cover those fees as a "transaction credit." *Id.* at ¶ IV.1.b.

The parties agree that these courtesy payments and transaction credits total $5,960,563.00 already paid to active Chime account holders due to the outage. *Id.* at ¶ IV.1.c. Defendants also concede that this litigation was "a motivation" for making these payments. SA at ¶ X.3. Pursuant to the settlement agreement, Defendants have agreed to further compensate settlement class members who submit verified claims under a two-tier system:

- Tier 1:  Class members who claim they suffered loss due to the outage, but who do not have or do not wish to provide documentation to substantiate their loss will be entitled to up to $25 for verified claims. *See id.* at ¶ IV.2. Defendants' aggregate payment under Tier 1 is $4 million. *See id.* at ¶ IV.2.c. If the amount of verified

3

claims under Tier 1 is less than $4 million, Defendants will retain any unclaimed amount, except to the extent that such funds are necessary to fully or partially satisfy Tier 2 claims. *Id.*

- Tier 2: Class members who claim they suffered loss due to the outage and have "reasonable documentation" to substantiate their loss will be entitled to up to $750, but not more than their verified loss. *See id.* at ¶ IV.3. Those who fail to provide documentation will be considered under Tier 1. Defendants' aggregate payment under Tier 2 is $1.5 million, plus any residual money unclaimed under Tier 1. *See id.* at ¶ IV.6.d.

All claims under both Tiers will be verified using a two-step system. *See id.* at ¶ IV.6.b. Under both Tiers, putative class members will have to submit a brief explanation, under penalty of perjury, as to how the outage caused them loss and what amount of loss they purport to have suffered. *See id.* Those submitting claims under Tier 2 will also be required to submit reasonable documentation to support their claims. *Id.* at ¶ IV.6.c. Defendants and the settlement administrator will then confirm through Chime's business records that the putative class member (a) held a Chime account at the time; and (b) either attempted a financial transaction that failed or had their card locked as a result of the outage. *Id.* at ¶ IV.6.b. During the hearing, Defendants confirmed that despite the service disruption, they have accurate records of attempted transactions during the relevant time period.

And under the settlement agreement, "[a]ny prior money received by a Settlement Class Member from Chime in connection with the Service Disruption will be offset against" the payment. *See id.* at ¶¶ IV.3.a, IV.3.b. Thus, any verified claims under Tier 1 and Tier 2 will be reduced by the amount the class member already received as a (1) courtesy payment; or (2) transaction credit. *See id.* At a minimum, however, Defendants will pay $1.5 million under the settlement agreement. *See id.* at ¶ IV.5.

<u>*Cy Pres* Distribution</u>: If the claim payments under Tiers 1 and 2 do not reach the $1.5 million minimum under the settlement agreement, Defendants will distribute funds to reach this minimum to the East Bay Community Law Center as the *cy pres* recipient. *See* SA at ¶ IV.5.

4

Defendants will, however, keep any money available for settlement but unclaimed above this $1.5 million threshold. *Id.*

Release: All settlement class members will release:

> [A]ny and all claims, demands, rights, actions or causes of action, liabilities, damages, losses, obligations, judgments, suits, penalties, remedies, matters and issues of any kind or nature whatsoever, whether known or unknown, contingent or absolute, existing or potential, suspected or unsuspected, disclosed or undisclosed, matured or unmatured, liquidated or unliquidated, legal, statutory or equitable, that have been or could have been asserted, or in the future might be asserted, in the Actions or in any court, tribunal or proceeding by or on behalf of the Named Plaintiffs, any and all of the members of the Settlement Class, and their respective present or past heirs, spouses, executors, estates, administrators, predecessors, successors, assigns, parents, subsidiaries, associates, affiliates, employers, employees, agents, consultants, independent contractors, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, investment bankers, underwriters, lenders, and any other representatives of any of these Persons, whether individual, class, direct, representative, legal, equitable or any other type or in any other capacity whether based on federal, state, local, statutory or common law or any other law, rule or regulation, including the law of any jurisdiction outside the United States, against any or all of the Released Parties, which the Named Plaintiffs or any member of the Settlement Class ever had, now has, or hereinafter may have, by reason of, resulting from, arising out of, relating to, or in connection with, the allegations, facts, events, transactions, acts, occurrences, statements, representations, omissions, or any other matter, thing or cause whatsoever, or any series thereof, embraced, involved, set forth or otherwise related to the alleged claims or events in the Action or the Service Disruption, including, but not limited to, use by a class member of their Chime Account up to and extending through the Service Disruption.

SA at ¶ II.20. In addition, class members:

> waive any rights they may have under California Civil Code Section 1542, Section 20-7-11 of the South Dakota Codified Laws, and any other similar law, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor, and a waiver of any similar, comparable, or equivalent provisions, statute, regulation, rule, or principle of law or equity of any other state or applicable jurisdiction.

*Id.* at ¶ IX.4.

Class Notice: A third-party settlement administrator will implement the "Notice

Program," which includes (1) an email Notice and (2) a Notice on the Settlement Website. *See* SA at ¶¶ V.I–VII.11; *see also* Dkt. No. 45-2, Ex. 2. The settlement administrator will send the Notice to class members by email within 30 days of the Court's order preliminarily approving the settlement. *See id.* at ¶ II.15, VII.1, VII.5. The settlement administrator will make reasonable efforts to locate updated email addresses for class members whose Notices are returned as undeliverable. *Id.* at ¶ VII.1. The Notice will include: the nature of the action, a summary of the settlement terms, and instructions on how to object to and opt out of the settlement, including relevant deadlines. *See* Dkt. No. 45-2, Ex. 2.

Opt-Out Procedure: Putative class members may opt out of or object to the settlement and/or Class Counsel's application for attorneys' fees, costs, and expenses. SA at ¶¶ II.17–II.18, VII.4–VIII.

Incentive Award: Named Plaintiffs as class representatives may apply for incentive awards of no more than $500 each. SA at ¶ X.1.

Attorneys' Fees and Costs: Class Counsel may file an application for attorneys' fees not to exceed $750,000. SA at ¶ X.2.

## II. PROVISIONAL CLASS CERTIFICATION

The plaintiff bears the burden of showing by a preponderance of the evidence that class certification is appropriate under Federal Rule of Civil Procedure 23. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). Class certification is a two-step process. First, a plaintiff must establish that each of the four requirements of Rule 23(a) is met: numerosity, commonality, typicality, and adequacy of representation. *Id.* at 349. Second, he must establish that at least one of the bases for certification under Rule 23(b) is met. Where, as here, a plaintiff seeks to certify a class under Rule 23(b)(3), he must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The criteria for class certification are applied differently in litigation classes and settlement classes." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019)

("*Hyundai II*"). When deciding whether to certify a litigation class, a district court must consider manageability at trial. *Id*. However, this concern is not present in certifying a settlement class. *Id*. at 556–57. Thus, in deciding whether to certify a settlement class, a district court "must give heightened attention to the definition of the class or subclasses." *Id*. at 557.

Because the parties reached settlement before the Court considered class certification in this case, the Court must determine whether provisional certification is appropriate. As detailed below, the Court finds that it is appropriate under the circumstances.

### A. Rule 23(a)

#### i. Numerosity

Rule 23(a) requires that the putative class be "so numerous that joinder of all members is impracticable." *See* Fed R. Civ. P. 23(a)(1). Here, Defendants have identified 528,000 account holders who experienced a transaction failure or had an account or card locked during the Service Disruption. *See* Dkt. No. 40 at 2. A class of several hundred thousand putative class members readily satisfies the numerosity requirement. *Id.* at 10.

#### ii. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." A contention is sufficiently common where "it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350 (citation omitted) (emphasis omitted). Even a single common question may do to satisfy the commonality requirement. *See id.* at 359.

Here, Plaintiffs allege that all members of the proposed class were Chime account holders who were unable to access or utilize functions of their Chime accounts during the same Service Disruption. *See* SA at ¶ III.1; *see also* Dkt. No. 40 at 10. Thus, their claims share common issues

7

deriving from the Service Disruption, including whether as a result (1) Defendants breached their contracts with Plaintiffs and class members; (2) Defendants breached any duties to Plaintiffs and class members; and (3) Defendants' subsequent conduct was unfair or unlawful. *See id.*

### iii. Typicality

Next, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). Under the "permissive standards" of Rule 23(a)(3), the claims need only be "reasonably co-extensive with those of absent class members," rather than "substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In other words, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quotation omitted). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158, & n.13 (1982). However, typicality—like adequacy—looks at whether the plaintiffs are proper parties to proceed with the suit. *Id.*

As with all putative class members, Plaintiffs were Chime account holders during the Service Disruption and were denied access to their funds. *See* Dkt. No. 40 at 10. There is no evidence before the Court to suggest that Plaintiffs' claims differ in any way from those of the putative class members. Thus, the typicality requirement is satisfied.

### iv. Adequacy

Finally, Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). On this question of adequacy, the Court must address two legal questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other putative class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the proposed class. *See In re*

8

*Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). This inquiry too "tend[s] to merge" with the commonality and typicality criteria. *See Falcon*, 457 U.S. at 158, n.13.

There is no indication that Plaintiffs have any conflict of interest with any putative class member. *See* Dkt. No. 40 at 10–11. Moreover, Plaintiffs have secured representation by competent counsel experienced in class actions. *See, e.g.*, *id.* at 11; Dkt. No. 40-8 at ¶¶ 3–14 (collecting cases). The Court accordingly finds the adequacy requirement is satisfied.

## B.    Rule 23(b)(3)

Additionally, to certify a class, a plaintiff must satisfy the two requirements of Rule 23(b)(3). *First*, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). *Second*, "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy." *Id*.

### i.    Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quotation omitted). The Supreme Court has defined an individualized question as one where "members of a proposed class will need to present evidence that varies from member to member." *Id.* (quotations omitted). A common question, on the other hand, is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (quotation omitted).

The Court concludes that for purposes of settlement, common questions predominate here, because the putative class members' claims turn on whether Defendants are liable for the Service Disruption, which prevented putative class members from accessing their Chime accounts.

### ii.    Superiority

The superiority requirement tests whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court considers four non-exclusive factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any

litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Id.*

The Court concludes that a class action enables the most efficient use of Court and attorney resources and reduces costs to the putative class members by allocating costs among them. Further, this forum is appropriate, and there are no obvious difficulties in managing this class action.

The Court therefore finds that the predominance and superiority requirements of Rule 23(b)(3) are met.

### C.     Class Representative and Class Counsel

Because the Court finds that Plaintiff meets the commonality, typicality, and adequacy requirements of Rule 23(a), the Court appoints named Plaintiffs as class representatives. When a court certifies a class, it must also appoint class counsel. Fed. R. Civ. P. 23(c)(1)(B). Factors that courts must consider when making that decision include:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

Counsel have investigated and litigated this case throughout its existence and have listed their many cases representing plaintiffs in consumer class actions. *See* Dkt. No. 40-8 at ¶¶ 3–14; Dkt. No. 40-9, Ex. 1. Accordingly, the Court appoints John A. Yanchunis of Morgan & Morgan Complex Litigation Group, Patrick A. Barthle II of Morgan & Morgan Complex Litigation Group, and Joshua H. Watson of Clayeo C. Arnold, APC as Class Counsel.

### III.    PRELIMINARY SETTLEMENT APPROVAL

#### A.     Legal Standard

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled . . .

only with the court's approval." Fed. R. Civ. P. 23(e).  "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).  Accordingly, before a district court approves a class action settlement, it must conclude that the settlement is "fundamentally fair, adequate and reasonable." *In re Heritage Bond Litig.*, 546 F.3d 667, 674–75 (9th Cir. 2008).

Where the parties reach a class action settlement prior to class certification, district courts apply "'a higher standard of fairness' and 'a more probing inquiry than may normally be required under Rule 23(e).'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012).  Such settlement agreements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048–49 (9th Cir. 2019) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)).  A more "'exacting review' is warranted 'to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Id.* (quotations omitted).

Courts may preliminarily approve a settlement and notice plan to the class if the proposed settlement:  (1) appears to be the product of serious, informed, non-collusive negotiations; (2) does not grant improper preferential treatment to class representatives or other segments of the class; (3) falls within the range of possible approval; and (4) has no obvious deficiencies. *In re Lenovo Adware Litig.*, No. 15-MD-02624-HSG, 2018 WL 6099948, at *7 (N.D. Cal. Nov. 21, 2018). Courts lack the authority, however, to "delete, modify or substitute certain provisions.  The settlement must stand or fall in its entirety." *Hanlon*, 150 F.3d at 1026.

**B.  Analysis**

**i.  Evidence of Conflicts and Signs of Collusion**

The first factor the Court considers is whether there is evidence of collusion or other conflicts of interest.  *See Roes*, 944 F.3d at 1049.  The Ninth Circuit has directed district courts to look for "subtle signs of collusion," which include whether counsel will receive a disproportionate distribution of the settlement, whether the parties negotiate a "'clear sailing' arrangement (i.e., an

1    arrangement where defendant will not object to a certain fee request by class counsel)," and
2    whether the parties agree to a reverter that returns unclaimed funds to the defendant. *Id.*

3    As discussed above, Defendants have already paid $5,960,563.00 to active Chime account
4    holders due to the Service Disruption, and $1.5 million of the additional $5.5 million that
5    Defendants are making available to pay claims under Tiers 1 and 2 is non-reversionary. *See* SA at
6    IV. Thus, although some portion of the funds is reversionary, Defendants have agreed to pay up
7    to $7 million based on the Service Disruption. However, the Settlement Agreement contains a
8    clear sailing arrangement, which states that "Defendants agree not to oppose Class Counsel's
9    request for fees and reimbursement of costs and expenses up to seven hundred fifty thousand
10   dollars ($750,000.00)." *See id.* at ¶ X.

### a. Clear Sailing Provision

Clear sailing provisions are not prohibited, though they "'by [their] nature deprive[] the court of the advantages of the adversary process' in resolving fee determinations and are therefore disfavored." *Id.* at 1050 (quoting *In re Bluetooth*, 654 F.3d at 949) (alterations in original). The Ninth Circuit has noted that clear sailing arrangements are "important warning signs of collusion," because "'[t]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class.'" *Id*. at 1051 (quoting *In re Bluetooth*, 654 F.3d at 948). Accordingly, when confronted with a clear sailing provision, the district court has a heightened duty to "scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.* (quotation omitted).

Here, Class Counsel may request fees and costs of up to $750,000. *See* SA at ¶ X.2. Such fees and costs, even were the Court to award them in their entirety, however, do not diminish the recovery to the class members under the settlement. *See id.*; *see also* Dkt. No. 40 at 18. The payments to each class member under Tiers 1 and 2 are unaffected by any requested attorneys' fees. *See id.* The Court also recognizes that Class Counsel obtained tangible results for the putative class members, as discussed in Section III.B.iii. below.

Moreover, Class Counsel assumed substantial risk in litigating this action on a contingency

12

fee basis, and incurring costs without the guarantee of payment for its litigation efforts. *See* Dkt. No. 40-8 at ¶ 3. Under the circumstances, the Court does not find it unreasonable that Class Counsel may request attorneys' fees of up to $750,000. The Court is cognizant of its obligations to review class fee awards with particular rigor, and at the final approval stage will carefully scrutinize the circumstances and determine what attorneys' fees award is appropriate in this case. Accordingly, given that at least a portion of the settlement is non-reversionary, and any attorneys' fees will not diminish the class recovery, the Court does not find that the clear sailing provision weighs against preliminary approval.

### b. *Cy Pres* Distribution

The Court must also evaluate whether the parties' proposed *cy pres* recipient is appropriate. A *cy pres* award must qualify as "the next best distribution" to giving the funds to class members. *Dennis*, 697 F.3d at 865. "Not just any worthy recipient can qualify as an appropriate *cy pres* beneficiary," and there must be a "'driving nexus between the plaintiff class and the *cy pres* beneficiaries.'" *Id.* (citation omitted). That is to say, a *cy pres* award must be "'guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members, and must not benefit a group too remote from the plaintiff class.'" *Id.* (citations omitted). A *cy pres* distribution is not appropriate if there is "'no reasonable certainty' that any class member would benefit from it." *Id*. (citation omitted).

Here, to the extent the aggregate claims under Tiers 1 and 2 do not reach the $1.5 million minimum payment, the parties have selected the East Bay Community Law Center as their *cy pres* recipient. *See* SA at ¶ IV.5. The East Bay Community Law Center is a non-profit organization in Berkeley, California, providing legal services and policy advocacy responsive to the needs of low-income communities and affords legal training to future attorneys committed to addressing the causes and conditions of racial and economic injustice and poverty. *See* Dkt. No. 40-8 at ¶ 50. Accordingly, the Court preliminarily finds that there is a sufficient nexus between the *cy pres* recipient and the class, as the East Bay Community Law Center shares the interests of the class members in protecting access to justice, regardless of socioeconomic status.

//

### ii. Preferential Treatment

The Court next considers whether the settlement agreement provides preferential treatment to any class member. The Ninth Circuit has instructed that district courts must be "particularly vigilant" for signs that counsel have allowed the "self-interests" of "certain class members to infect negotiations." *In re Bluetooth*, 654 F.3d at 947. For that reason, courts in this district have consistently stated that preliminary approval of a class action settlement is inappropriate where the proposed agreement "improperly grant[s] preferential treatment to class representatives." *Lenovo*, 2018 WL 6099948, at *8 (quotations omitted).

Although the Settlement Agreement authorizes named Plaintiffs to seek an incentive award of no more than $500 for their role in this lawsuit, *see* SA at ¶ X.1, the Court will ultimately determine whether they are entitled to such an award and the reasonableness of the amount requested. Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). Plaintiffs must provide sufficient evidence to allow the Court to evaluate their awards "individually, using relevant factors includ[ing] the actions the plaintiff[s have] taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff[s] expended in pursuing the litigation . . . ." *Stanton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (quotation omitted). The Court will consider the evidence presented at the final fairness hearing and evaluate the reasonableness of any incentive award request. Nevertheless, because incentive awards are not per se unreasonable, the Court finds that this factor weighs in favor of preliminary approval. *See Rodriguez*, 563 F.3d at 958 (finding that "[i]ncentive awards are fairly typical in class action cases" and "are discretionary" (emphasis omitted)).

### iii. Settlement within Range of Possible Approval

The third factor the Court considers is whether the settlement is within the range of possible approval. To evaluate whether the settlement amount is adequate, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Lenovo*, 2018 WL 6099948, at *8. This requires the Court to evaluate the strength of Plaintiffs' case.

14

Here, putative class members already received $5,960,563 from Defendants, including a $10 courtesy payment received by all class members and transaction credits to cover certain fees that some Chime account holders incurred during the Service Disruption. The parties acknowledged during the hearing the difficulty in assessing the precise scope of any further damages. Still, the Settlement Agreement provides a means for putative class members to receive compensation for losses without the burden of providing documentation to support their damages. They may recoup up to $25 without documentation and up to $750 if they provide documentation. Under this process, Defendants have agreed to pay up to $5.5 million to putative class members for any verified damages suffered during the 72-hour Service Disruption. Plaintiffs acknowledge that, absent the settlement, they would face substantial risk in continuing to litigate this case, such as opposing a motion to compel arbitration, certifying a class, and prevailing at trial. Dkt. No. 40 at 14–15. The Court finds that the settlement amount, given these risks, weighs in favor of granting preliminary approval.

### iv. Obvious Deficiencies

The fourth and final factor that the Court considers is whether there are obvious deficiencies in the settlement agreement. The Court finds no obvious deficiencies, and therefore finds that this factor weighs in favor of preliminary approval.

\*     \*     \*

Having weighed the relevant factors, the Court preliminarily finds that the settlement agreement is fair, reasonable, and adequate, and **GRANTS** preliminary approval. The Court **DIRECTS** the parties to include both a joint proposed order and a joint proposed judgment when submitting their motion for final approval.

## IV. PROPOSED CLASS NOTICE PLAN

For Rule 23(b)(3) class actions, "the court must direct notice to the class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Individual notice must be sent to all class members "whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974).

15

Here, the notice plan provides direct notice via email to class members. *See* SA at ¶¶ V.I–VII.11; *see also* Dkt. No. 45-2, Ex. 2. During the hearing, counsel confirmed that email is one of the primary means through which Chime, an online-only bank, communicates with its account holders. The Court finds that the proposed notice process is thus "'reasonably calculated, under all the circumstances,' to apprise all class members of the proposed settlement." *Roes*, 944 F.3d at 1045.

With respect to the content of the Notice itself, the notice must clearly and concisely state in plain, easily understood language:

> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members.

Fed. R. Civ. P. 23(c)(2)(B). The Court finds that the content of the proposed Notice, Dkt. No. 45-2, Ex. 2, provides sufficient information about the case and thus conforms with due process requirements. *See Hyundai II*, 926 F.3d at 567 ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." (quotations omitted)).

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for preliminary approval of class action settlement. The parties are **DIRECTED** to meet and confer and stipulate to a schedule of dates for each event listed below, which shall be submitted to the Court within seven days of the date of this Order:

| Event | Date |
| --- | --- |
| Deadline for Settlement Administrator to mail notice to all putative Class Members | |
| Filing deadline for attorneys' fees and costs motion | |
| Filing deadline for incentive payment motion | |

| | |
|---|---|
| Deadline for Class Members to opt-out or object to settlement and/or application for attorneys' fees and costs and incentive payment | |
| Filing deadline for final approval motion | |
| Final fairness hearing and hearing on motions | |

The parties are further **DIRECTED** to implement the proposed class notice plan.

**IT IS SO ORDERED.**

Dated: 10/28/2020

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge