John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Morgan & Morgan Complex Litigation Group
201 North Franklin Street 7th Floor
Tampa, Florida 33602
(813) 223-5505 (tel)
(813) 223-5402 (fax)

Joshua H. Watson
**CLAYEO C. ARNOLD, APC**
865 Howe Ave
Sacramento, CA 95825

*Counsel for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RICHARDS, RUBA AYOUB, BRANDY TERBAY AND TRACY CUMMINGS, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>CHIME FINANCIAL, INC., GALILEO FINANCIAL TECHNOLOGIES, INC., and THE BANCORP INC.,<br><br>     Defendants. | **CASE NO. 4:19-cv-06864**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS** |

### NOTICE OF MOTION

PLEASE TAKE NOTICE Plaintiffs Ryan Richards, Ruba Ayoub, Brandy Terbay, and Tracy Cummings ("Plaintiffs" or "Settlement Class Representatives") will and hereby do respectfully move the Court for entry of an Order (1) awarding attorneys' fees, costs, and expenses in the total amount of $750,000.00, and (2) service awards to each of the Settlement Class Representatives in the amount of $500 per Settlement Class Representative.

Plaintiffs' motion is based on this notice; the accompanying Memorandum of Points and Authorities and all attachments thereto; and all records, pleadings and papers filed in this Action.  This Motion is unopposed by Defendants.

DATED: December 30, 2020               Respectfully submitted,

/s/ John A. Yanchunis
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
John A. Yanchunis
201 North Franklin Street 7th Floor
Tampa, Florida 33602
(813) 223-5505
(813) 223-5402 (fax)

*Settlement Class Lead Counsel*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   OVERVIEW OF THE LITIGATION AND PROPOSED SETTLEMENT ............................ 2

      A.    Background .............................................................................................. 2

      B.    Overview of the Proposed Settlement ...................................................... 5

III.  ARGUMENT ...................................................................................................... 5

      A.    The Parties' Agreed Fee Amount Should be Given Deference .................... 5

      B.    The Court Should Apply the Percentage of the Fund Method ...................... 7

            1.    The Results Achieved and the Risk of Litigation ............................ 11

            2.    The Skill Required and the Quality of Work .................................... 15

            3.    The Contingent Nature of the Fee and Financial Burden on Plaintiffs .......... 16

            4.    Awards in Similar Cases ............................................................... 17

      C.    The Request is Reasonable Under the Lodestar Cross-Check ..................... 17

      D.    The Expenses of Class Counsel Are Reasonable ........................................ 22

      E.    The Requested Service Awards are Reasonable and Should Be Approved ................ 22

IV.   CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1081 (N.D. Cal. 2010) ................................... 18

*Browne v. American Honda Motor Co.*, No. 09-06750-MMM-DTBx, 2010 WL 9499073, at *10-11 (C.D. Cal. Oct. 5, 2010) ................................................ 18

*Building a Better Redondo, Inc. v. City of Redondo Beach*, 203 Cal. App. 4th 852, 872 n.14, 137 Cal. Rptr. 3d 622 (2012) ................................................ 19

*Cabrales v. Cnty. of Los Angeles*, 935 F.2d 1050, 1052-53 (9th Cir. 1991); .................................... 18

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) ........................................ 19

*Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Circ. 2000). ...................................... 17

*Center for Biological Diversity v. Cnty. of San Bernardino*, 185 Cal. App. 4th 866, 897-98, 111 Cal. Rptr. 3d 374 (2010) ................................................ 19

*Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 902 (C.D. Cal. 2016)................................ 15, 19

*Chieftain Royalty Co. v. XTO Energy Inc.*, CIV-11-29-KEW, 2018 WL 2296588, at *2 (E.D. Okla. Mar. 27, 2018)................................................ 9

*Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) ............................. 21

*David v. American Suzuki Motor Corp.*, 2010 WL 1628362 at *8 n.14 (S.D. Fla. Apr. 15, 2010).... 10

*Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 4 (1st Cir.1999) ...................................... 10

*Dyer v. Wells Fargo Bank, N.A.*, No. 3:13-cv-02858, ...................................................... 20

*Evans v. Linden Research, Inc.*, C-11-01078 DMR, 2014 WL 1724891, at *6 (N.D. Cal. Apr. 29, 2014) ................................................ 10

*Fischel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) ...................... 21

*Fuentes v. UniRush, LLC*, No. 1:15-cv-08372, ECF No. 49 (S.D.N.Y. Sept. 12, 2016)................... 14

*Goldkorn v. Cnty. Of San Bernardino*, No. 06-707-VAP-OPx, 2012 WL 476279, at *9 (C.D. Cal. Feb. 13, 2012) ................................................ 20

*Guschausky v. Am. Family Life Assur. Co. of Columbus*, 851 F. Supp. 2d 1252, 1259 (D. Mont. 2012), ................................................ 10

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) ............................................. 6, 15, 19

*Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir. 1994) ................................................................... 22

*Hawthorne v. Umpqua Bank*, No. 11-6700, 2015 WL 1927342, at *8 (N.D. Cal. Apr. 28, 2015) .... 23

*Hendricks v. Starkist Co.*, No. 13-cv-00729-HSG, 2016 WL 5462423, at *10 (N.D. Cal. Sept. 29, 2016). ................................................................................................................................... 13

*Hensley v. Eckerhart*, 461 U.S. 424, (1983) ...................................................................... 6, 11, 18

*Horsford v. Board of Trustees*, 132 Cal. App. 4th 359, 397, 33 Cal. Rptr. 3d 644 (2005) ............... 19

*In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) ...................................................................................................................... 8, 9

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ......................... 7, 8

*In re classmates.com Consol. Litig.*, C09-45RAJ, 2012 WL 3854501, at *7 (W.D. Wash. June 15, 2012) ......................................................................................................................................... 9

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 1:17-MD-2800-TWT, 2020 WL 256132, at *36 (N.D. Ga. Jan. 13, 2020). ........................................................................................................ 9

*In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 09 C 7670, 2011 WL 13257072, at *5 (N.D. Ill. Nov. 30, 2011) ............................................................................... 9

*In re M.D.C. Holdings Sec. Litig.*, No. CV 89-0090, 1990 WL 454747, at *4  (S.D. Cal. Aug. 30, 1990) ......................................................................................................................................... 6

*In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) ............................ 22

*In re Mego Fin. Corp.*, 213 F.3d at 457, 463 .................................................................................. 23

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); ................................. 11

*In re Quantum Health Res.*, 962 F. Supp. 1254, 1257-58 (C.D. Cal. 1997). ...................................... 7

*In re Sony Gaming Network & Customer Data Breach and Security Litig.*, 903 F. Supp. 2d 942, 963 (S.D. Cal. 2012) ...................................................................................................................... 12

*In re Wal–Mart Stores, Inc. Wage & Hour Litig.*, No. 06–02069, 2011 WL 31266, at *5 n.5 (N.D. Cal. Jan. 5, 2011)). ................................................................................................................. 10

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300-1301 (9th Cir. 1994) .............. 21

*In re Washington Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299-1300  (9th Cir. 1994) . 16

MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS
CASE NO. 4:19-cv-06864

*In re: Equifax Inc. Customer Data Security Breach Litigation*, Case No 1:17-md-02800-TWT, ECF 956 at 105 (N.D. Ga. Jan. 13, 2020), ..................................................................................... 20

*In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*, 16-MD-02752-LHK, 2020 WL 4212811, at *26 (N.D. Cal. July 22, 2020) ......................................................................................................... 20

*Johnston v. Comerica Mtg. Corp.*, 83 F.3d 241, 245-46 (8th Cir. 1996) ........................................... 10

*Jones v. Commerce Bank, N.A.*, 2006 WL 2642153, *2 (S.D.N.Y 2006) ........................................... 12

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975), ..................................... 16, 20

*Ketchum v. Moses*, 24 Cal. 4th 1122, 1133 (Cal. 2001) .................................................................... 18

*Kuhns v. Scottrade*, 868 F.3d 711, 718 (8th Cir. 2017) .................................................................... 12

*Laguna v. Coverall N. Am.*, 753 F.3d 918, 922 (9th Cir. 2014) ........................................................ 6

*Lewis v. Green Dot Corporation*, Case No. 2:16-cv-03557 ............................................................. 14

*Lobatz v. U.S. W. Cellular of California, Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000) ...................... 10

*Lopez v. Youngblood*, No. CV–F–07–0474 DLB, 2011 WL 10483569, at *12 (E.D. Cal. Sept. 1, 2011); ........................................................................................................................................... 10

*Miller v. Bank of Am. N.T. & S.A.*, 2014 WL 5091897, *11 (Cal. Super. 2014) ................................ 12

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970) ......................................................... 22

*Moore v. Verizon Communs. Inc.*, No. 09-1823, 2014 WL 588035, at *6 (N.D. Cal. Feb. 14, 2014):21

*Nwabueze v. AT & T Inc.*, C 09-01529 SI, 2013 WL 6199596, at *11 (N.D. Cal. Nov. 27, 2013).... 10

*Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1170 (C.D. Cal. 2010) ............................ 21

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ................................. 7

*Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 5402120, at *6 (N.D. Cal. Sept. 26, 2013) .................................................................................................................................................. 23

*Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 157, 163 (9th Cir. 2013) .................................. 22

*Reed v. 1-800 Contacts*, No. 12-cv-02359, 2014 WL 29011, at *10 (S.D. Cal. Jan. 2, 2014) .......... 22

*Resnick v. Frank*, 779 F.3d 934, 941 (9th Cir. 2015) ....................................................................... 24

*Roberts v. Electrolux Home Prods., Inc.*, No. 12-1644-CAS-FBKx, 2014 WL 4568632, at *24-25 (C.D. Cal. Sept. 11, 2014 ................................................................................................................. 15

*Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009 ....................................... 22

*Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, *8 (S.D.N.Y. 2019) ............................ 12

*Shaffer v. Cont'l Cas. Co.*, 362 Fed. Appx. 627 (9th Cir. 2010),................................... 10

*Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)........................ 7

*Staton v. Boeing Co.*, 327 F.3d 938, (9th Cir. 2003.................................................. 7, 8, 22

*Turner v Talbert*, 2011 WL 4479766, *2 (M.D. La. 2011) ........................................ 12

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995)................................ 21, 23

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ................................... 7

*Walters v. Kimpton Hotel & Restaurant*, No. 3:16-cv-05387, ECF 117 (N.D. Cal. July 11, 2019),.. 20

*Wehlage v. Evergreen at Arvin LLC*, No. 4:10-CV-05839-CW, 2012 WL 4755371, at *1 (N.D. Cal. Oct. 4, 2012) ............................................................................................. 6

*Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007) ..................................... 19

*White v. City of Richmond*, 559 F. Supp. 127, 133 (N.D. Cal. 1982));............................... 16

*Wilson v. Airborne, Inc.*, No. 07-cv-00770, 2008 U.S. Dist. LEXIS 110411, at *36-37 (C.D. Cal. Aug. 13, 2008). .............................................................................................. 23

*Wren v. RGIS Inventory Specialists*, No. C-06-05778-JCS, 2011 WL 1230826, at *36 (N.D. Cal. Apr. 1, 2011) ................................................................................................. 23

## Other Authorities

*Manual for Complex Litigation* § 21.7 at 335 (4th ed.) ............................................. 9

Newberg on Class Actions §§ 15:62, 15:65 (5th ed. 2018);......................................... 9

## Rules

Fed. R. Civ. P. 23(h) ...................................................................................... 5

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This Action was brought by Plaintiffs, individually and on behalf of a class of similarly situated customers, against Defendants Chime Financial, Inc. ("Chime"), The Bancorp Inc. ("Bancorp"), and Galileo Financial Technologies, LLC (formerly known as Galileo Technologies, Inc.) ("Galileo") (collectively, "Defendants"), arising from an intermittent disruption in service that some account holders experienced  for portions of the period of time between October 16, 2019 and October 19, 2019 (the "Service Disruption").[1]  After extensive discussions, including multiple settlement conferences with United States Magistrate Judge Laura Beeler, and an exchange of information regarding the facts surrounding the Service Disruption, the Parties reached a resolution of this Action.  Significantly, the proposed Amended[2] Settlement Agreement ("Settlement" or "Settlement Agreement") provides substantial relief to address the claims of the Settlement Class, including $5,960,563.00 in payments that have already been made to Settlement Class Members for any inconveniences and losses resulting from the Service Disruption, and up to an additional $5.5 million on a claims-made basis—split between two alternative tiers of compensation (Tiers 1 and 2) available to the Settlement Class—against which Settlement Class Members may file claims for losses resulting from the Service Disruption. *See* SA § IV.1-3.

Having obtained valuable relief for the Settlement Class, Settlement Class Representatives Ryan Richards, Ruba Ayoub, Brandy Terbay, and Tracy Cummings respectfully request that the Court enter an Order that awards (a) $750,000.00 to Class Counsel for attorneys' fees and reimbursement of costs and expenses pursuant to Section X.2 of the Amended Settlement Agreement ("Settlement" or "SA"), and (b) incentive awards of $500.00 to each Settlement Class Representatives as provided for by Section X.1 of the Settlement.  Under the terms of the Settlement, any award of attorneys' fees, costs, and expenses and service awards to the Settlement Class

---

[1] Unless otherwise noted, capitalized terms used herein are defined in the Amended Stipulation of Agreement and Settlement and Release, as previously filed at ECF No. 45-4.

[2] At the Court's direction, the parties prepared and filed an Amended Stipulation of Agreement and Settlement and Release that addressed the concerns raised by the Court at the preliminary approval hearing. *See* (ECF No. 45).

MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS
CASE NO. 4:19-cv-06864

Representatives is to be paid separate and apart from the monetary relief being provided to the Class, and as a consequence, will not diminish the relief being made available to the Class.

The amount sought is reasonable in light of the complexities of the litigation, the contingent risk assumed by Class Counsel, the results achieved for the Settlement Class, and the work performed by Class Counsel.  The requested fee represents approximately 6% of the total Settlement value and a multiplier of 2.467 on Class Counsel's combined lodestar and costs and expenses to date (were the Court to employ the lodestar analysis).  The work of Class Counsel is not yet complete, as additional hours will be required to respond to objections (if any), prepare for the final fairness hearing, supervise the claims administration process until the final checks are distributed to Settlement Class Members, and handle any appeals that might be filed by objectors.

For the reasons set forth in greater detail below, Plaintiffs respectfully submit that the requested attorneys' fees, cost and expense reimbursements, and Service Awards are fair and reasonable, and should be approved.

## II.   OVERVIEW OF THE LITIGATION AND PROPOSED SETTLEMENT

### A.   Background

Chime is an online-only service started in 2013 as an alternative to traditional brick and mortar banks.[3]  Since its inception, Chime has attracted more than five million new account holders, giving it the largest customer base of any digital challenger bank in the U.S.[4]  Chime markets primarily to millennials and others who make $35,000 to $70,000 a year—the segment of the population that relies heavily on debit cards to pay for everyday expenses while attempting to stay within budget.[5]  One of Chime's biggest selling points to its cost sensitive customers has been its "no hidden fees" approach to creating a transaction account—meaning no overdraft fees, no monthly

---

[3] As used herein, when discussing accounts and services "Chime" refers to the Chime products and services.  When referring to a party, "Chime" refers to Defendant Chime Financial, Inc.

[4] *Chime now has 5 million customers and introduces overdraft alternative*, Tech Crunch, September 4, 2019, https://techcrunch.com/2019/09/04/chime-now-has-5-million-customers-and-introduces-overdraft-alternative/

[5] *This branchless bank quadrupled its customer base to 4 million in a single year*, CNBC, June 17, 2019 https://www.cnbc.com/2019/06/12/chime-has-quadrupled-its-customer-base-to-4-million-in-a-single-year.html

MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS
CASE NO. 4:19-cv-06864

maintenance or service fees, no minimum balance, and no charges on foreign transactions.[6] Critical to Chime's success is providing customers immediate access to their funds with minimal cost. Chime customers receive a debit card, a Spending Account (aka checking account), a Savings Account, and a phone App that is iPhone and Android compatible.  Chime is the program manager for deposit accounts administered by Bancorp, for which Galileo acts as a processor (the "Accounts"). SA § I.A.

From October 16, 2019 to October 19, 2019, some Chime accountholders experienced intermittent disruptions in service.  For example, for approximately four and a half non-consecutive hours during the Service Disruption, card purchases for certain members were unavailable; and for approximately 60 hours, certain members could not transfer money from their Chime accounts. These issues were intermittent during the Service Disruption period and did not impact all Chime customers. Rather, in connection with the Action and the Settlement, Defendants have identified approximately 528,000 accountholders that had an account open with Chime during the Service Disruption who experienced a transaction failure or had an account or card locked during the Service Disruption.  SA § III.1.

Immediately upon learning of the Service Disruption, Class Counsel worked vigorously to remedy the harms imposed on the Settlement Class.  This Action was filed on October 22, 2019. (ECF No. 1).  Upon filing, Chime and Bancorp received a demand from Lead Class Counsel seeking compensation for impacted customers.  In recognition of the pendency of this Action and having received the demand, Settlement Class Members with an active Chime account received a credit to their account in the amount of ten dollars ($10.00), on or about November 14, 2019.  SA § IV.1.a. Moreover, Settlement Class Members with an active Chime account who incurred certain transaction fees during the Service Disruption received a credit to cover those fees.  SA § IV.1.b.  The total amount already paid to the Settlement Class from Plaintiffs' efforts is $5,960,563.00. SA § IV.1.c.

---

[6] *Chime Bank disrupting the banking industry with fintech*, MarketWatch, January 31, 2019, https://www.marketwatch.com/press-release/chime-bank-disrupting-the-banking-industry-with-fintech-2019-01-31

MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS
CASE NO. 4:19-cv-06864

On February 6, 2020, counsel for the Parties attended an initial settlement conference in front of United States Magistrate Judge Laura Beeler. The conference was held in San Francisco, California to discuss the facts and the law underlying the Action. Counsel for the Parties engaged in discussions regarding the factual circumstances of the case, as well as potential strengths and weaknesses of the allegations in support of, and defenses to, the Action. Following that meeting, counsel for Plaintiffs made a settlement demand on Defendants to resolve this matter. SA § I.D; (ECF No. 40-8 ¶ 18).

During the months that followed, counsel for the Parties continued discussions via multiple telephone conferences and correspondence exchanges. Counsel continued to exchange proposals and discuss resolution, as disclosed to the Court in their Stipulation and Proposed Order to extend the case stay on March 19, 2020. (ECF No. 30). On May 7, 2020, after weeks of additional negotiations, Counsel for the Parties attended an additional settlement videoconference in front of Judge Beeler to discuss preliminary settlement terms and structure. On May 12, 2020, with the assistance of Judge Beeler, the Parties reached an agreement in principle with regard to the material terms of the proposed settlement, as memorialized in this Settlement Agreement. (ECF No. 40-8 ¶ 19).

On August 7, 2020, Plaintiffs filed their Motion for Preliminary Approval. (ECF No. 40). On September 24, 2020, a preliminary approval hearing was held. *See* (ECF Nos. 43 & 44). At the hearing, the Court raised concerns regarding whether "Section IX Paragraph 2 of the settlement agreement regarding the scope of the release should be removed or clarified, as well as whether the language requiring objectors to include the number of times the objector or her counsel has objected to a class action in Section VII Paragraph 4 should be removed." (ECF No. 44). As directed by the Court, the parties met and conferred regarding these issues, and, on October 8, 2020, filed an Amended Settlement Agreement along with revised notices containing the revised release and objection related language. (ECF No. 45). On October 28, 2020, this Court granted the Motion for Preliminary Approval. (ECF No. 46). A further order, setting the relevant settlement related deadlines, was entered on November 10, 2020. (ECF No. 48).

**B.**      **Overview of the Proposed Settlement**

As explained in the Motion for Preliminary Approval, in addition to the benefits already afforded to the Settlement Class, the Settlement provides two alternative tiers of relief to compensate Settlement Class Members for inconveniences and losses as a result of the Service Disruption.  These alternative tiers allow Settlement Class Members to make a claim for either undocumented losses (Tier 1) or for documented losses (Tier 2). Defendants have agreed to pay allowed claims under Tiers 1 and 2 of up to $5.5 million, but in any event will make a minimum settlement fund payment of $1,500,000, taking into account claimed amounts under either Tier, which $1,500,000 will not revert to Defendants.  Should amounts claimed under Tier 1 and Tier 2, when combined, fail to exhaust the $1,500,000 fund, any difference between the claimed amounts and $1,500,000 will be subject to a *cy pres* distribution to the East Bay Community Law Center or such other *cy pres* recipient or recipients as directed and agreed to by the Court.  SA § IV.  Subject to the terms of the Settlement Agreement, Defendants are not creating a settlement fund beyond the $1.5 million dollars but instead will only pay validated claims up to the Tier Maximums.  Should the amounts claimed not reach the Tier Maximums, Defendants will retain those funds.

Defendants will also separately bear the costs of class notice and other costs associated with administering the Settlement at a fixed sum price of no more than $250,000.  SA § VI.3. Defendants will also separately pay Class Counsel's attorneys' fees, costs, and expenses, not to exceed $750,000 in the aggregate, and Service Awards not to exceed $500 per Settlement Class Representative. These fees, costs, and expenses, and the Service Awards, will be paid by Defendants separate and apart from the relief provided to Settlement Class Members; that is, the fees, cost, and expenses and Service Awards will not in any way reduce the benefits and payments to the Settlement Class Members provided by the Settlement Agreement.  SA § X.1-2.

**III.**   **ARGUMENT**

**A.**      **The Parties' Agreed Fee Amount Should be Given Deference**

Rule 23(h) provides that in a class action settlement, "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  As the Supreme Court has explained: "A request for attorney's fees should not

result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Thus, litigants are encouraged to resolve fee issues by agreement as long as the amount is reasonable.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *see also In re M.D.C. Holdings Sec. Litig.*, No. CV 89-0090, 1990 WL 454747, at *4 (S.D. Cal. Aug. 30, 1990) ("Because this Court believes the parties should be encouraged to settle all their disputes as part of the settlement . . . including the amount of the fee . . . if the agreed-to fee falls within a range of reasonableness, it should be approved as part of the negotiated settlement . . . ."); *Wehlage v. Evergreen at Arvin LLC*, No. 4:10-CV-05839-CW, 2012 WL 4755371, at *1 (N.D. Cal. Oct. 4, 2012) ("The award of Class Counsel's fees and costs will be paid directly by Defendants and will not affect the injunctive relief benefiting the Class.  Under these circumstances, the Court finds that the agreed amounts for attorneys' fees and expenses, and service awards for the Class Representatives, are presumed to be reasonable.").

In the Settlement Agreement, Defendants agreed to pay "attorneys' fees, costs, and expenses awarded by the Court to Class Counsel separately from and in addition to the Settlement Relief up to seven hundred fifty thousand dollars ($750,000.00)."  (SA § X.2).  The Parties' Agreement is that the award of attorneys' fees, costs, and expenses will not impact the monetary relief to be made available to the Settlement Class, and is to compensate Class Counsel for the services they have performed in the past as well as services they may be required to perform in the future through final implementation of the Settlement.  Pursuant to the Settlement Agreement, Plaintiffs now apply for a total fee, cost, and expense award of $750,000.00, which accounts for the attorneys' fees for both the law firms representing Plaintiffs (who have amassed to date a collective lodestar of $295,915.20), and the reimbursement of their cumulative litigation expenses (which to date total $8,146.75).  *See* Declaration of John Yanchunis, attached hereto as **Exhibit 1**, at ¶¶ 12, 23.

In light of the policy favoring settlement of fee disputes, it is appropriate to account for the fact that "the parties are compromising to avoid litigation."  *Laguna v. Coverall N. Am.*, 753 F.3d 918, 922 (9th Cir. 2014), *vac'd on other grounds*, 772 F.3d 608 (9th Cir. 2014).  Accordingly, the Ninth Circuit holds that "the court need not inquire into the reasonableness of the fees . . . with precisely the same level of scrutiny as when the fee amount is litigated."  *Id.* (quoting *Staton v.*

*Boeing Co.*, 327 F.3d 938, 966 (9th Cir. 2003)) (internal quotations omitted).  Thus, while the Court must conduct an inquiry into the reasonableness of the fee request, the parties' negotiated agreement as a reasonable attorneys' fees request should be given substantial weight.  Plaintiffs' fee request, negotiated at arm's length by the parties, is reasonable considering the work performed (and remaining to be performed) and the results achieved, and is consistent with similar awards recently approved in this Circuit.  The settlement is the product of strenuous and efficient efforts by Class Counsel in a case involving complex issues of fact and law.

### B.   The Court Should Apply the Percentage of the Fund Method

"Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (same). "[T]he choice between lodestar and percentage calculation depends on the circumstances, but [ ] 'either method may ... have its place in determining what would be reasonable compensation for creating a common fund.'" *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (ellipsis in original) (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)). The Ninth Circuit also "encourage[s] courts to guard against an unreasonable result by cross-checking their calculations against a second method." *In re Bluetooth*, 654 F.3d at 944-45.

Where the percentage-of-recovery method is employed, it is well established that 25% of the common fund is the benchmark award of attorney's fees. *See, e.g.*, *In re Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."); *Six Mexican Workers*, 904 F.2d at 1311 (same). "The 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases." *Vizcaino*, 290 F.3d at 1048. Upward departures may be warranted in particular circumstances, while downward departures may be warranted, for instance, where there is no "realistic risk of nonrecovery." *In re Quantum Health Res.*, 962 F. Supp. 1254, 1257-58 (C.D. Cal. 1997). Whether upward or downward, departures from the

---

7

25% "starting point" require consideration of the relevant factors at play in each instance. *In re Bluetooth*, 654 F.3d at 942.

Under the lodestar method, a "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)). The Court may adjust this lodestar figure "upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors." *Id.* at 941-42.

Whether the Court utilizes the 25% benchmark amount or some other rate, the award must be supported "by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048. The Ninth Circuit has identified five factors that may inform this inquiry: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases. *Id.* at 1048-50.

The nature of this action warrants application of percentage-of-the-fund approach as the principal method determining the reasonableness of Settlement Class Counsel's fee request. As courts recognize, this method "is commonly used in the legal marketplace to determine attorneys' fees in contingency fee cases." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018). Further, the novel and complex nature of this action affords a dearth of established precedent and other guidance by which to employ the lodestar method. *See id.* ("[T]he combination of novel legal issues and technical subject matter present in the instant [data breach] case counsels against the lodestar method because there is no set baseline against which to compare whether hours were reasonably expended."). Other considerations also command using the percentage approach here, including (1) replicating more accurately the manner that plaintiffs' lawyers practice outside of the class action context, (2) ensuring that class counsel's interests are more directly aligned with the interests of the class, (3) rewarding counsel for assuming the risks of litigating a matter, and (4) avoiding the trappings often associated with the lodestar

1    method, such as encouraging counsel to bill time and to find reasons to do so. *See* 5 Newberg on

2    Class Actions §§ 15:62, 15:65 (5th ed. 2018); *see also In re Anthem*, 2018 WL 3960068, at *5-6; *In*

3    *re Equifax Inc. Customer Data Sec. Breach Litig*., 1:17-MD-2800-TWT, 2020 WL 256132, at *36

4    (N.D. Ga. Jan. 13, 2020).

5         Here the Settlement provides for a constructive common fund.  As explained above,

6    $5,960,563.00 has already been paid or credited to Settlement Class Members as part of the class

7    relief in this case.  SA § IV.1.c.  Settlement Class Members can also make claims for losses under

8    Tiers 1 and 2 up to an aggregate total $5.5 million.  SA §§ IV.2.c., IV.3.c, and IV.5.  Likewise,

9    Defendants are separately paying for: (1) the costs of notice and administration of up to $250,000.00,

10   (SA §§ VI.3, VII.8), these requested attorneys' fees, costs, and expenses of up to $750,000.00; and

11   up to $500 in service awards per Settlement Class Representative, an additional up to $2,000, (S.A.

12   §§ X.1, X.2). Such separate payment by Defendants for notice and administration, fees and costs,

13   and service awards, should be included in valuing the total benefit to the class and hence the total

14   constructive fund from which Plaintiffs' fee request is judged because if such amounts were not paid

15   separately, class members would have to pay them directly out of the fund. *Manual for Complex*

16   *Litigation* § 21.7 at 335 (4th ed.) ("If an agreement is reached on the amount of a settlement fund

17   and a separate amount for attorney's fees and expenses … the sum of the two amounts ordinarily

18   should be treated as a settlement fund for the benefit of the class.").[7]

19

20   ────────────────

[7] *See also, e.g.*, *Chieftain Royalty Co. v. XTO Energy Inc*., CIV-11-29-KEW, 2018 WL 2296588, at
21   *2 (E.D. Okla. Mar. 27, 2018) (noting that the "750,000 in administration, notice and distribution
     costs . . . is a significant benefit to the Settlement Class as such funds would otherwise be paid from
22   the Gross Settlement Fund"); *In re classmates.com Consol. Litig*., C09-45RAJ, 2012 WL 3854501,
     at *7 (W.D. Wash. June 15, 2012) ("Class counsel argues that the common fund should also include
23   about $1.5 million in settlement administration costs that Classmates has paid or will
     pay . . . . Because Classmates' payment of these costs relieves the class of the burden of these
24   expenses, the court may consider them as part of the common fund."); *In re Kentucky Grilled
     Chicken Coupon Mktg. & Sales Practices Litig*., 09 C 7670, 2011 WL 13257072, at *5 (N.D. Ill.
25   Nov. 30, 2011) ("[T]he common-fund doctrine applies to the entire sum recovered by class counsel
     for purposes of settling a class action lawsuit. Because the costs of class action litigation necessarily
26   include the costs of notice, administration of the settlement fund, incentive awards, and attorneys'
     fees, and because the settling defendants in these types of lawsuits have agreed to pay these costs 'in
27   exchange for release of [their] liability,' the court finds that such costs are reasonably viewed as
     having been paid 'for the benefit of the class.'") (citations omitted); *cf, e.g.*, *Johnston v. Comerica*
28

9

1

2

The Ninth Circuit has recognized this constructive common fund approach.  In *Shaffer v.*

*Cont'l Cas. Co.*, 362 Fed. Appx. 627 (9th Cir. 2010), the court noted that:

3

4

5

6

7

> Here, no cash fund exists. However, class counsel's expert actuary estimated the value of class benefits to be $24–33 million. Of the $5 million for costs, attorneys' fees, and incentive payments, about $4.4 million represents attorneys' fees. Thus, attorneys' fees represent about 13–18% of the value of class benefits—well below the 25% benchmark.

8

*Id.* at 631–32.  Other courts in the Ninth Circuit and in this District have likewise recognized the

9

constructive common fund approach.[8]

10

"To calculate appropriate attorneys' fees under the constructive common fund method, the

11

court looks to the maximum settlement amount that could be claimed."  *Evans*, 2014 WL 1724891,

12

at *6 (citing *Nwabueze*, 2013 WL 6199596, at *11).[9]  This is done by aggregating all amounts

13

*Mtg. Corp.*, 83 F.3d 241, 245-46 (8th Cir. 1996) ("Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."); *David v. American Suzuki Motor Corp.*, 2010 WL 1628362 at *8 n.14 (S.D. Fla. Apr. 15, 2010) ("While I recognize that the fee award requested by Class Counsel will be paid separately by Defendants and is not drawn from a 'common fund' in the traditional sense, there is authority directing 'district courts to exercise their equitable jurisdiction to review counsel-fee arrangements negotiated in connection with class-action settlements—even where the counsel fees are not taken from a common fund but are instead paid separately by a class-action defendant.'") (quoting *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 4 (1st Cir.1999)).

14

15

16

17

18

19

[8] *See, e.g.*, *Evans v. Linden Research, Inc.*, C-11-01078 DMR, 2014 WL 1724891, at *6 (N.D. Cal. Apr. 29, 2014) ("The court will evaluate the requested fee under the percentage method and analyze the recovery obtained as a constructive common fund."); *Nwabueze v. AT & T Inc.*, C 09-01529 SI, 2013 WL 6199596, at *11 (N.D. Cal. Nov. 27, 2013) ("Where, as here, a settlement does not create a common fund from which to draw, the Ninth Circuit may analyze the case as a 'constructive common fund' for fee-setting purposes.") (citing *Bluetooth*, 654 F.3d at 940–41); *Guschausky v. Am. Family Life Assur. Co. of Columbus*, 851 F. Supp. 2d 1252, 1259 (D. Mont. 2012), *vacated on other grounds*, CV 10-59-H-DWM, 2012 WL 4849688 (D. Mont. Oct. 11, 2012) ("While the settlement might not have created a traditional common fund, it created a constructive common fund . . . . There is not a definitive sum of money that has been set aside for settlement claims, but the Court can reasonably estimate the settlement value, as explained above.  That sum, when aggregated with the independent payment of attorney's fees, creates a constructive common fund.") (internal citations omitted) (citing *Lobatz v. U.S. W. Cellular of California, Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000)).

20

21

22

23

24

25

26

[9] *See also Nwabueze*, 2013 WL 6199596, at *11 ("To calculate appropriate attorneys' fees under the constructive common fund method, the Court should look to the maximum settlement amount that could be claimed.") (citing *Lopez v. Youngblood*, No. CV–F–07–0474 DLB, 2011 WL 10483569, at *12 (E.D. Cal. Sept. 1, 2011); *In re Wal–Mart Stores, Inc. Wage & Hour Litig.*, No. 06–02069, 2011 WL 31266, at *5 n.5 (N.D. Cal. Jan. 5, 2011)).

27

28

MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS
CASE NO. 4:19-cv-06864

payable under the settlement, including, for example, potential claims-made payments, amounts for fees and costs, and amounts for notice and administration.  *See, e.g.*, *Evans*, 2014 WL 1724891, at *6 (aggregating amounts to be repaid to class members in cash, amounts to be repaid in virtual currency, amounts to be otherwise paid in cash or virtual currency, as well as amounts for fees and costs and notice costs, to reach a total settlement value against which the fee request was analyzed).

All combined, the relief made available via the Settlement amounts to $12,462,563.[10] Plaintiffs' fee, cost, and expense request of $750,000.00 represents just 6% of this total—an eminently reasonable request considering the 25% benchmark in this Circuit. Even if the Court were only to consider the amounts already provided ($5,960,563.00), the amounts for notice and administration ($250,000), and the required minimum payment of $1.5 million related to Tiers 1 and 2—amounts which Defendants are required to pay (or have already paid) and are not dependent on claims rates or other contingencies—it amounts to $7,710,563, making Plaintiffs' request only 9.7% of the total.  Again, a sum far below the 25% benchmark.

Accordingly, considering the substantial amounts made available via the Settlement, Plaintiffs' fee request is fair and reasonable, representing only 6% of the constructive common fund, and should be granted. Moreover, as set out below, consideration of the factors articulated in *Vizcaino* counsels strongly in favor of an award at or above the Ninth Circuit's 25% benchmark, further militating in favor of Plaintiffs' request for an award of less than 10%.  *Vizcaino*, 290 F.3d at 1048-50.

### 1.     The Results Achieved and the Risk of Litigation

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor" in considering the reasonableness of fee request is "degree of success obtained").

Here, if the Parties had been unable to resolve this case through settlement, the litigation would likely have been protracted and costly. Although Plaintiffs and Class Counsel believe that the

---

[10] $5,960,563 (relief already provided) + $5,500,000 (total available under Tiers 1 and 2) + $250,000 (notice and administration costs) + $750,000 (attorneys' fees, costs, and expenses) + $2,000 (service awards) = $12,462,563

MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS
CASE NO. 4:19-cv-06864

claims asserted are meritorious, continued litigation against Defendants posed significant risks that made any recovery uncertain. At the outset, continued litigation of this matter would require the Court to resolve several separate threshold questions concerning the viability of the litigation. First, the Court would have to decide the question of the arbitrability of Plaintiffs' claims. Defendants have maintained that this provision should be enforced and that all claims should be submitted to individual arbitration proceedings. A victory by Defendants would have likely ended any relief being made available to any one class member as it is highly improbable that any class member would have pursued their claims in arbitration based on the amount of any one class member's claim and the costs of the arbitration. And gone with it would have been Class Counsel's ability to recover a fee. Next, pursuant to the express terms of the agreement between Chime and Settlement Class Members, any claims arising from outages, such as the Service Disruption, are barred. If the Named Plaintiffs had been able to overcome these difficult hurdles, the Court would have to turn to the question of class certification and Defendants' contention that individualized factual inquiries and damages and legal variation among the laws of the states would preclude class certification. (ECF No. 40-8 ¶ 30–32). "Even if plaintiff[s] were to prevail at trial, there is a real risk that plaintiff[s] could recover nothing." *Spann I*, 314 F.R.D. at 327.[11]

In light of these difficult issues, the Settlement's monetary benefits are significant, going well beyond the potential litigated recovery. Class members already received benefits without taking

---

[11] For example, Defendants would likely contend that temporary loss of access to funds, without more, is not compensable harm. *See, e.g., In re Sony Gaming Network & Customer Data Breach and Security Litig.*, 903 F. Supp. 2d 942, 963 (S.D. Cal. 2012) (rejecting negligence claim because nothing in the agreement suggested a duty to provide uninterrupted service); *Turner v Talbert*, 2011 WL 4479766, *2 (M.D. La. 2011) (temporary account freeze was not compensable injury); *Kuhns v. Scottrade*, 868 F.3d 711, 718 (8th Cir. 2017) ("Massive class action litigation should be based on more than allegations of worry and inconvenience") (holding no contract damages absent allegation of misuse or information); *Jones v. Commerce Bank, N.A.*, 2006 WL 2642153, *2 (S.D.N.Y 2006) ("Plaintiff has submitted no evidence that she suffered any compensable injury stemming from the loss of access to these funds between May 22, 2005 and June 9, 2005"); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, *8 (S.D.N.Y. 2019) ("Rudolph does not identify any such injury that arose from the brief freeze placed on her own account. Absent an allegation of how an account freeze resulted in a loss to Rudolph, the claim that she was injured by the temporary inability to access her account does not demonstrate injury."); *Miller v. Bank of Am. N.T. & S.A.*, 2014 WL 5091897, *11 (Cal. Super. 2014) ("temporary inability to access an account, without more, does not constitute 'actual damages,'" under California Consumer Legal Remedies Act, and "Plaintiff provides no way to calculate compensation under this theory—and it is compensation, as such, which is the essence of damages available under the CLRA.").

any action; Defendants made the Courtesy Payment and Transaction Credit benefits available automatically and immediately, in the sum of $5,960,563. Further, under the Settlement, Settlement Class Members can receive compensation for losses without the burden of providing any documentation to support their damages. Settlement Class Members with more significant losses may file supporting documentation to seek greater relief. Combined, and subject to the terms of the Agreement, Tiers 1 and 2 provide up to $5.5 million in additional relief available to Settlement Class Members submitting valid claims. Considering the significant threshold challenges, this is an exceptional result. (ECF No. 40-8 ¶¶ 33–35).

Moreover, the Settlement's terms meet the demands in the Complaint. All Class Members received monetary benefits under the Courtesy Payment and Transaction Credit provisions of the Settlement and Class Members with losses may elect to file a claim under Tier 1 or Tier 2 for additional monetary relief. SA § IV.2–3. These terms strongly suggest that Class benefits were not traded for individual benefits. *See Hendricks v. Starkist Co.*, No. 13-cv-00729-HSG, 2016 WL 5462423, at \*10 (N.D. Cal. Sept. 29, 2016).

Importantly, the Settlement provides immediate and significant benefits for Settlement Class Members they otherwise may not receive, providing virtually everything Plaintiffs sought in the Complaint.

In evaluating the Settlement's benefits, it is of course relevant to consider the amount that Settlement Class Members will recover individually. Settlement Class Members with an active Chime account previously received a credit to their account in the amount of $10.00 and those who incurred certain transaction fees during the Service Disruption received a credit to cover those fees. Settlement Class Members may also file claims for reimbursement of financial or other losses suffered as a result of the Service Disruption. Subject to offsets for amounts previously provided, Settlement Class Members who do not wish to submit supporting documentation, but attest to having losses, will be eligible for a payment of up to $25.00. Subject to the same offset, Settlement Class Members with more significant losses and who provide Reasonable Documentation of such losses will be eligible for a payment of up to $750.00. (ECF No. 40-8 ¶ 33).

And, as explained in the Motion for Preliminary Approval, the Settlement's benefits are also well within the range of settlements approved in the quite similar consumer class actions of *Fuentes v. UniRush, LLC*, No. 1:15-cv-08372, ECF No. 49 (S.D.N.Y. Sept. 12, 2016) (Final Approval Order) ("*RushCard*") and *Lewis v. Green Dot Corporation*, Case No. 2:16-cv-03557, ECF No. 109 (Final Approval Order) (C.D. Cal. Nov. 22, 2017) ("*Green Dot*"). *See* (ECF No. 40 at 23–24).

Here, the Settlement more likely than not provides 100 percent of losses sustained by any individual consumer. Based on Class Counsel's experience in those prior cases, the $750 individual cap, and the $5.5 million aggregate cap, considering the relief already provided to all Settlement Class Members, should be sufficient to recompense legitimate individual claims. (ECF No. 40-8 ¶ 41).

While there are striking similarities between *RushCard*, *Green Dot*, and the present matter, there are also differences that highlight the more favorable benefits that Settlement Class Members are receiving under the presently proposed Settlement. The Chime Service Disruption was the result of intermittent technical issues that led to some Chime account holders losing account access for different (and intermittent) lengths of time. This is significantly more limited—and inherently individualized—than what occurred in *RushCard* or *Green Dot*. (ECF No. 40-8 ¶ 42). Further, the Service Disruption in this case was briefer than in *RushCard* (two weeks) and in *Green Dot*.  *Id*. Similar to the proposed Settlement, the *RushCard* settlement provided class members with tiered reimbursements for losses related to the service disruption. Class members who submitted reasonable documentation were eligible to receive payment of up to $500, and class members who did not submit documentation were eligible to receive payment of up to $100. The proposed Settlement here increases the maximum for documented losses to $750 per Class Member. In *Green Dot*, class members who submitted reasonable documentation were, like here, eligible to receive payment of up to $750, and those who did not were eligible to receive payment of up to $100. Additionally, the proposed Settlement provides a minimum settlement contribution of $1,500,000 for Tier 1 and 2 claims combined, a term not present in *RushCard*. This minimum is *in addition to* the $5,960,563 already paid under the Courtesy Payment and Transaction Credit provision of the Agreement.

While most class actions are complex and involve some risk, Class Counsel settled this litigation with a substantial benefit to the Class against the backdrop of Defendants' arbitration provision that they contend is applicable to the class claims here.  (SA § XIII.2.)  Had Defendants advanced a demand for arbitration, and based upon the small recoveries potentially possible in successful arbitrations, as well as considering the substantial costs to litigate individual arbitrations, it is unlikely that any consumer would have sought relief through the arbitration process. In addition, in the absence of arbitration, a trial would have added years to the resolution of this case because of the legal and factual issues raised and the likelihood of appeals.  *See Roberts v. Electrolux Home Prods., Inc.*, No. 12-1644-CAS-FBKx, 2014 WL 4568632, at *24-25 (C.D. Cal. Sept. 11, 2014 (acknowledging "the complexity of the case" and "novelty of issues presented (including the sophisticated engineering concepts involved in this case)").

The total Settlement value here of $12,462,563 is substantial by any measure.  This is particularly true given the real risk that Plaintiffs could have recovered nothing if litigation had continued due to the arbitration provision and the proof of damages that could be recovered in this case not being certain.  (ECF No. 40-8 ¶ 24).

### 2.   The Skill Required and the Quality of Work

In setting fee awards, courts also consider counsel's experience and skill.  *Hanlon*, 150 F.3d at 1029; *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 902 (C.D. Cal. 2016), *aff'd in part, vacated in part, remanded*, 980 F.3d 645 (9th Cir. 2020).  Here, the reputation, experience, and ability of Class Counsel were essential to the litigation's success.  Their record in similar class actions and complex litigation, and their commitment of resources to this action, made credible their commitment to pursue this case until they achieved a fair result.  Their skill in investigating the claims and negotiating a favorable resolution was essential to achieving the benefits under the Settlement.  Moreover, the comprehensive and detailed provisions of the Settlement agreement, and the favorable relief provided pursuant to a notice and claims process, demonstrate the skill applied by Class Counsel.

### 3.      The Contingent Nature of the Fee and Financial Burden on Plaintiffs

Contingency risk is one of the primary fee analysis factors. *Chambers*, 214 F. Supp. 3d at 902 (stating "one extremely important factor ... is the contingent nature of success; for every successful ... action brought, several more may be lost, and in these no fee will be received.") (citing *White v. City of Richmond*, 559 F. Supp. 127, 133 (N.D. Cal. 1982)); *In re Washington Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299-1300  (9th Cir. 1994) ("Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose."); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).  As noted above, Defendants maintained that there was an arbitration provision that applied to Plaintiffs' class claims, and Defendants adamantly denied (and continue to deny) any wrongdoing, much less a legal entitlement to class certification or any recovery.  The path to establishing liability was particularly challenging given these risks.  Class Counsel invested $295,915.20 in lodestar in a case that could have failed, and advanced over $8,146.75 in litigation expenses.

Class Counsel prosecuted this case on a pure contingent-fee basis, advancing all expenses on the understanding that they would receive a fee only if the case was successful.  In all, Class Counsel and their staffs have spent approximately 379 hours investigating, analyzing, researching, litigating, and negotiating a favorable resolution of this case, as well as incurring $8,146.75 in necessary litigation expenses.  Class Counsel expended these resources despite the genuine risk that they would never be compensated at all.  Moreover, the suit was highly risky because, unlike most class actions, here only one case was filed by a small, cohesive team of counsel, and Class Counsel faced Defendants with ample resources to vigorously fight the litigation.  Presumably, if this case were viewed as a "slam dunk," other members of the class action bar would have piled on and filed numerous copycat cases, as often occurs in widely-publicized consumer cases.  Defendants vigorously contested the factual basis of Plaintiffs' claims.  Class Counsel faced risks not only in proving their claims but also in getting a class certified and proving damages.

And yet, ample works remains to be completed, including obtaining final approval, and responding to objections and defending against any potential appeals related thereto.

### 4.    Awards in Similar Cases

The amount for attorneys' fees, costs, and expenses is identical or less than that awarded in the similar cases, *RushCard* and *Green Dot*.  In *RushCard*, the court awarded $1,500,000 in fees, costs, and expenses.  *See RushCard*, ECF No. 49 at ¶ 10. In *Green Dot*, the court awarded $750,000 in fees, costs, and expenses.  *See Green Dot*, ECF No. 109 at 16–20.  Accordingly, the amount requested here is half of that awarded in *RushCard*, and the same as that awarded in *Green Dot*.

### C.    The Request is Reasonable Under the Lodestar Cross-Check

The accompanying declarations of John Yanchunis and Joshua Watson state the hours worked and billing rates used to calculate Class Counsel's lodestar.  *See* Exhibit 1 at ¶ 13; Exhibit 2 at ¶ 6.  As described in the declarations and the exhibits thereto, Class Counsel and their staffs have spent approximately 397 hours working this case, for a total unadjusted lodestar of approximately $295,915.20 to date, exclusive of costs.  These calculations reflect the amount of time Class Counsel spent working to ensure effective representation on behalf of the Settlement Class, including: pre-suit investigation and analysis; interviewing members of the class to determine how those members were affected by the problems associated with the Service Disruption; reviewing and analyzing information produced by Defendants; preparing for and participating in settlement discussions; participating in a number of telephonic settlement negotiations; drafting settlement documents; drafting papers in support of preliminary approval of the Settlement; working with the Class Administrator and Defendants' counsel to implement the notice program; and working with the class in connection with notice and administration issues.  *Id.* Class Counsel expect to devote further time to this matter through the implementation of the Settlement, including additional time spent on notice and administration issues, responding to inquiries from class members, participating in the final approval hearing, responding to objections and related appeals (if any), and overseeing distribution of benefits to the Settlement Class.

Class Counsel devoted a reasonable amount of professional time to this case.  *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Circ. 2000).  The declarations attest that Class

Counsels' reported hours were accurate and reasonably incurred in connection with the prosecution and settlement of this matter, and that their firms require their attorneys and other professionals to maintain daily, contemporaneous time records, and summarizing the number of hours billed by each attorney and that attorney's hourly rate.  All of this work is compensable.  *Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1081 (N.D. Cal. 2010) ("An attorney's sworn testimony that, in fact, it took the time claimed '. . . is evidence of considerable weight on the issue of the time required . . .'") (citation omitted) (alterations in original).

Class Counsel were required to spend considerable time investigating the issues in this litigation. Those efforts were critical to the success of this case.  Class Counsel conducted a pre-litigation investigation into the Service Disruption, discussed the impact of the Service Disruption with Chime's customers, researched potential legal claims, and prepared and filed the complaint. Thereafter, Class Counsel engaged in extensive negotiations with Defendants regarding the Service Disruption that ultimately resulted in the Settlement.  These tasks were done for the benefit of Plaintiffs and the Class they represent, and the time spent was reasonable.  Plaintiffs, thus, respectfully submit that all such time should be considered for compensation in the cross-check analysis.[12]  Moreover, additional work will be required by Class Counsel, as noted above.

Class Counsel's lodestar is not bloated by unnecessary duplication or inefficiencies.  The number of attorneys and firms working on this case was small.  The team was a tightly-knit group of lawyers, who had experience working with each other, and most of whom had experience prosecuting the similar *RushCard* and *Green Dot* actions.  Class Counsel endeavored to prevent duplication of work and avoid inefficiencies that might otherwise have resulted from multiple firms working on this case.  Tasks were managed so as to promote efficiency and ensure continuity. Because complex litigation often requires a team structure, courts have compensated time spent in

---

[12] *See Hensley*, 461 U.S. at 435-36; *Cabrales v. Cnty. of Los Angeles*, 935 F.2d 1050, 1052-53 (9th Cir. 1991); *Ketchum v. Moses*, 24 Cal. 4th 1122, 1133 (Cal. 2001) (fee award should be "fully compensatory [and] absent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours reasonably spent.") (emphasis in original); *Browne v. American Honda Motor Co.*, No. 09-06750-MMM-DTBx, 2010 WL 9499073, at *10-11 (C.D. Cal. Oct. 5, 2010) (awarding fees for pre-filing and post-filing investigation, including communicating with class members).

collaborative efforts.[13]  Class Counsel should not be punished for their efficiency in litigating this matter via use of the lodestar cross-check, especially here where their percentage of the fund request is so imminently reasonable.

Not only were the hours spent by Class Counsel reasonable in light of the needs of the case, but their work served the public good by securing significant relief that the consumer protection statutes were intended to provide.[14]  Based on the foregoing, Plaintiffs respectfully request that the Court find that the hours Class Counsel worked were reasonable and necessary to the successful prosecution of this action.

The rates sought are likewise reasonable.  "[T]he determination of a reasonable hourly rate is not made by reference to the rates actually charged the prevailing party[,]" but rather, "by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity."  *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007) (internal quotation marks omitted).  The court must determine the reasonable hourly rate in the context of rates charged in "the relevant community[,]" which is "the forum in which the district court sits."  *See Chambers*, 214 F. Supp. 3d at 896 (quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) . The hours expended and the rate should be supported by adequate documentation and other evidence.  *Hanlon*, 150 F.3d at 1029.

As set forth in the attached declarations, Class Counsel are well-credentialed, greatly experienced in consumer class action litigation, including in service disruption related cases, and

---

[13] See *Horsford v. Board of Trustees*, 132 Cal. App. 4th 359, 397, 33 Cal. Rptr. 3d 644 (2005) (finding time reasonable where multiple attorneys represented plaintiffs to prepare notes, attend conferences to discuss strategies, and assign tasks, as part of a "supervision structure within the plaintiffs' litigation team"); *Building a Better Redondo, Inc. v. City of Redondo Beach*, 203 Cal. App. 4th 852, 872 n.14, 137 Cal. Rptr. 3d 622 (2012) (compensating counsel for inter-office communications as "some conferences between counsel might be expected, particularly in a case of some complexity").

[14] *See Center for Biological Diversity v. Cnty. of San Bernardino*, 185 Cal. App. 4th 866, 897-98, 111 Cal. Rptr. 3d 374 (2010) (declining to reduce an award of attorneys' fees where the plaintiff "achieved its primary objective"; noting such a reduction 'would impede the Legislature's intent of 'encouraging attorneys to act as private attorneys general and vindicate important rights affecting the public interest." (citing *Ketchum*, 24 Cal. 4th at 1133-34)).

MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES, AND SERVICE AWARDS
CASE NO. 4:19-cv-06864

have received similar rates in other cases around the country, including within this Circuit and District.[15]

The Court previously reviewed Class Counsel's background and experience in conjunction with the Order preliminarily approving the Settlement. *See* (ECF No. 46 at 10). Counsel's hourly rates are set forth in the attached declarations. The rates of the partners who prosecuted this case range from $750 – $950 and the rates of associates and senior counsel range from $450–$658. These hourly rates are reasonable and consistent with what attorneys of comparable skill charge for complex litigation in the Northern District of California.

In light of the results achieved given the risks involved, as well as the other *Vizcaino* factors explained above, the attendant multiplier resulting from a lodestar analysis is also reasonable.

Once the lodestar figure has been calculated, "the Court must decide whether to adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc*., 526 F.2d 67, 69-70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976), that have not been subsumed in the lodestar calculation." *Goldkorn v. Cnty. Of San Bernardino*, No. 06-707-VAP-OPx, 2012 WL 476279, at *9 (C.D. Cal. Feb. 13, 2012) (citing *Caudle*, 224 F.3d at 1028-29). The *Kerr* "enhancement" factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the

---

[15] *See, e.g.*, *In re: Yahoo! Inc. Customer Data Sec. Breach Litig*., 16-MD-02752-LHK, 2020 WL 4212811, at *26 (N.D. Cal. July 22, 2020) (approving as reasonable rates of class counsel, which included $900 for John Yanchunis, and $550 for Mr. Barthle, and finding as reasonable: "billing rates for partners range from about $450 to $900, depending on seniority level," "billing rates for non-partner attorneys, including of counsel, associates, and staff/project attorneys, range from about $160 to $850, with most under $500," and "billing rates for paralegals range from $50 to $380"); *In re: Equifax Inc. Customer Data Security Breach Litigation*, Case No 1:17-md-02800-TWT, ECF 956 at 105 (N.D. Ga. Jan. 13, 2020), (approving as reasonable rates of class counsel, which included $950 for John Yanchunis, and approving rates ranging from $750 - $1050 for lead counsel); *Walters v. Kimpton Hotel & Restaurant*, No. 3:16-cv-05387, ECF 117 (N.D. Cal. July 11, 2019), *id*., ECF 113-1 (May 8, 2019) (identifying Morgan and Morgan rates of $864-950 for partners, $450-636 for associates, $196 for paralegals, and $300 for investigators); *Dyer v. Wells Fargo Bank, N.A*., No. 3:13-cv-02858, ECF 51 at 10 (N.D. Cal. Oct. 22, 2014); id., ECF 43-1 (July 11, 2014) (identifying Morgan and Morgan rates of $900 for John Yanchunis, $550 for associate).

circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Class Counsel seeks $750,000.00 in attorneys' fees, costs, and expenses against a current lodestar of about $295,915.20, and costs and expenses of $8,146.75, which would represent a 2.467 multiplier—were a lodestar analysis employed here.[16]   In the Ninth Circuit, multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Vizcaino*, 290 F.3d at 1051 n. 6 (approving multiplier of 3.65 and citing cases approving multipliers averaging 3.32 and as high as 19.6); *see also Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1170 (C.D. Cal. 2010) ("Where appropriate, multipliers may range from 1.2 to 4 or even higher.") (citations omitted); *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) (awarding 5.2 multiplier; citing cases approving multipliers ranging from 4.7 to 19.6); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (multiplier of 3.6 was "well within the acceptable range for fee awards in complicated class action litigation" and stating that "[m]ultipliers in the 3-4 range are common").   Moreover, as reiterated in *Moore v. Verizon Communs. Inc.*, No. 09-1823, 2014 WL 588035, at *6 (N.D. Cal. Feb. 14, 2014):

> A district court generally has discretion to apply a multiplier to the attorney's fees calculation to compensate for the risk of nonpayment. It is an abuse of discretion to fail to apply a risk multiplier, however, when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky." *Fischel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) (citation omitted); *see In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300-1301 (9th Cir. 1994) (noting that "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases" and finding district court's failure to apply multiplier to lodestar calculation was abuse of discretion where case was "fraught with risk and recovery was far from certain").

Pursuant to the factors discussed above in connection with the percentage analysis, Plaintiffs and their counsel submit that a multiplier of 2.467 would also be appropriate in this case were the

---

[16] Excluding the costs and removing them from the total amount sought for fees the multiplier equals 2.506.

Court to use the lodestar approach.  Plaintiffs submit, however, that the percentage of the fund is the proper analysis here.

### D.     The Expenses of Class Counsel Are Reasonable

Recovery of litigation costs in the context of class action settlements is allowed in the Ninth Circuit.  *See Staton*, 327 F.3d at 974.  Attorneys may recover the out-of-pocket costs they reasonably incurred in investigating, prosecuting, and settling this case.  *See In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970)); *Staton*, 327 F.3d at 974. While Class Counsel's requested $750,000.00 is inclusive of costs and expenses, and Class Counsel make no separate request for the reimbursement of costs and expenses (SA § X.2), an inquiry into the reasonableness of these expenses is appropriate.

Attorneys in a contingency case are entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee- paying client."  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citation omitted).  Class Counsel here incurred $8,146.75 in unreimbursed, out-of-pocket costs expenses in this action.  *See* Exhibit 1 at ¶¶ 24–25; Exhibit 2 at ¶ 11–12.  These expenses include costs advanced in connection with investigating the claims, travel, photocopying, PACER, and other customary litigation expenses.  *Id.*  These costs were necessary for the investigation, prosecution, and settlement of this action.  They should be reimbursed in full.  *Reed v. 1-800 Contacts*, No. 12-cv-02359, 2014 WL 29011, at *10 (S.D. Cal. Jan. 2, 2014) (finding requested litigation expenses reasonable and proportionate to the attorneys' fees requested).

### E.     The Requested Service Awards are Reasonable and Should Be Approved

The Ninth Circuit has recognized that "named plaintiffs, as opposed to designated members who are not named plaintiffs, are eligible for reasonable incentive payments."  *Staton*, 327 F.3d at 977; *Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009 (service awards "are fairly typical in class action cases").  Such awards are "intended to compensate class representatives for work done on behalf of the class [and] make up for financial or reputational risk undertaken in bringing the action."  *Id*; *see also Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 157, 163 (9th Cir. 2013) ("Incentive awards are payments to class representatives for their service to the class in

bringing the lawsuit.").  Service awards should be awarded based upon the Court's required inquiry into criteria including the amount of time and effort spent on the litigation, the duration of the litigation, and the degree of personal gain obtained as a result of the litigation.  *See Van Vranken*, 901 F. Supp. at 299; *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 5402120, at *6 (N.D. Cal. Sept. 26, 2013); *Wilson v. Airborne, Inc.*, No. 07-cv-00770, 2008 U.S. Dist. LEXIS 110411, at *36-37 (C.D. Cal. Aug. 13, 2008).  So long as the service awards do not create a conflict of interest between the representatives and class members, modest payments to named plaintiffs for their services as class representatives are customary and commonly approved.  *See, e.g.*, *Van Vranken*, 901 F. Supp. at 300; *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463 (9th Cir. 2000) (approving $5,000 service awards); *Wren v. RGIS Inventory Specialists*, No. C-06-05778-JCS, 2011 WL 1230826, at *36 (N.D. Cal. Apr. 1, 2011) ("As Plaintiffs correctly note, there is ample case law finding $5,000 to be a reasonable amount for an incentive payment.").

   As part of the Settlement Agreement, Defendants have agreed to pay, subject to court approval, a service award to each Settlement Class Representative in the modest amount of $500 in recognition of the time and effort they personally invested in this lawsuit.  (SA § X.1).  The requested Service Awards are reasonable and appropriate.  Each of the Settlement Class Representatives has served the Settlement Class well.  The Settlement Class Representatives lent their names to this case and thereby subjected themselves to public attention, including being forever linked to the litigation in any internet searches using their names.  In addition, each of them participated in numerous conferences with their attorneys, reviewed (suggesting edits as appropriate) and authorized the filing of the class action complaint in this action, produced relevant documents and information to Class Counsel, and evaluated and supported the proposed settlement. *See* Exhibit 1 at ¶¶ 29–31.

   The $500 awards sought will not affect the benefits provided to any consumers covered by the Settlement, and fall at the lower end of the spectrum of amounts awarded in comparable cases. *See*, *e.g.*, *Hawthorne v. Umpqua Bank*, No. 11-6700, 2015 WL 1927342, at *8 (N.D. Cal. Apr. 28, 2015) ("Many courts in the Ninth Circuit have also held that a $5,000 incentive award is 'presumptively reasonable.'") (citation omitted); *In re Mego Fin. Corp.*, 213 F.3d at 457, 463

1   (service awards of $5,000); *Resnick v. Frank*, 779 F.3d 934, 941 (9th Cir. 2015) (approving service

2   awards of $5,000 to class representatives in a consumer case).

3        In light of the Plaintiffs' willingness to step forward on behalf of consumers on a class-wide

4   basis, the Court should grant the requested Service Awards, which Defendants have agreed to pay

5   separate and apart from the relief to the Settlement Class.

6   **IV.**    **CONCLUSION**

7        For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order (1)

8   approving the payment of $750,000.00 in attorneys' fees, costs, and expenses to Class Counsel, (2)

9   approving Service Awards in the amount of $500 to each of the four Settlement Class

10  Representatives, and (3) granting Class Counsel and Settlement Class Representatives such other

11  and further relief as is appropriate

12

13  DATED: December 30, 2020          Respectfully submitted,

14

15                                **MORGAN & MORGAN**
                              **COMPLEX LITIGATION GROUP**

16                                */s/ John A. Yanchunis*

17                                John A. Yanchunis (*pro hac vice*)
                              Patrick A. Barthle II (*pro hac vice*)

18                                201 North Franklin Street 7th Floor
                              Tampa, Florida  33602

19                                (813) 223-5505

20                                (813) 223-5402 (fax)

21                                Joshua H. Watson

22                                CLAYEO C. ARNOLD, APC
                              Cal. Bar No. 238058

23                                865 Howe Ave

24                                Sacramento, CA 95825
                              (916) 777-7777 (tel)

25                                (916) 924-1829 (fax)
                              jwatson@justice4you.com

26

27                                ***Attorneys for Plaintiffs and***
                                ***Class Counsel***

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that December 30, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed December 30, 2020.

/s/ *John A. Yanchunis*
John A. Yanchunis
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 N. Franklin Street,
7th Floor Tampa, FL 33602
Telephone:  813/223-5505
813/223-5402 (fax)

25