John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Morgan & Morgan Complex Litigation Group
201 North Franklin Street 7th Floor
Tampa, Florida 33602
(813) 223-5505 (tel)
(813) 223-5402 (fax)

Joshua H. Watson
**CLAYEO C. ARNOLD, APC**
865 Howe Ave
Sacramento, CA 95825

*Counsel for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RICHARDS, RUBA AYOUB, BRANDY TERBAY AND TRACY CUMMINGS, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>CHIME FINANCIAL, INC., GALILEO FINANCIAL TECHNOLOGIES, INC., and THE BANCORP INC.,<br><br>        Defendants. | **CASE NO. 4:19-cv-06864**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE Plaintiffs Ryan Richards, Ruba Ayoub, Brandy Terbay, and Tracy Cummings ("Plaintiffs") will and hereby do respectfully move the Court for entry of an Order (1) finally approving the Settlement Agreement; (2) certifying, for settlement purposes, the proposed Settlement Class under Rule 23(a), (b)(3), and (e); (3) finding the class notice as implemented satisfied Rule 23 and due process; (4) finally appointing Plaintiffs as Settlement Class Representatives; (5) finally appointing as Lead Counsel John A. Yanchunis of Morgan & Morgan Complex Litigation Group, and as Class Counsel Patrick A. Barthle II of Morgan & Morgan Complex Litigation Group and Joshua H. Watson of Clayeo C. Arnold, APC, each as counsel for the Settlement Class ("Class Counsel") under Rule 23(g); (6) finally appointing Epiq Class Action and Claims Solutions, Inc. ("Epiq") as the Settlement Administrator; (7) overruling the objection; and (8) any other relief the Court deems just and proper.

Plaintiffs' motion is based on this notice; the accompanying Memorandum of Points and Authorities and all attachments thereto; the Proposed Order Granting Preliminary Approval of Class Action Settlement; and all records, pleadings and papers filed in this Action.  This Motion is unopposed by Defendants.

DATED: March 1, 2021                    Respectfully submitted,

                                        /s/ John A. Yanchunis
                                        **MORGAN & MORGAN**
                                        **COMPLEX LITIGATION GROUP**
                                        John A. Yanchunis
                                        201 North Franklin Street 7th Floor
                                        Tampa, Florida 33602
                                        (813) 223-5505
                                        (813) 223-5402 (fax)

                                        *Proposed Lead Counsel*

Contents

NOTICE OF MOTION ..................................................................................................................... i

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

I.     INTRODUCTION .................................................................................................................. 1

II.    BACKGROUND ..................................................................................................................... 1

III.   THE SETTLEMENT .............................................................................................................. 5

       A.     The Settlement Class .................................................................................................... 5

       B.     Settlement Relief .......................................................................................................... 5

              1.     Courtesy Payment and Transaction Credits ....................................................... 5

              2.     Additional Tiered Relief ..................................................................................... 6

       C.     Notice Implementation ................................................................................................ 8

       D.     Claims Experience ..................................................................................................... 10

IV.    ARGUMENT ......................................................................................................................... 11

       A.     The Court Should Certify the Settlement Class ......................................................... 11

       B.     The Settlement Merits Final Approval ...................................................................... 11

              1.     Adequacy of Relief: Costs, Risks, and Delay .................................................. 12

              2.     Adequacy of Relief:  Proposed Method of Distributing Relief ........................ 15

              3.     Adequacy of Relief:  Attorneys' Fees .............................................................. 16

              4.     Rule 23(e)(3) Agreements and Equality of Treatment ..................................... 16

       C.     The District's Procedural Guidance ........................................................................... 17

       D.     The Notice Plan Met the Requirements of Due Process ............................................ 19

       E.     Final Appointment of Settlement Class Counsel ....................................................... 20

       F.     Ninth Circuit Final Approval Factors   ...................................................................... 20

              1.     The Presence of a Government Participant ....................................................... 21

              2.     The Reaction of the Class Members to the Settlement ..................................... 21

V.     CONCLUSION ..................................................................................................................... 21

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:19-cv-06864

**TABLE OF AUTHORITIES**

**Cases**

*Altamirano v. Shaw Indus., Inc.*, No. 13-CV-00939-HSG, 2015 WL 4512372, at *8 (N.D. Cal. July 24, 2015) .................................. 16

*Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 885-86 (C.D. Cal. 2016) .................................................... 11

*Fuentes v. UniRush, LLC,*  Final Approval Order, No. 1:15-cv-08372 (S.D.N.Y. Sept. 12, 2016).................................... 10, 15

*G. F. v. Contra Costa Cty.*, No. 13-CV-03667-MEJ, 2015 WL 4606078, at *14 (N.D. Cal. July 30, 2015) .......................................... 16

*Hendricks v. Starkist Co.*, No. 13-cv-00729-HSG, 2016 WL 5462423, at *10 (N.D. Cal. Sept. 29, 2016) ........................... 14

*Hughes v. Microsoft Corp.*, No. 98-CV-01646, 2001 WL 34089697 ................................................. 10

*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 320–21 (N.D. Cal. 2018) ................................................. 9

*In re Apollo Grp. Inc. Sec. Litig.*, No. 04-2147, 2012 WL 1378677, *4 (D. Ariz. 2012)........................................ 11

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)................................... 21

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) ................................. 17

*In re Sony Gaming Network & Customer Data Breach and Security Litig.*, 903 F. Supp. 2d 942, 963 (S.D. Cal. 2012)...................... 13

*Jones v. Commerce Bank, N.A.*, 2006 WL 2642153, *2 (S.D.N.Y 2006) ................................. 13

*Ko v. Natura Pet Prods., Inc.*, No. C 09-02619 SBA, 2012 WL 3945541, at *4 (N.D. Cal. Sept. 10, 2012)........................................ 14

*Kuhns v. Scottrade*, 868 F.3d 711, 718 (8th Cir. 2017)........................................... 13

*Lewis v. Green Dot Corporation*, Case No. 2:16-cv-03557 (C.D. Cal. Nov. 22, 2017)............................. 10, 15

*Miller v. Bank of Am. N.T. & S.A.*, 2014 WL 5091897, *11 (Cal. Super. 2014) ................................ 13

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). ................................. 19

*Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) ................................. 17

*Rannis v. Recchia*, 380 F. App'x. 646, 650 (9th Cir. 2010) ................................. 10

*Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, *8 (S.D.N.Y. 2019) ................................. 13

*Smith v. Am. Greetings Corp.*, No. 14-CV-02577-JST, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016)........................ 17

*Staton v. Boeing, Co.*, 327 F.3d 938, 977 (9th Cir. 2003) ................................. 17

*Stern v. Superior Court*, 129 Cal. Rptr. 2d 275, 282 (Cal. Ct. App. 2003) ................................. 14

*Turner v Talbert*, 2011 WL 4479766, *2 (M.D. La. 2011) ................................. 13

**Statutes**

(CAFA), 28 U.S.C. § 1715 ................................................................. 8

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:19-cv-06864

CAFA, 28 U.S.C. § 1715 ........................................................................................................... 21

California Consumer Legal Remedies Act .................................................................................. 13

**Rules**

Fed. R. Civ. P. 23 .......................................................................................................... 8, 12, 19, 20

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:19-cv-06864

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Settlement in this Action[1] brings real, valuable relief to Class Members, including $5,960,563.00 in payments that have already been made to Settlement Class Members for any inconveniences and losses resulting from the Service Disruption, and up to an additional $5,500,000 on a claims-made basis—split between two alternative tiers of compensation (Tiers 1 and 2) available to the Settlement Class—against which Settlement Class Members may file claims for losses resulting from the Service Disruption. *See* SA § IV.1-3. On October 28, 2020, this Court preliminarily approved the Settlement. (ECF No. 46). As discussed below, the terms of the Settlement create substantial benefits for the thousands of Settlement Class members; the Settlement is fair, reasonable, and adequate; and meets all the requisite criteria for final approval under Rule 23(e). The overwhelmingly positive response by members of the Settlement Class confirms that final approval is warranted—only one (1) objection and five (5) requests for exclusion have been received. Accordingly, this motion should be granted, and the Settlement finally approved.

## II.   BACKGROUND

This Action was brought by Plaintiffs, individually and on behalf of a class of similarly situated customers, against Defendants Chime Financial, Inc. ("Chime"), The Bancorp Inc. ("Bancorp"), and Galileo Financial Technologies, LLC (formerly known as Galileo Technologies, Inc.) ("Galileo") (collectively, "Defendants"), arising from an intermittent disruption in service for portions of the period of time between October 16, 2019 and October 19, 2019 (the "Service Disruption").

From October 16, 2019 to October 19, 2019, certain Chime accountholders experienced intermittent disruptions in service.  For example, for approximately four and a half non-consecutive hours during the Service Disruption, card purchases for certain members were unavailable; and for approximately 60 hours, certain members could not transfer money from their Chime accounts. These issues were intermittent during the Service Disruption period and did not impact all Chime

---

[1] Capitalized terms used herein are defined in the Amended Settlement Agreement ("SA"), previously filed at Docket No. 45-4.

customers. Rather, in connection with the Action and the Settlement, Defendants have identified approximately 528,000 accountholders that had an account open with Chime during the Service Disruption who experienced a transaction failure or had an account or card locked during the Service Disruption. SA § III.1.

Immediately upon learning of the Service Disruption, Class Counsel worked vigorously to remedy the harms imposed on the Settlement Class. This Action was filed on October 22, 2019. (ECF No. 1). Upon filing, Chime and Bancorp received a demand from Lead Counsel seeking compensation for impacted customers. In recognition of the pendency of this Action and having received the demand, Settlement Class Members with an active Chime account received a credit to their account in the amount of ten dollars ($10.00), on or about November 14, 2019. SA § IV.1.a. Moreover, Settlement Class Members with an active Chime account who incurred certain transaction fees during the Service Disruption received a credit to cover those fees. SA § IV.1.b. The total amount already paid to the Settlement Class from Plaintiffs' efforts is $5,960,563.00. SA § IV.1.c.

On February 6, 2020, counsel for the Parties attended an initial settlement conference in front of United States Magistrate Judge Laura Beeler. The conference was held in San Francisco, California to discuss the facts and the law underlying the Action. Counsel for the Parties engaged in discussions regarding the factual circumstances of the case, as well as potential strengths and weaknesses of the allegations in support of, and defenses to, the Action. Following that meeting, counsel for Plaintiffs made a settlement demand on Defendants to resolve this matter. SA § I.D; Declaration of John A. Yanchunis, ECF No. 40-8, at ¶ 18.

During the months that followed, counsel for the Parties continued discussions via multiple telephone conferences and correspondence exchanges. Counsel continued to exchange proposals and discuss resolution, as disclosed to the Court in their Stipulation and Proposed Order to extend the case stay on March 19, 2020. (ECF No. 30). On May 7, 2020, after weeks of additional negotiations, Counsel for the Parties attended an additional settlement videoconference in front of Judge Beeler to discuss preliminary settlement terms and structure. On May 12, 2020, with the assistance of Judge Beeler, the Parties reached an agreement in principle with regard to the material

2

**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
**CASE NO. 4:19-cv-06864**

terms of the proposed settlement, as memorialized in this Settlement Agreement.  ECF No. 40-8 ¶ 19.

On August 7, 2020, Plaintiff filed their Motion for Preliminary Approval. (ECF No. 40). On September 24, 2020, the Court held a hearing on the motion. (ECF No. 44). At the hearing, the Court raised minor points for clarification about the Settlement, specifically, the Court requested the Parties consider: (1) whether the additional language in Section IX Paragraph 2 of the settlement agreement regarding the scope of the release should be removed as redundant or clarified so as to avoid confusion, and (2) whether the language requiring objectors to include the number of times the objector or his or her counsel has objected to a class action in Section VII Paragraph 4 should be removed as to the amended settlement agreement. (ECF No. 44).

In response, the Parties met, discussed, and agreed to an Amended Stipulation of Agreement and Settlement and Release, which was filed on October 8, 2020. (ECF No. 45).[2] The Amended Settlement Agreement simplified the objection process and clarified the release language as suggested by the Court. *See, e.g.*, (ECF No. 45-1 at 15, 17).[3] On October 28, 2020, the Court entered its Preliminary Approval Order. (ECF No. 46).

As explained previously and in greater detail below, in addition to the benefits already afforded to the Settlement Class, the Settlement provides two alternative tiers of relief to compensate Settlement Class Members for inconveniences and losses as a result of the Service Disruption.  These alternative tiers allow Settlement Class Members to make a claim for either undocumented losses (Tier 1) or for documented losses (Tier 2). Defendants have agreed to pay allowed claims under Tiers 1 and 2 of up to $5,500,000, but in any event will make a minimum settlement fund payment of $1,500,000, taking into account claimed amounts under either Tier, which $1,500,000 will not revert to Defendants.  Should amounts claimed under Tier 1 and Tier 2, when combined, fail to exhaust the $1,500,000 fund, any difference between the claimed amounts

---

[2] The Parties provided clean and redline versions of the revised documents, which included the Amended Settlement Agreement and certain notice documents which had also been revised in accord with the amended agreement. (ECF No. 45-2).

[3] Pinpoint cites to materials on the Court's Docket refer to the CM/ECF system's pagination in the upper right-hand corner of the document.

and $1,500,000 will be subject to a *cy pres* distribution to the East Bay Community Law Center or such other *cy pres* recipient or recipients as directed and agreed to by the Court.  SA § IV.  Subject to the terms of the Settlement Agreement, Defendants are not creating a settlement fund beyond the $1,500,000 but instead will only pay validated claims up to the Tier Maximums.  Should the amounts claimed not reach the Tier Maximums, Defendants will retain those funds.  *Id.*

Defendants also separately bore the costs of class notice and other costs associated with administering the Settlement at a fixed sum price of no more than $250,000.  SA § VI.3. Defendants have also agreed to separately pay Class Counsel's attorneys' fees, costs, and expenses, not to exceed $750,000 in the aggregate, and Service Awards not to exceed $500 per Settlement Class Representative. These fees, costs, and expenses, and the Service Awards, will be paid by Defendants separate and apart from the relief provided to Settlement Class Members; that is, the fees, cost, and expenses and Service Awards will not reduce the benefits and payments to the Settlement Class Members provided by the Settlement Agreement.  SA § X.1-2.

After investigating the facts and carefully considering applicable law, the Named Plaintiffs and Class Counsel concluded that it was (and is) in the best interests of the Settlement Class Members to enter into the Settlement in order to avoid the uncertainties of litigation and to assure meaningful and timely benefits to the Settlement Class Members.  For the reasons stated herein, the Named Plaintiffs and Class Counsel respectfully submit that the terms and conditions of this Settlement are fair, reasonable, and adequate and in the best interests of all Members of the Settlement Class.

Accordingly, the Named Plaintiffs respectfully request that the Court enter an Order (1) finally approving the Settlement; (2) finally certifying, for settlement purposes, the proposed Settlement Class under Rule 23(a), (b)(3), and (e); (3) finding the Notice Program as implemented satisfied Rule 23 and due process; (4) finally appointing Named Plaintiffs as Settlement Class Representatives; (5) finally appointing as Lead Counsel John A. Yanchunis of Morgan & Morgan Complex Litigation Group, and as Class Counsel Patrick A. Barthle II of Morgan & Morgan Complex Litigation Group and Joshua H. Watson of Clayeo C. Arnold, APC, all to serve as counsel for the Settlement Class ("Class Counsel") under Rule 23(g); (6) finally appointing Epiq Class

Action and Claims Solutions, Inc. ("Epiq") as the Settlement Administrator; (7) overruling the objection, and (8) ordering any other relief the Court deems just and proper.

## III.   THE SETTLEMENT

### A.   The Settlement Class

The Settlement contemplates relief for the following proposed Settlement Class:

> All consumers who attempted to and were unable to access or utilize the functions of their accounts with Chime, as confirmed by a failed transaction or a locked card as recorded in Chime's business records, beginning on October 16, 2019 through October 19, 2019, as a result of the Service Disruption.

SA § III.1. For purposes of determining membership in the Settlement Class, Chime has identified approximately 528,000 accountholders that had an account open with Chime during the Service Disruption who experienced a transaction decline due to the processor outage and/or had an account or card locked at any time from October 16 to 19, 2019, and these criteria will be used for determining Settlement Class membership, for purposes of notice, and for the claim validation processes described below.  SA § III.1.[4]

### B.   Settlement Relief

The valuable benefits made available pursuant to the Settlement squarely address the issues raised in the litigation and provide significant relief to the Settlement Class Members.

### 1.   Courtesy Payment and Transaction Credits

To compensate Settlement Class Members for inconveniences and losses as a result of the Service Disruption, and in recognition of the pendency of this class litigation and a demand for compensation for impacted customers from Lead Counsel, Defendants have already provided two valuable benefits.  Settlement Class Members with an active Chime account received a credit to their account in the amount of $10.00 on or about November 14, 2019.  SA § IV.1.a.  And Settlement Class Members with an active Chime account who incurred certain transaction fees during the Service Disruption received a credit to cover those fees. SA § IV.1.b.  The total amount already paid or credited to Settlement Class Members as part of this class relief is $5,960,563.00.  SA § IV.1.c.

---

[4] Excluded from the Settlement Class are the Court, the officers and directors of Defendants, persons who have been separately represented by an attorney and entered into a separate settlement agreement in connection with the Service Disruption, and persons who timely and validly request exclusion from the Settlement Class.  S.A. § III.2.

## 2.      Additional Tiered Relief

Defendants have agreed to provide the following additional relief to Settlement Class Members who make valid and verified claims under the two mutually exclusive tiers of relief:

### a)      Tier 1 Claims – Payments for Losses Without Documentation

Settlement Class Members who claim they suffered a financial or other loss because of the Service Disruption, but do not have or do not wish to provide Reasonable Documentation, will be eligible for a payment up to $25.00.  SA § IV.2.a.  Tier 1 payments will be reduced by any prior payments Settlement Class Members already received from Chime in connection with the Service Disruption.  SA § IV.2.b.  Defendants have agreed to pay up to $4,000,000 to satisfy valid Tier 1 claims.  SA § IV.2.c.  If the amount of valid Tier 1 Claims is less than $4,000,000, the difference between the claimed amount and the Tier 1 Maximum, (the "Tier 1 Residue"), will be made available to fully or partially satisfy Tier 2 claims, but otherwise will be retained by the Defendants who will not have to make those funds available. SA § IV.2.c. If the amount of valid Tier 1 Claims, net of offsets, exceeds $4,000,000, each claim will be reduced on a *pro rata* basis.  SA § IV.2.c.

### b)      Tier 2 Claims – Payments for Substantiated Losses

Alternatively, settlement Class Members who provide Reasonable Documentation of Substantiated Losses will be eligible for a payment of the amount of loss proven up to $750.00. SA § IV.3.a. Tier 2 payments will also be reduced by any prior payments Settlement Class Members already received from Chime in connection with the Service Disruption. SA § IV.3.b.  Defendants have agreed to pay up to $1,500,000 to satisfy valid Tier 2 claims. SA §§ IV.3.c and IV.5.  Should the total value of valid Tier 2 claims exceed $1,500,000, plus the Tier 1 Residue, if any, then all payments will be reduced on a *pro rata* basis.  SA § IV.3.c.  If the amount of valid Claims is less than $4,000,000 for Tier 1, or $1,500,000 for Tier 2, Defendants will retain any unclaimed amounts, except to the extent that Tier 1 Residue funds are necessary to fully or partially satisfy Tier 2 claims. SA §§ IV.2.c; IV.3.c.  For the avoidance of doubt, Defendants will pay only the verified claims made under Tiers 1 or 2. *Id.* With the exception of the $1,500,000 minimum, non-reversionary payment, from which both claims made under Tier 1 and Tier 2 will initially be drawn, Defendants are not creating a settlement fund as part of the Settlement.  *Id.*

Class Members may seek to participate in either Tier 1 or Tier 2, but not both. SA § IV.4.

### c)      Minimum Contribution

Taking into account claimed amounts under either Tier 1 or Tier 2, Defendants will make a minimum settlement fund payment of $1,500,000, which amount will not under any circumstances revert to Defendants.  Should amounts claimed under Tier 1 and Tier 2, when combined, fail to exhaust the $1,500,000 fund, any such excess will be subject to a *cy pres* distribution to the East Bay Community Law Center as directed and agreed to by the Court. SA § IV.5.

### d)      Claims Verification Process

Tier 1 and Tier 2 Claims will be subject to a two-part verification process. SA §§ IV.2.a, 3.a., 6.b, 6.c. Settlement Class Members did not have to submit any Claim Form or documents to receive benefits under the Courtesy Payment and Transaction Credits. SA § IV.1. To receive cash payment under Tiers 1 or 2, however, Settlement Class Members must submit a valid Claim Form by the Claims Deadline. SA § IV.6.a. Under both Tiers, Settlement Class Members must submit, under penalty of perjury, an explanation as to what losses they incurred as a result of the Service Disruption. SA § IV.6.b. Additionally, the Settlement Administrator and Chime will confirm according to Chime's business records that the Settlement Class Member held a Chime account and attempted a financial transaction that failed or had their card locked as a direct result of the Service Disruption. *Id.* To receive payment under Tier 2, Settlement Class Members must also submit Reasonable Documentation to support their losses. SA § IV.6.c. Any Tier 2 Claim submitted without Reasonable Documentation will be processed as a Tier 1 Claim. SA § IV.6.d.

### e)      Administrative Costs

Defendants also separately bore the costs of class notice and other costs associated with administering the Settlement at a fixed sum price of no more than $250,000.  SA § VI.3.

### f)      Release

In exchange for the benefits provided under the Settlement, Class Members will release Defendants and related entities from all claims related to the alleged claims or events in the Action or the Service Disruption. SA §§ II.20, IX.  The Released Claims do not include any claims arising

from or relating to any conduct by Defendants after the date the Settlement is executed.  SA § IX.1.

Under the guidance of the Court, the Parties have clarified the Release. (ECF No. 45).

### C. <u>Notice Implementation</u>

The Notice Program was implemented as set out in the Settlement Agreement and as directed by the Court.

First, the Settlement Administrator, Epiq, sent a CAFA notice packet (or "CAFA Notice"), on behalf of Defendants—as required by the federal Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1715—to 59 federal and state officials on August 17, 2020. *See* Declaration of Cameron R. Azari, Esq. on Implementation of Settlement Notice Program at ¶ 7 (hereinafter "Azari Decl."), attached hereto as **<u>Exhibit A</u>**.

Second, the notice issued to the Settlement Class was the "best notice . . . practicable under the circumstances" pursuant to Fed. R. Civ. P. 23(c)(2)(b). In its Preliminary Approval Order, the Court also approved the Notice Program set forth in the Settlement Agreement. The Notice Program consisted of two components: (1) E-mail Notice and (2) Notice on the Settlement Website. SA § VII.2.  On November 4, 2020, Epiq received one data file from counsel, which contained 527,505 records for potential Settlement Class Members.  All records included a facially valid email address. Azari Decl. ¶ 9.  On December 1, 2020, Epiq sent 527,505 Email Notices to all potential Settlement Class Members for whom a facially valid email address was available.  The Email Notice used an embedded html text format.  This format provided easy to read text without graphics, tables, images and other elements that would increase the likelihood that the message could be blocked by Internet Service Providers (ISPs) and/or SPAM filters.  Azari Decl. ¶ 10.  Each Email Notice was transmitted with a unique message identifier and included an embedded link to the case website. *Id*.

If the receiving email server could not deliver the message, a "bounce code" was returned along with the unique message identifier.  For any Email Notice for which a bounce code was received that indicated the message was undeliverable, at least two additional attempts were made to deliver the Notice by email.  *Id*. ¶ 11.  After completion of the Email Notice effort, 32,499 Email Notices remain undeliverable.  As of February 5, 2021, an Email Notice was delivered to 495,006 of the 527,505 identified Settlement Class Members - a deliverable rate and reach of 93.8%.  *Id*. ¶ 12.

On November 30, 2020, a neutral, informational settlement website was established (www.RichardsServiceDisruptionClassAction.com) to reflect the Settlement of the case.  Settlement Class Members are able to obtain additional information and documents including the Long Form Notice, Summary Notice, Claim Form, Exclusion Form, Settlement Agreement, Preliminary Approval Order, and a list of answers to Frequently Asked Questions ("FAQs").  Settlement Class Members were also able to file an online claim.  The website also includes information on how potential Settlement Class Members can opt-out of or object to the Settlement if they choose.  The website address was prominently displayed in all printed notice documents. Azari Decl. ¶ 13. As of March 1, 2021, there have been 163,425 visitors to the case website and 745,087 website page views presented. *Id*. ¶ 14.

On November 30, 2020, a toll-free number (1-855-917-3581) was also established.  Callers can call the toll-free telephone number and hear an introductory message.  Callers then have the option to continue to get information about the Settlement in the form of recorded answers to FAQs. Callers can also request that a Long Form Notice or Claim Form be mailed to them.  This automated phone system is available 24 hours per day, 7 days per week.  As of March 1, 2021, Epiq handled 5,346 calls to the toll-free telephone number for a total of 16,342 minutes.  As of March 1, 2021, Epiq has mailed 872 Long Form Notices and Claim Forms as a result of requests to the toll-free telephone number. *Id*. ¶ 15. Epiq also established a postal mailing address to allow Settlement Class Members the opportunity to request additional information or ask questions. *Id*. ¶ 16.

In early February, the Parties conferred with Epiq and agreed that additional notice efforts should be undertaken to further stimulate additional claims. *Id*. ¶ 17. Accordingly, on February 10, 2021, Epiq sent a Reminder Email Notice to all Settlement Class Members with a valid email, who had not already filed a claim.  The Reminder Email Notice stressed the impending claim filing deadline and included a link to the case website. *Id*.

The deadline to request exclusion from the Settlement or to object to the Settlement was February 1, 2021.  As of March 1, 2021, Epiq had received six requests for exclusion. This represents a miniscule opt-out rate of 0.0011%, further supporting approval. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig*., 327 F.R.D. 299, 320–21 (N.D. Cal. 2018) ("[O]nly 406 Settlement Class

Members have opted out of the Settlement (about 0.0005% of the Class). Such low rates of objections and opt-outs are 'indicia of the approval of the class.'") (citations omitted) (quoting *Hughes v. Microsoft Corp.*, No. 98-CV-01646, 2001 WL 34089697, at *1, *8 (W.D. Wash. Mar. 26, 2001)).

As of March 1, 2021, there was one objection to the Settlement, which was filed directly with the Court.  Epiq is aware of no other objections or exclusions. Azari Decl. ¶ 18.

The reach rate of 93.8% of the Settlement Class is at the high end of the range suggested in the Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide. *Id.* ¶¶ 21–22.  Thus, the Notice Plan was designed to reach as many of the Settlement Class Members as possible, and fully comports with due process under the circumstances of this case. The proposed notice plan thus provides the best method of notice practicable for the Class. *See, e.g.*, *Rannis v. Recchia*, 380 F. App'x. 646, 650 (9th Cir. 2010) (finding best notice practicable where reasonable efforts were taken to ascertain class members addresses).

## D.   <u>Claims Experience</u>

As of March 1, 2021, Epiq has received 22,017 Claim Forms (21,790 online and 227 paper). Since the deadline to file a claim was February 15, 2021, Epiq will continue to receive and process claim forms (it is common to receive timely postmarked claims upwards of 10–20 business days after a claims filing deadline, especially this year with the USPS mail handling and delivery delays). Azari Decl. ¶ 19. This claims rate of 4.17% is in line with that seen in many other consumer class action cases,[5] and quite similar to that seen in the analogous service disruption cases, *Fuentes v. UniRush, LLC* No. 1:15-cv-08372 (S.D.N.Y. Sept. 12, 2016) ("*RushCard*") and *Lewis v. Green Dot Corporation*, Case No. 2:16-cv-03557 (C.D. Cal. Nov. 22, 2017) ("*Green Dot*").

Specifically, in *Green Dot*, the class comprised 57,808 cardholders.  With respect to the equivalent of Tiers 1 and 2 here, 2,050 completed claims were received and paid, comprising a

---

[5] *See, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (approving 35 million-member settlement class when only 1.183 million—less than 4%—filed claims; "settlements have been approved where less than five percent of class members file claims"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc) (noting evidence that claims rates in consumer class settlements "rarely" exceed 7%, "even with the most extensive notice campaigns");

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:19-cv-06864

claims rate of 3.5%.  Likewise, in *RushCard*, there were 35,334 claims in Tiers II and III (the equivalents to Tiers 1 and 2 here), for a total distribution of $3,439,868.64; a claims rate of 8.3%. (ECF No. 40-8 ¶ 40).

Accordingly, the claims rate here was, as predicted in Plaintiffs' Motion for Preliminary Approval, between 3.5% and 8.3%. (ECF No. 40 at 28).

## IV.   ARGUMENT

### A.   The Court Should Certify the Settlement Class

As the Court found at the preliminary approval stage, the Settlement Class is appropriate for certification under Rule 23(a) and 23(b) in this settlement context. (ECF No. 46 at 6–10). Because no substantive changes have occurred since that finding, and no objections or other arguments have been raised in opposition to a finding of certification, the Court's previous finding should be made final here. *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 887 (C.D. Cal. 2016) ("Because circumstances have not changed, and for the reasons set forth in its Order of November 12, 2015, the court hereby affirms its order certifying the class for settlement purposes under Rule 23(e).") (citing *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-2147, 2012 WL 1378677, *4 (D. Ariz. 2012) ("The Court has previously certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and hereby reconfirms its order certifying a class.")).[6]

### B.   The Settlement Merits Final Approval

Rule 23(e) requires judicial approval of the compromise of claims brought on a class basis. Amended Rule 23(e) standardizes the factors governing final approval, stating that approval is proper upon a finding that the settlement is "fair, reasonable, and adequate" after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

---

[6] Plaintiffs incorporate by reference their prior arguments regarding certification of the Settlement Class, as set forth in the Motion for Preliminary Approval, rather than repeating them here.  (ECF No. 40 at 17–18)

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e).

The applicable standard for preliminary approval also now incorporates these factors, which Plaintiffs analyzed at the preliminary-approval stage, (ECF No. 40 at 19–27), along with the Northern District of California's Procedural Guidance for Class Action Settlements' multiple applicable criteria for preliminary approval and this Circuit's factors for final approval, (*id.* at 27–30). Accordingly, Plaintiffs incorporate by reference their previously submitted argument and analysis. To avoid further burdening the record, Plaintiffs recap highlights of those arguments below and address any new matters evolving since that filing.

### 1.  Adequacy of Relief: Costs, Risks, and Delay

The relief provided by the Settlement is fair, reasonable, and adequate, particularly in light of the risks and delay trial and associated appeals would wreak. At bottom, Plaintiffs faced difficult hurdles in successfully maintaining this action in this Court, or in certifying a class. (ECF No. 40-8 ¶ 29).

If the Parties had been unable to resolve this case through settlement, the litigation would likely have been protracted and costly. Although Named Plaintiffs and Class Counsel believe that the claims asserted are meritorious, continued litigation against Defendants posed significant risks that made any recovery uncertain. At the outset, continued litigation of this matter would require the Court to resolve several separate threshold questions concerning the viability of the litigation. First, the Court would have to decide the question of the arbitrability of Plaintiffs' claims. Defendants have maintained that this provision should be enforced and that all claims should be submitted to individual arbitration proceedings. A victory by Defendants would have likely ended any relief being made available to any one class member as it is highly improbable that any class member would

have pursued their claims in arbitration based on the amount of any one class member's claim and the costs of the arbitration. Next, pursuant to the express terms of the agreement between Chime and Settlement Class Members, any claims arising from outages, such as the Service Disruption, are barred. If the Named Plaintiffs had been able to overcome these difficult hurdles, the Court would have to turn to the question of class certification and Defendants' contention that individualized factual inquiries and damages and legal variation among the laws of the states would preclude class certification. (ECF No. 40-8 ¶¶ 30–32). "Even if plaintiff[s] were to prevail at trial, there is a real risk that plaintiff[s] could recover nothing." *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 327 (C.D. Cal. 2016) ("*Spann I*").[7]

In light of these difficult issues, the Settlement's monetary benefits are appropriate and the timing in which they will be provided is significant, going well beyond the potential litigated recovery. Class members already received benefits without taking any action; Defendants made the Courtesy Payment and Transaction Credit benefits available automatically and immediately, in the sum of $5,960,563. Further, under the Settlement, Settlement Class Members can receive compensation for losses without the burden of providing any documentation to support their damages. Settlement Class Members with more significant losses may file supporting documentation to seek greater relief. Combined, and subject to the terms of the Agreement, Tiers 1 and 2 provide up to $5,500,000 in additional relief available to Settlement Class Members submitting valid claims.

---

[7] For example, Defendants would likely contend that temporary loss of access to funds, without more, is not compensable harm. *See, e.g., In re Sony Gaming Network & Customer Data Breach and Security Litig.*, 903 F. Supp. 2d 942, 963 (S.D. Cal. 2012) (rejecting negligence claim because nothing in the agreement suggested a duty to provide uninterrupted service); *Turner v Talbert*, 2011 WL 4479766, *2 (M.D. La. 2011) (temporary account freeze was not compensable injury); *Kuhns v. Scottrade*, 868 F.3d 711, 718 (8th Cir. 2017) ("Massive class action litigation should be based on more than allegations of worry and inconvenience") (holding no contract damages absent allegation of misuse or information); *Jones v. Commerce Bank, N.A.*, 2006 WL 2642153, *2 (S.D.N.Y 2006) ("Plaintiff has submitted no evidence that she suffered any compensable injury stemming from the loss of access to these funds between May 22, 2005 and June 9, 2005"); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, *8 (S.D.N.Y. 2019) ("Rudolph does not identify any such injury that arose from the brief freeze placed on her own account. Absent an allegation of how an account freeze resulted in a loss to Rudolph, the claim that she was injured by the temporary inability to access her account does not demonstrate injury."); *Miller v. Bank of Am. N.T. & S.A.*, 2014 WL 5091897, *11 (Cal. Super. 2014) ("temporary inability to access an account, without more, does not constitute 'actual damages,'" under California Consumer Legal Remedies Act, and "Plaintiff provides no way to calculate compensation under this theory—and it is compensation, as such, which is the essence of damages available under the CLRA.").

Considering the significant threshold challenges, this is an exceptional result. (ECF No. 40-8 ¶¶ 33–35).

In addition, the Settlement terms are favorable to the Class and meet the demands in the Complaint. All Class Members received monetary benefits under the Courtesy Payment and Transaction Credit provisions of the Settlement and Class Members with losses may elect to file a claim under Tier 1 or Tier 2 for additional monetary relief. SA § IV.2–3. These terms strongly suggest that Class benefits were not traded for individual benefits. *See Hendricks v. Starkist Co.*, No. 13-cv-00729-HSG, 2016 WL 5462423, at *10 (N.D. Cal. Sept. 29, 2016).

The Settlement provides immediate and significant benefits for Settlement Class Members they otherwise may not receive, providing virtually everything Plaintiffs sought in the Complaint.

In evaluating the Settlement, it is of course relevant to consider the amount that Settlement Class Members will recover individually. Settlement Class Members with an active Chime account previously received a credit to their account in the amount of $10.00 and those who incurred certain transaction fees during the Service Disruption received a credit to cover those fees.  If finally approved by the Court, Settlement Class Members who filed a claim for reimbursement of financial or other losses suffered as a result of the Service Disruption will be compensated for those losses. Subject to offsets for amounts previously provided, Settlement Class Members who did submit supporting documentation, but attest to having losses, will be eligible for a payment of up to $25.00. Subject to the same offset, Settlement Class Members with more significant losses and who provided Reasonable Documentation of such losses will be eligible for a payment of up to $750.00. (ECF No. 40-8 ¶ 33).

The forms of "discernible benefits" provided under the Settlement to Class Members "achieve the primary objective of the lawsuit" and weigh in favor of approving the Settlement.  *See Ko v. Natura Pet Prods., Inc.*, No. C 09-02619 SBA, 2012 WL 3945541, at *4 (N.D. Cal. Sept. 10, 2012); *see also Stern v. Superior Court*, 129 Cal. Rptr. 2d 275, 282 (Cal. Ct. App. 2003).

As set out in more detail in the Motion for Preliminary Approval (ECF No. 40 at 23–25), the Settlement is also well within the range of settlements approved in quite similar consumer class actions involving analogous service disruptions, each of which achieved final approval. *See Fuentes*

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 4:19-cv-06864

*v. UniRush, LLC* No. 1:15-cv-08372, ECF No. 49 (S.D.N.Y. Sept. 12, 2016) (Final Approval Order) ("*RushCard*") (finding that the "[s]ettlement reflects an outstanding result for the Class in a case with a high level of risk"); *Lewis v. Green Dot Corporation*, Case No. 2:16-cv-03557, ECF No. 109 at 13 (Final Approval Order) (C.D. Cal. Nov. 22, 2017) ("*Green Dot*") (finding that the "settlement benefits were fair, adequate, reasonable and compelling in light of the litigation risks in th[e] case").

Based on Class Counsel's experience in *RushCard* and *Green Dot*—and on the claims received to date as well as considering the relief already provided to all Settlement Class Members, the settlement is fair, adequate, and reasonable and has provided substantial relief to Settlement Class Members. (ECF No. 40-8 ¶ 41).

The proposed total Settlement value here of $12,462,563[8] is substantial by any measure and certainly falls within a range of approval.  This is particularly true given the real risk that Plaintiffs could have recovered nothing if litigation had continued, due to the arbitration provision, and the proof of damages that could be recovered in this case not being certain. (ECF No. 40-8 ¶ 24).

## 2.    Adequacy of Relief:  Proposed Method of Distributing Relief

Relief will be distributed to the Class via the use of Claim Forms on which Class Members will submit a brief explanation as to how the Service Disruption caused them a loss and the amount of loss claimed as a result of the Service Disruption. SA § IV.6.b. To the extent Settlement Class Members seek to recover under Tier 2, they must also provide Reasonable Documentation, SA § IV.6.c, consisting of any documentation tending to establish Substantiated Losses fairly traceable to the Service Disruption, including receipts, account statements, letters or records from employers confirming payments or losses, and letters from landlords confirming payments or losses, SA § II.19. The claims period was open for 75 days after the Notice Deadline. SA § II.4.

---

[8] Consisting of: $5,960,563 Courtesy Payment; up to $5,500,000 available in Tiers 1 and 2; $250,000 for Notice and Administration; the $500 per Named Plaintiff for service awards; and $750,000 for attorneys' fees, costs, and expenses.  As discussed supra, subject to the terms of the Settlement Agreement, Defendants are not creating a settlement fund beyond the $1,500,000 from which the Tier 1 and Tier 2 claims will initially draw, but instead will only pay validated claims up to the Tier Maximums.  Should the validated amounts claimed not reach the Tier Maximums, Defendants will retain those funds.

3.      **Adequacy of Relief:  Attorneys' Fees**

The Settlement permits Plaintiffs to seek no more than $750,000 in attorneys' fees, costs, and expenses, which amount will be paid by Defendants separate and apart from the relief obtained for the Settlement Class. Plaintiffs filed their Motion for Attorneys' Fees, Costs, and Expenses, and Service Awards on December 30, 2020, (ECF No. 49), seeking those amounts, as further articulated in that motion.

4.      **Rule 23(e)(3) Agreements and Equality of Treatment.**

Finally, the Court should examine whether the Settlement provides preferential treatment to any class member. This analysis turns, among other things, on whether there is any disparity among what Class Members are poised to receive and, if so, whether the Settlement "compensates class members in a manner generally proportionate to the harm they suffered on account of [the] alleged misconduct." *Altamirano v. Shaw Indus., Inc.*, No. 13-CV-00939-HSG, 2015 WL 4512372, at *8 (N.D. Cal. July 24, 2015); *G.F. v. Contra Costa Cty.*, No. 13-CV-03667-MEJ, 2015 WL 4606078, at *14 (N.D. Cal. July 30, 2015) (analyzing whether settlement "appears uniform").

Here, Plaintiffs seek certification of a single class and all members of the proposed Settlement Class are entitled to the same benefits. All Settlement Class Members who do not exclude themselves will be eligible to submit claims for payment under Tier 1 or 2. The amounts of these reimbursements may vary, but those differences reflect the differing amounts of potential losses Settlement Class Members incurred (if any) because of the Service Disruption. Thus, each Settlement Class Member who submits a valid claim will be paid proportionate to the harm they suffered. (ECF No. 40-8 ¶ 44).

The Settlement Agreement authorizes a Service Award for each Named Plaintiff, in an amount to be determined by the Court but not to exceed $500, in recognition for the services they performed on behalf of the entire class that resulted in the Settlement. If approved by the Court, these Service Awards will be paid by Defendants separately from the relief obtained for the Settlement Class. Thus, the Service Awards will have no bearing on Class Relief. SA § X.1.

In evaluating whether the Settlement grants preferential treatment to Plaintiffs, the Court may consider whether there is a "significant disparity between the incentive award[] and the payments to

the rest of the class members" such that it creates a conflict of interest. *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013). More importantly, however, are "the number of class representatives, the average incentive award amount, and the proportion of the total settlement that is spent on incentive awards." *Staton v. Boeing, Co.*, 327 F.3d 938, 977 (9th Cir. 2003).

The Service Awards requested will not be "unreasonably large and thus unfair." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015). Rather, the awards contemplated here are much lower than "typical incentive awards in the Ninth Circuit, where $5,000 is presumptively reasonable." *Smith v. Am. Greetings Corp.*, No. 14-CV-02577-JST, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016); *see also Online DVD-Rental*, 779 F.3d at 947-48 (affirming awards of $5,000 to each of nine class representatives). The amount requested is appropriate given the time, effort, and risk of each Named Plaintiff's participation in this Action. (ECF No. 40-8 ¶ 45). Critically, the Settlement is not conditioned on the Court's approval of the Service Awards. SA § X.1; *Spann I*, 314 F.R.D. at 328-29 ("[B]ecause . . . the Settlement Agreement shall remain in force regardless of any service awards, the awards here are unlikely to create a conflict of interest between the named plaintiffs and absent class members."). Accordingly, the Named Plaintiffs' interests did not conflict with the interests of the Settlement Class. *Radcliffe*, 715 F.3d at 1161; (ECF No. 40-8 ¶ 45).

And, lastly, no Rule 23(e)(3) agreements are in place in this matter. (ECF No. 40-8 ¶ 52).

## C.    The District's Procedural Guidance

The Northern District of California's Procedural Guidance for Class Action Settlements directs that a motion for final approval should include:

> information about the number of undeliverable class notices and claim packets, the number of class members who submitted valid claims, the number of class members who elected to opt out of the class, and the number of class members who objected to or commented on the settlement. In addition, the motion for final approval should respond to any objections.

N.D. Cal., *Procedural Guidance for Class Action Settlements* (Dec. 5, 2018) (hereinafter "District Guidance").[9]

---

[9] Plaintiffs Motion for Preliminary Approval analyzed the District's Guidance as regards preliminary approval, and that analysis is incorporated by reference here. *See* (ECF No. 40 at 27–30).

17

As described above, 32,499 Email Notices (of the 527,505 identified Settlement Class Members) were returned undeliverable, a deliverable rate and reach of 93.8%.  Azari Decl. ¶ 12. As of March 1, 2021, Epiq had received 22,017 Claim Forms (21,790 online and 227 paper), and Epiq expects to receive and process additional claim forms upwards of 10–20 business days after the claims filing deadline, especially this year with the USPS mail handling and delivery delays. *Id*. ¶ 19.[10]  And, as of March 1, 2021, Epiq had received six requests for exclusion, and was aware of only one objection (which was filed directly with the Court). *Id*. ¶ 18.

The only objection was that of Pamela Sweeney. (ECF No. 51). Ms. Sweeney objects solely to the amount of attorneys' fees, arguing that because compensation paid under Tiers 1 and 2 is contingent upon the amount claimed within those Tiers, with funds reverting to Defendants if the full amounts under the Tiers are not claimed, attorney's fees could be disproportionate:  "In this senario [*sic*] the attorneys would be getting around 37% of the actual amount brought to the class members. It is impossible to know what this number will be and therefore I suggest the plaintiff attorneys get a set percent." (ECF No. 51 at 2).

However, as explained in Plaintiffs' Motion for Attorneys' Fees, Costs, and Expenses, Ms. Sweeney's objection wholly ignores the constructive common fund method, including the *amounts already provided* to Class Members without need for filing any claim. (ECF No. 49 at 16–18). Specifically, all combined, the relief made available via the Settlement amounts to $12,462,563.[11] Plaintiffs' fee, cost, and expense request of $750,000.00 represents just 6% of this total—an eminently reasonable request considering the 25% benchmark in this Circuit.

Notably for purposes of Ms. Sweeney's objection, even if the Court were only to consider the amounts already provided to Class Members ($5,960,563.00), the amounts for notice and administration ($250,000), and the required minimum payment of $1,500,000 related to Tiers 1 and 2—amounts which Defendants are required to pay (or have already paid) and are not dependent on claims rates or other contingencies—it amounts to $7,710,563, making Plaintiffs' $750,000 request

---

[10] Plaintiffs and Epiq will update the Court once additional claims statistics are available.  Azari Decl. ¶ 20.

[11] *See supra* note 8.

only 9.7% of the total.

Thus, under the scenario in which Defendants pay the least amount permitted by the Settlement, Plaintiffs' fee request still amounts to less than 10% of the amounts paid (with, notably, any amounts for fees, costs, and expenses being paid separately and in addition to this minimum); a sum far below the 25% benchmark, and even further below Ms. Sweeney's hypothetical amount of 37%. Ms. Sweeney's objection, therefore, is simply mistaken, and misapprehends—or fails to account for—each of the amounts provided, or made available by, the Settlement.

Accordingly, the objection should be overruled, and Plaintiffs' full fee request should be granted. In any event, Ms. Sweeney raised no objection to the substantive terms of the class relief provided by the Settlement and she raises no argument as to why final approval should not be granted.

**D.     The Notice Plan Met the Requirements of Due Process**

In any proceeding that is to be accorded finality, due process requires that interested parties be provided with notice reasonably calculated, under the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). That means the settlement notices must fairly apprise the class members of the terms of the proposed compromise and give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. *Id.* Additionally, the notice must be designed to have a reasonable chance of reaching a substantial percentage of the class members. *Id.* at 318 (explaining notice must be reasonably calculated to reach interested parties).

For classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Under amended Rule 23(c)(2)(B), "[t]he notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B) (effective Dec. 1, 2018).

Here, as explained above, the Notice plan was implemented via direct Email Notice, along the Settlement Website. Azari Decl. ¶ 8. Accordingly, the Court should find the Notice Plan was reasonably calculated to give actual notice to Settlement Class Members of the right to receive benefits from the Settlement, and to be excluded from or object to the Settlement, and that the Notice Program therefore met the requirements of Rule 23 and due process.

### E.    Final Appointment of Settlement Class Counsel

Under Rule 23(g)(1)(B), "a court that certifies a class must appoint class counsel [who must] fairly and adequately represent the interests of the class." In making this determination, courts generally consider the following attributes: the proposed class counsel's: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i–iv).

Plaintiffs request that the Court finally appoint John A. Yanchunis and Patrick A. Barthle II of Morgan & Morgan Complex Litigation Group and Joshua H. Watson of Clayeo C. Arnold, APC as Class Counsel. Class Counsel meet the requirements of Rule 23(g), as the Court previously recognized.  (ECF No. 46 at 10). They have invested considerable time and resources into the investigation of the facts underlying the claims, and have performed work critical to achieving benefits for the Class. (ECF No. 40-8 ¶¶ 11–12). The proposed Class Counsel firms have significant experience in similar class actions, and proposed Lead Counsel Mr. Yanchunis served as co-Lead Counsel in two very similar cases involving service disruptions, *RushCard* and *Green Dot*.  The firms have the experience to ensure the implementation of the Settlement and the resources to continue their representation of the Settlement Class.

### F.    Ninth Circuit Final Approval Factors

Amended Rule 23 and the District Guidance reflect many of the factors already used in this Circuit for final approval: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental

participant; (8) the reaction of the class members to the proposed settlement; and (9) whether the settlement is a product of collusion among the parties. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Because only factors (7) and (8) have the potential for evolution since the preliminary approval stage, with all others being previously addressed, they are further detailed below.

### 1. The Presence of a Government Participant

As described above, pursuant to the Notice Plan, the Attorney General of the United States, and the 51 Attorneys General as well as to 5 territories were notified pursuant to CAFA, 28 U.S.C. § 1715, and given an opportunity to raise any objections. No such objections have been received.

Likewise, so far as Plaintiffs are aware, no investigations by governmental and regulatory authorities were commenced relating to the Service Disruption, and, in any event, Plaintiffs here pursued their claims independently.

### 2. The Reaction of the Class Members to the Settlement

As described above, the reaction of the Settlement Class has been positive, with a claims rate of approximately 4%, only five (5) requests for exclusion; and only one (1) objection.

## V.   CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court enter an Order substantially in the form of the Proposed Final Approval Order attached hereto as **Exhibit B**, (1) finally approving the Settlement Agreement; (2) certifying, for settlement purposes, the proposed Settlement Class under Rule 23(a), (b)(3), and (e); (3) finding the class notice as implemented satisfied Rule 23 and due process; (4) finally appointing Plaintiffs as Settlement Class Representatives; (5) finally appointing as Class Counsel John A. Yanchunis and Patrick A. Barthle II of Morgan & Morgan Complex Litigation Group and Joshua H. Watson of Clayeo C. Arnold, APC, under Rule 23(g); (6) finally appointing Epiq Class Action and Claims Solutions, Inc. ("Epiq") as the Settlement Administrator; (7) overruling the objection; and (8) any other relief the Court deems just and proper.

DATED: March 1, 2021                                    Respectfully submitted,

                                                    **MORGAN & MORGAN**

**COMPLEX LITIGATION GROUP**

*/s/ John A. Yanchunis*
John A. Yanchunis (*pro hac vice*)
Patrick A. Barthle II (*pro hac vice*)
201 North Franklin Street 7th Floor
Tampa, Florida  33602
(813) 223-5505
(813) 223-5402 (fax)

Joshua H. Watson
CLAYEO C. ARNOLD, APC
Cal. Bar No. 238058
865 Howe Ave
Sacramento, CA 95825
(916) 777-7777 (tel)
(916) 924-1829 (fax)
jwatson@justice4you.com

***Attorneys for Plaintiffs and the
Proposed Settlement Class***

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that March 1, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed March 1, 2021.

*/s/ John A. Yanchunis*
John A. Yanchunis
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 N. Franklin Street,
7th Floor Tampa, FL 33602
Telephone:  813/223-5505
813/223-5402 (fax)