UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RICHARDS, et al., | Case No. 19-cv-06864-HSG |
| Plaintiffs, | **ORDER GRANTING MOTION FOR FINAL APPROVAL AND GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS' FEES** |
| v. | |
| CHIME FINANCIAL, INC., et al., | Re: Dkt. Nos. 49, 52 |
| Defendants. | |

Pending before the Court are the motions for final approval of class action settlement and for attorneys' fees, costs, and incentive award, filed by Plaintiffs Ryan Richards, Ruba Ayoub, Brandy Terbay, and Tracy Cummings. Dkt. Nos. 49, 52. The Court held a final fairness hearing on April 29, 2021. For the reasons detailed below, the Court **GRANTS** final approval. The Court also **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for attorneys' fees, costs, and incentive award.

## I. BACKGROUND

### A. Factual Background

Plaintiffs filed this putative class action against Defendant Chime Financial, Inc., The Bancorp Inc., and Galileo Financial Technologies, LLC based on a disruption in Defendant Chime's online-only banking services.[1] *See* Dkt. No. 1. ("Compl."). Plaintiffs allege that on October 16, 2019, Chime had a system-wide service outage (the "Service Disruption") that lasted approximately 72 hours. *See id.* at ¶ 22. During this Service Disruption, Chime's customers,

---

[1] Plaintiffs allege that Chime is an online-only bank; Galileo makes the Application Programming Interfaces that Chime uses to offer credit and debit cards, as well as banking and money transfer services; and Bancorp is a financial holding company whose wholly owned subsidiary, The Bancorp Bank, provides licensed banking services for Chime. *See id.* at ¶¶ 11–14.

approximately 5 million people, could not access their funds, including through card purchases and ATM withdrawals. *Id.* at ¶¶ 23, 31, 36, 43, 50–51. Following the Service Disruption, some customers reported incorrect account balances and unauthorized charges. *See id.* at ¶¶ 28, 33, 40.

Plaintiffs bring this action on behalf of a putative nationwide class of Chime customers who were denied access to their accounts beginning on October 16, 2019, as well as subclasses of customers denied access to their accounts who reside in Florida, Texas, Illinois, and Georgia. *See id.* at ¶ 57. And based on the above facts, Plaintiffs allege causes of action for negligence; unjust enrichment; breach of contract; conversion; breach of fiduciary duty; violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201; violation of the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. §§ 505/1 *et seq.*; and violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. §§ 510/2 *et seq.* *See* Compl. at ¶¶ 70–127.

**B.    Procedural History**

Plaintiffs initially filed this action on November 22, 2019. *See* Dkt. No. 1. The parties did not engage in motions practice, and instead attended two settlement conferences with Magistrate Judge Laurel Beeler. *See* Dkt. Nos. 28, 31, 35. With Judge Beeler's assistance, the parties reached an agreement in principle on May 12, 2020. *See* Dkt. No. 40-8, Ex. B at ¶ 19. The parties entered into a written settlement agreement in early August 2020. *See* Dkt. No. 40-1, Ex. A. Following the hearing on the unopposed motion for preliminary settlement approval, the parties submitted a revised settlement agreement that addressed concerns that the Court raised about the scope of the release, as well as the process for any objectors to object to the proposed settlement. *See* Dkt. No. 45-1, Ex. A ("SA"). The Court granted the motion on October 28, 2020. *See* Dkt. No. 46. The parties now seek final approval of the class action settlement and Plaintiffs seek attorneys' fees, costs, and an incentive award for the named Plaintiffs. *See* Dkt. Nos. 49, 52.

**i.    Settlement Agreement**

The key terms of the parties' settlement are as follows:

Class Definition:  The Settlement Class is defined as:

> All consumers who attempted to and were unable to access or utilize the functions of their accounts with Chime, as confirmed by a failed transaction or a locked card as recorded in Chime's business records,

SA at ¶ III.1.

> Settlement Benefits:

The parties have agreed to monetary relief that incorporates an offset for credits that Chime already provided to the accounts of active customers because of the outage:

- Approximately a month after the outage, Chime credited $10 to the accounts of all active customers as a "courtesy payment" because of the outage. SA at ¶ IV.1.a.

- Chime also credited the accounts of those customers who incurred "certain transaction fees" during the outage to cover those fees as a "transaction credit." *Id.* at ¶ IV.1.b.

The parties agree that these courtesy payments and transaction credits total $5,960,563.00 already paid to active Chime account holders due to the outage. *Id.* at ¶ IV.1.c. Defendants also concede that this litigation was "a motivation" for making these payments. SA at ¶ X.3. Pursuant to the settlement agreement, Defendants have agreed to further compensate settlement class members who submit verified claims under a two-tier system:

- Tier 1: Class members who claim they suffered loss due to the outage, but who do not have or do not wish to provide documentation to substantiate their loss will be entitled to up to $25 for verified claims. *See id.* at ¶ IV.2. Defendants' aggregate maximum payment under Tier 1 is $4 million. *See id.* at ¶ IV.2.c. If the amount of verified claims under Tier 1 is less than $4 million, Defendants will retain any unclaimed amount, except to the extent that such funds are necessary to fully or partially satisfy Tier 2 claims. *Id.*

- Tier 2: Class members who claim they suffered loss due to the outage and have "reasonable documentation" to substantiate their loss will be entitled to up to $750, but not more than their verified loss. *See id.* at ¶ IV.3. Those who fail to provide documentation will be considered under Tier 1. Defendants' aggregate maximum payment under Tier 2 is $1.5 million, and any residual money unclaimed under Tier 1 can be used to pay Tier 2 claims in excess of the $1.5 million cap. *See id.* at

¶ IV.6.d.

All claims under both Tiers will be verified using a two-step system. *See id.* at ¶ IV.6.b. Under both Tiers, putative class members will have to submit a brief explanation, under penalty of perjury, as to how the outage caused them loss and what amount of loss they purport to have suffered. *See id.* Those submitting claims under Tier 2 will also be required to submit reasonable documentation to support their claims. *Id.* at ¶ IV.6.c. Defendants and the settlement administrator will then confirm through Chime's business records that the putative class member (a) held a Chime account at the time; and (b) either attempted a financial transaction that failed or had their card locked as a result of the outage. *Id.* at ¶ IV.6.b. During the hearing, Defendants confirmed that despite the service disruption, they have accurate records of attempted transactions during the relevant time period.

Under the settlement agreement, "[a]ny prior money received by a Settlement Class Member from Chime in connection with the Service Disruption will be offset against" the payment. *See id.* at ¶¶ IV.3.a, IV.3.b. Thus, any verified claims under Tier 1 and Tier 2 will be reduced by the amount the class member already received as a (1) courtesy payment; or (2) transaction credit. *See id.* At a minimum, however, Defendants will pay $1.5 million under the settlement agreement. *See id.* at ¶ IV.5.

*Cy Pres* Distribution: If the claim payments under Tiers 1 and 2 do not reach the $1.5 million minimum under the settlement agreement, Defendants will distribute funds to reach this minimum to the East Bay Community Law Center as the *cy pres* recipient. *See* SA at ¶ IV.5. Defendants will, however, keep any money available for settlement but unclaimed above this $1.5 million threshold. *Id.*

Release: All settlement class members will release:

> [A]ny and all claims, demands, rights, actions or causes of action, liabilities, damages, losses, obligations, judgments, suits, penalties, remedies, matters and issues of any kind or nature whatsoever, whether known or unknown, contingent or absolute, existing or potential, suspected or unsuspected, disclosed or undisclosed, matured or unmatured, liquidated or unliquidated, legal, statutory or equitable, that have been or could have been asserted, or in the future might be asserted, in the Actions or in any court, tribunal or proceeding by or on behalf of the Named Plaintiffs, any and all of the

4

members of the Settlement Class, and their respective present or past heirs, spouses, executors, estates, administrators, predecessors, successors, assigns, parents, subsidiaries, associates, affiliates, employers, employees, agents, consultants, independent contractors, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, investment bankers, underwriters, lenders, and any other representatives of any of these Persons, whether individual, class, direct, representative, legal, equitable or any other type or in any other capacity whether based on federal, state, local, statutory or common law or any other law, rule or regulation, including the law of any jurisdiction outside the United States, against any or all of the Released Parties, which the Named Plaintiffs or any member of the Settlement Class ever had, now has, or hereinafter may have, by reason of, resulting from, arising out of, relating to, or in connection with, the allegations, facts, events, transactions, acts, occurrences, statements, representations, omissions, or any other matter, thing or cause whatsoever, or any series thereof, embraced, involved, set forth or otherwise related to the alleged claims or events in the Action or the Service Disruption, including, but not limited to, use by a class member of their Chime Account up to and extending through the Service Disruption.

SA at ¶ II.20.  In addition, class members:

waive any rights they may have under California Civil Code Section 1542, Section 20-7-11 of the South Dakota Codified Laws, and any other similar law, each of which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor, and a waiver of any similar, comparable, or equivalent provisions, statute, regulation, rule, or principle of law or equity of any other state or applicable jurisdiction.

*Id*. at ¶ IX.4.

Class Notice:  A third-party settlement administrator will implement the "Notice Program," which includes  (1) an email Notice and (2) a Notice on the Settlement Website.  *See* SA at ¶¶ V.I–VII.11; *see also* Dkt. No. 45-2, Ex. 2.   The settlement administrator will send the Notice to class members by email within 30 days of the Court's order preliminarily approving the settlement.  *See id.* at ¶ II.15, VII.1, VII.5.  The settlement administrator will make reasonable efforts to locate updated email addresses for class members whose Notices are returned as undeliverable.  *Id.* at ¶ VII.1.  The Notice will include:  the nature of the action, a summary of the settlement terms, and instructions on how to object to and opt out of the settlement, including relevant deadlines.  *See* Dkt. No. 45-2, Ex. 2.

Opt-Out Procedure: Putative class members may opt out of or object to the settlement and/or Class Counsel's application for attorneys' fees, costs, and expenses. SA at ¶¶ II.17–II.18, VII.4–VIII.

Incentive Award: Named Plaintiffs as class representatives may apply for incentive awards of no more than $500 each. SA at ¶ X.1.

Attorneys' Fees and Costs: Class Counsel may file an application for attorneys' fees not to exceed $750,000. SA at ¶ X.2.

## II. ANALYSIS

### A. Final Settlement Approval

#### i. Class Certification

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019–1022 (9th Cir. 1998). Because no facts that would affect these requirements have changed since the Court preliminarily approved the class on October 28, 2020, this order incorporates by reference the Court's prior analysis under Rules 23(a) and (b) as set forth in the order granting preliminary approval. *See* Dkt. No. 46 at 6–10.

#### ii. The Settlement

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). The Court may finally approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) ("The district court's role in evaluating a proposed settlement must be tailored to fulfill the objectives outlined above. In other words, the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties . . . ."). To assess whether a proposed settlement comports with Rule 23(e), the Court "may consider some or all" of the following factors: (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely

1    duration of further litigation; (3) the risk of maintaining class action status throughout the trial;

2    (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the

3    proceedings; (6) the experience and views of counsel; (7) the presence of a governmental

4    participant; and (8) the reaction of the class members to the proposed settlement. *Rodriguez v.*

5    *West Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009); *see also Hanlon*, 150 F.3d at 1026. "The

6    relative degree of importance to be attached to any particular factor" is case specific. *Officers for*

7    *Justice*, 688 F.2d at 625.

8           In addition, "[a]dequate notice is critical to court approval of a class settlement under Rule

9    23(e)." *Hanlon*, 150 F.3d at 1025. As discussed below, the Court finds that the proposed

10   settlement is fair, adequate, and reasonable, and that Class Members received adequate notice.

### a. Adequacy of Notice

12          Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable

13   manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

14   Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including

15   individual notice to all members who can be identified through reasonable effort." The notice

16   must "clearly and concisely state in plain, easily understood language" the nature of the action, the

17   class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ.

18   P. 23(c)(2)(B). Although Rule 23 requires that reasonable efforts be made to reach all class

19   members, it does not require that each class member actually receive notice. *See Silber v. Mabon*,

20   18 F.3d 1449, 1454 (9th Cir. 1994) (noting that the standard for class notice is "best practicable"

21   notice, not "actually received" notice).

22          The Court finds that the notice and notice plan previously approved by the Court was

23   implemented and complies with Rule 23(c)(2)(B). *See* Dkt. No. 46 at 5–6, 15–16. The Court

24   ordered that the third-party settlement administrator send class notice via email based on a class

25   list Defendant provided. *Id*. at 16. Epiq Class Action & Claims Solutions, Inc., the third-party

26   settlement administrator, represents that class notice was provided as directed. Dkt. No. 52-1, Ex.

27   A ("Azari Decl.") at ¶¶ 6, 8–12. Epiq received a total of 527,505 records for potential Class

28   Members, including their email addresses. *See id.* at ¶ 9. If the receiving email server could not

deliver the message, a "bounce code" was returned to Epiq indicating that the message was undeliverable. *See id.* at ¶ 11. Epiq made two additional attempts to deliver the email notice. *Id.* As of Mach 1, 2021, a total of 495,006 email notices were delivered, and 32,499 remained undeliverable. *See id.* at ¶ 12.

In light of these facts, the Court finds that the parties have sufficiently provided the best practicable notice to the Class Members.

### b. Fairness, Adequacy, and Reasonableness

Having found the notice procedures adequate under Rule 23(e), the Court next considers whether the entire settlement comports with Rule 23(e).

### 1. Strength of Plaintiff's Case and Litigation Risk

Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case. *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010). Courts "may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365-CW, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). Additionally, difficulties and risks in litigating weigh in favor of approving a class settlement. *Rodriguez*, 563 F.3d at 966. "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014) (quotations omitted).

The Court finds that the amount offered in settlement is reasonable in light of the complexity of this litigation and the substantial risk that Plaintiffs would face in litigating the case given the nature of the asserted claims. *See* Dkt. No. 52 at 12–15. Were the case to proceed, Defendants would likely move to compel individual arbitration of Plaintiffs' claims, and would challenge Plaintiffs' ability to recoup any damages arising from the Service Disruption. *Id.* at 12–13. Defendants contend that under the express terms of the agreement between Chime and Class Members, "any claims arising from outages, such as the Service Disruption, are barred." *Id.* at 13. Additionally, Defendants would likely argue that the temporary loss of access to funds from the

Service Disruption does not constitute compensable harm. *See id.* at 13, & n.7. In reaching a settlement, Plaintiffs have ensured a favorable recovery for the class. *See Rodriguez*, 563 F.3d at 966 (finding litigation risks weigh in favor of approving class settlement). Accordingly, these factors weigh in favor of approving the settlement. *See Ching*, 2014 WL 2926210, at *4 (favoring settlement to protracted litigation).

### 2. Risk of Maintaining Class Action Status

In considering this factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed. Certifying a class encompassing approximately over 500,000 Chime account holders presents complex issues, including factual inquiries about the impact of the Service Disruption on individual account holders across the country, that could undermine certification. *See* Dkt. No. 52 at 13. Accordingly, this factor also weighs in favor of settlement.

### 3. Settlement Amount

The amount offered in the settlement is another factor that weighs in favor of approval. Based on the facts in the record and the parties' arguments at the final fairness hearing, the Court finds that the settlement amount falls "within the range of reasonableness" in light of the risks and costs of litigation. *See* Dkt. No. 52 at 13–15; Dkt. No. 36-1 at ¶ 55; *see also Villanueva v. Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2016 WL 1070523 *4 (N.D. Cal. March 18, 2016) (citing cases).

Here, Class Members already received $5,960,563 from Defendants, including a $10 courtesy payment received by all class members and transaction credits to cover certain fees that some Chime account holders incurred during the Service Disruption. *See* SA at ¶¶ IV.1.a–b. Although the parties have acknowledged the difficulty in assessing the precise scope of any further damages, the Settlement Agreement provided a means for class members to receive compensation for additional losses. Class Members could recoup up to $25 without documentation and up to $750 if they provided documentation. Under this process, Defendants agreed to pay up to $5.5 million for any verified damages suffered during the 72-hour Service Disruption. Epiq confirmed that as of April 28, 2021, it received 22,325 unique Claim Forms (26 were duplicates). *See* Dkt. No. 67-1 ("Engler Decl.") at ¶ 7. Epiq received 16,843 Claim Forms under Tier 1 (eligible for up

to \$25); 5,434 Claim Forms under Tier 2 (eligible for up to \$750); and 48 Claim Forms that did not specify whether they were under Tier 1 or 2. *Id.* Following the claims adjustment process, Epiq verified 22,128 of the 22,325 claims.[2] *Id.* at ¶¶ 7, 13. Epiq identified 22,033 valid claims under Tier 1, which after offsets for money previously received by those Class Members for the Service Disruption, total \$330,495.00, or an average of \$15 per claim. *Id.* at ¶ 13. Epiq also identified 95 valid claims under Tier 2, which after offsets for money previously received by those Class Members for the Service Disruption, total \$7,375.32, or an average of approximately \$77.63 per claim. *Id.*

Given the relatively short duration of the Service Disruption and the significant litigation risks discussed above, the Court finds that this factor weighs in favor of approval. *See, e.g.*, *Lewis v. Green Dot Corp.*, Case No. 2:16-cv-03557, ECF No. 109 at 13 (C.D. Cal. Nov. 22, 2017) (approving similar tiered settlement amount based on service disruption); *Fuentes v. UniRush, LLC*, Case No. 1:15-cv-08372, ECF No. 49 (S.D.N.Y. Sept. 12, 2016) (same).

### 4. Extent of Discovery Completed and Stage of Proceedings

The Court finds that Class Counsel had sufficient information to make an informed decision about the merits of the case. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). The parties settled only after they had informally exchanged significant information relevant to Plaintiffs' claims. *See* Dkt. No. 40 at 15; Dkt. No. 40-8, Ex. B at ¶ 46. Thus, the Court is persuaded that the Class Counsel entered the settlement discussions with a substantial understanding of the factual and legal issues, sufficient to allow them to assess the likelihood of success on the merits. This factor weighs in favor of approval.

### 5. Experience and Views of Counsel

The Court next considers the experience and views of counsel. "[P]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez*, 563 F.3d at 967 (quotations omitted).

---

[2] Epiq explained that 197 claims were not approved: 184 claims were ineligible because they did not match Class Member records, and 13 claims were ineligible based on account holders' answers to the eligibility questions on the Claim Form. *See* Engler Decl. at ¶ 13.

Accordingly, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008). Class Counsel has substantial experience in similar class actions. *See* Dkt. No. 40-8, Ex. B at ¶¶ 11–13; *see also* Dkt. No. 40-9, Ex. 1. The Court recognizes, however, that courts have diverged on the weight to assign counsel's opinions. *Compare Carter v. Anderson Merch.*, LP, 2010 WL 1946784, at *8 (C.D. Cal. May 11, 2010) ("Counsel's opinion is accorded considerable weight."), *with Chun-Hoon*, 716 F. Supp. 2d at 852 ("[T]his court is reluctant to put much stock in counsel's pronouncements. . . ."). This factor's impact is therefore modest, but favors approval.

### 6. Reaction of Class Members

The reaction of the Class Members supports final approval. "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528–29 (C.D. Cal. 2004); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval.").

Class notice, which was served in accordance with the method approved by the Court, advised the Class of the requirements to object to or opt out of the settlement. The deadline to do so was February 1, 2021. *See* Dkt. No. 48. Epiq received one objection and only six requests for exclusion, out of the 495,006 Class Members who received email notice. *See* Azari Decl. at ¶¶ 12, 18. The objection itself, filed by Pamela Sweeney, is not directed at the settlement amount or settlement process itself. *See* Dkt. No. 51. Rather, Ms. Sweeney raises concerns with the $750,000 in attorneys' fees that Class Counsel seeks. *Id.* The Court shares Ms. Sweeney's concerns and discusses this in more depth in Section II.B.i below. Nevertheless, the Court finds that the minimal number of objections and opt-outs in comparison to the size of the class indicate overwhelming support among the Class Members and weigh in favor of approval of the settlement. *See*, *e.g.*, *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement where 45 of approximately 90,000 class members objected); *Rodriguez v. West Publ. Corp.*, Case No. CV05–3222 R, 2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007)

(finding favorable class reaction where 54 of 376,301 class members objected).

\* \* \*

After considering and weighing the above factors, the Court finds that the settlement agreement is fair, adequate, and reasonable, and that the settlement Class Members received adequate notice. Accordingly, Plaintiff's motion for final approval of the class action settlement is **GRANTED**.

### B. Attorneys' Fees, Costs and Expenses, and Incentive Award

In its unopposed motion, Class Counsel asks the Court to approve an award of $750,000 in attorneys' fees and costs. Dkt. No. 49 at 1–22. Class Counsel also seeks a $500 incentive award for each of the four Named Plaintiffs. *Id.* at 22–24.

#### i. Attorneys' Fees & Costs

##### a. Legal Standard

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In a state law action—like this one—state law also governs the calculation of attorneys' fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). Nevertheless, the Court may still look to federal authority for guidance in awarding attorneys' fees. *See Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253, 1264 n.4 (2005) ("California courts may look to federal authority for guidance on matters involving class action procedures.").

Under California law, the "percentage of fund method" is proper in class actions. *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 506 (2016). In addition, "trial courts have discretion to conduct a lodestar cross-check on a percentage fee." *Id.* The "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003). Trial courts "also retain the discretion to forgo a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee." *Laffitte*, 1 Cal. 5th at 506. Class Counsel is also entitled to recover "those out-of-pocket expenses that would

normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quotations omitted).

### b. Discussion

Class Counsel here seeks $750,000 in attorneys' fees, costs, and expenses. *See* Dkt. No. 49 at 1–22. Under the settlement agreement, this amount will not reduce the monetary relief available to Class Members. Class Counsel acknowledges that its lodestar and accrued litigation expenses are significantly less than the $750,000 requested. *See id.* at 6. As of the filing of the motion for attorneys' fees, Class Counsel had incurred $295,915.20 in fees for approximately 380 hours of work, and $8,146.75 in litigation expenses.[3] *See* Dkt. No. 49-1, Ex. 1 ("Yanchunis Decl.") at ¶¶ 12, 23. Nevertheless, Class Counsel urges that the full $750,000 is appropriate under the "percentage of fund" method. *See* Dkt. No. 49 at 7.

Using federal law for guidance, 25% of the common fund is the benchmark for attorney fee awards. *See*, *e.g.*, *In re Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."). The Court considers the reasonableness of the percentage requested in light of the factors endorsed by the Ninth Circuit, with the 25% award as a starting point. The Ninth Circuit has identified several factors that a court should consider to determine whether to adjust a fee award from the benchmark: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiff; and (5) awards made in similar cases. *See Vizcaino*, 290 F.3d at 1048–50.

Class Counsel argues that the settlement in this case "provides for a constructive common fund" of $12,462,563.00. *See* Dkt. No. 49 at 9–11, & n.10. In particular, Counsel points to the following:

---

[3] As discussed in more detail below, when the Court directed counsel to provide billing records to support its lodestar calculation, counsel added an additional 110.9 hours of work and approximately $85,000 more in fees. *See* Dkt. No. 70. Almost $20,000 of this newly-claimed time was incurred over two days in 2019 by a single attorney who discussed the case and retainer agreement with Plaintiffs. It gives the Court pause that counsel did not show more attention to detail before being pressed by the Court.

- Prior to entering into the settlement agreement, Defendants paid all customers a $10 "courtesy payment," and also credited some customers a "transaction credit" to cover "certain transaction fees" incurred because of the Service Disruption. *See* SA at ¶ IV.1.a–b. The parties agree that these courtesy payments and transaction credits total **$5,960,563.00**. *Id.* at ¶ IV.1.c.

- Under the settlement agreement, Class Members may make claims for losses under Tiers 1 and 2 up to an aggregate total of **$5.5 million**. *See* SA at ¶¶ IV.2–3, 5.

- Under the settlement agreement, Defendants separately have agreed to pay for costs of notice and claims administration up to **$250,000**. *See* SA at ¶¶ VI.3, VII.8.

- Under the settlement agreement, Defendants also separately agreed to pay up to **$750,000** in attorneys' fees and costs and up to **$2,000** in incentive awards to the named Plaintiffs. *See* SA at ¶¶ X.1, X.2.

Under Counsel's calculation, therefore, they are seeking less than 6% of this constructive common fund. *See* Dkt. No. 49 at 2, 11.

The Ninth Circuit has explained that "attorneys for a successful class may recover a fee based on the entire common fund created for the class, even if some class members make no claims against the fund so that money remains in it that otherwise would be returned to the defendants." *Williams v. MGM–Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480–81 (1980)). However, the court also clarified that "the percentage may be adjusted to account for any unusual circumstances," and that district courts may instead apply the lodestar approach. *See id.* The Court finds that such "unusual circumstances" exist here.

*First*, Defendants concede that this litigation was "a motivation" for making the courtesy payments and transaction credits of $5,960,563. SA at ¶ X.3. But these payments were made *before* the parties settled this case, and Defendant does not state that this litigation was the *only* motivation for these payments. Plaintiffs' counsel acknowledged that although he "made demand

14

for immediate compensation to the class" the day after he filed the complaint in this case, "[a] specific dollar demand was not discussed."[4]  *See* Dkt. No. 70 at ¶ 7.  Moreover, if this $5 million were part of the current settlement, then the parties should have sought approval in advance of the payment as required by Federal Rule of Civil Procedure 23(e), as they have with the rest of the proposed settlement.  The parties did not do so.  As the parties confirmed during the final fairness hearing, if the Court were to deny final approval of this settlement for whatever reason, Defendants would not be able to recoup the money they already paid as courtesy payments and transaction credits.  The courtesy payments and transaction credits therefore appear to be—at least in part—a business decision that Defendants made following the Service Disruption.  The Court therefore has concerns with retroactively deeming the entire $5,960,563 to be part of the settlement fund.

*Second*, during the final fairness hearing, first held on April 1, 2021, the parties could only speculate as to the actual amount of damages that Class Members suffered from the Service Disruption.  Even in discussion with counsel, it was unclear whether the Class had incurred any additional harm beyond the money Defendants already paid in courtesy payments and transaction credits.  The Court raised concerns that this $5.5 million for losses under Tiers 1 and 2 was therefore largely illusory.  This was borne out by the low number of Claim Forms received.  Epiq confirmed that it received just 22,325 Claim Forms out of the 495,006 email notices delivered (or less than 5%).  And of the 22,325 Claim Forms received, Epiq only verified 22,128 of them.  These verified claims represent just a small fraction of the $5.5 million that Defendants have proffered to pay Claims under Tiers 1 and 2.

Moreover, under the settlement agreement only $1.5 million of the $5.5 million that Defendants made available to pay verified claims under Tier 1 and 2 is non-reversionary.  In other words, only $1.5 million of the $5.5 million is guaranteed to be paid—no matter how many

---

[4] During the final approval hearing, counsel represented that he had sent a demand letter to Defendants, which prompted these courtesy payments and transaction credits.  Counsel later clarified that it was a phone call, and not a formal letter.  *See* Dkt. No. 70 at ¶¶ 8–9.  As a result, there is no record of what counsel actually said to Defendants and how, if at all, it prompted Defendants' pre-settlement payments.

verified claims there are—either to Class Members or to the East Bay Community Law Center as a *cy pres* recipient. *See id.* at ¶ IV.5. If there were few verified claims (as unsurprisingly turned out to be the case), Defendants would retain the rest (or $4 million) of the available funds. Following the claims adjustment process, Epiq confirmed that Defendants will pay $337,870.32 total for these verified claims. Thus, $337,870.32 will be paid to Class Members under Tiers 1 and 2; $1,162,129.68 (*i.e.*, the substantial bulk of the non-reversionary $1.5 million) will be distributed to the East Bay Community Law Center; and $4 million will revert to Defendants. Just 6% of the $5.5 million will therefore be paid to Class Members at all. The Court finds that much of the asserted relief for the Class is illusory.

Both in the briefs and during the hearing, Class Counsel argued that he has nevertheless received attorneys' fees awards based on similarly-structured settlements in other cases. *See, e.g.*, Dkt. No. 49 at 17 (citing *Green Dot*, Case No. 2:16-cv-03557, ECF No. 109 at 13 (C.D. Cal. Nov. 22, 2017); *UniRush*, Case No. 1:15-cv-08372, ECF No. 49 (S.D.N.Y. Sept. 12, 2016)). The Court finds it notable, however, that it appears that attorneys' fees were awarded in both cases before the claims adjustment process was complete. Thus, it is unclear whether these cases shared similarly low rates of verified (and paid) claims. Moreover, in *Green Dot*, the court awarded attorneys' fees based on the lodestar, and not the percentage of the fund. In any event, the Court is not persuaded that counsel should be entitled to the full amount of its requested fees simply because it may have been successful in persuading a court to award such fees before. The Court has an independent obligation to ensure the reasonableness of any fee award.

The Court therefore turns to Class Counsel's lodestar. During the April 29, 2021 hearing, the Court requested that counsel provide the underlying billing records in support of the motion for attorneys' fees. *See* Dkt. No. 68. In response, counsel supplemented its lodestar based on time spent (1) by attorney Michael Braun investigating this matter for two days in October 2019; and (2) by Class Counsel since it prepared its motion for attorneys' fees in December 2020 and to prepare for the final fairness hearing. *See* Dkt. No. 70. Counsel asserts that it "discovered" Mr. Braun's hours were missing when preparing the time entries for submission to the Court. *See id.* at 4. Counsel now represents that in sum it has spent 490.9 hours on this case, and calculates its

lodestar as $380,968.80. *See id.* at 5. This time includes:

> [P]re-suit investigation and analysis; interviewing members of the class to determine how those members were affected by the problems associated with the Service Disruption; reviewing and analyzing information produced by Defendants; preparing for and participating in settlement discussions; participating in a number of telephonic settlement negotiations; drafting settlement documents; drafting papers in support of preliminary approval of the Settlement; working with the Class Administrator and Defendants' counsel to implement the notice program; and working with the class in connection with notice and administration issues.

*See* Dkt. No. 49 at 17; *see also* Yanchunis Decl. at ¶¶ 12–17, & Ex. A.

Having reviewed the itemized billing records in detail, the Court finds that Class Counsel's lodestar calculation contains some inefficient and unreasonable time. *See Jankey v. Poop Deck*, 537 F.3d 1122, 1132 (9th Cir. 2008) (directing courts to exclude from a fee request any hours that are "excessive, redundant, or otherwise unnecessary"). For example, the records indicate that the attorneys spent significant time discussing the case via intraoffice meetings, emails, and phone calls with co-counsel. The Ninth Circuit has indicated that the Court has discretion to discount such time. *See Terry v. City of San Diego*, 583 Fed. App'x 786, 790–91 (9th Cir. 2014) (permitting reductions for time counsel spent conferring among themselves and co-counsel editing each other's briefs because this time could be considered duplicative).

The Court also has reservations about the amount of time that counsel spent preparing the motions in this case. Class counsel claims that it spent 185.80 hours on "Motions Practice" as of December 29, 2020. *See* Yanchunis Decl., Ex. A. Only the preliminary approval motion and motion for attorneys' fees were filed by the end of December 2020, and no other motions practice occurred in this case. Counsel therefore spent almost 200 hours on two motions. In contrast, Class Counsel appears to have spent approximately 30 hours preparing the motion for final approval. Although the motion for preliminary approval may have required the coordination of additional information, including the settlement agreement and proposed notices, the Court finds that almost 186 hours spent on the motions for preliminary approval and for attorneys' fees and costs is still excessive. The Court finds that a five percent reduction of Plaintiffs' lodestar is thus

warranted to account for the inefficiencies present in counsel's billing records.

Class Counsel also billed substantial time for travel to and from the settlement conference. Courts in this district have frequently reduced travel time by half to create a reasonable rate. *See, e.g.*, *In re Washington Public Power Supply Sys. Sec. Lit.*, 19 F.3d 1291, 1298–99 (9th Cir. 1994) (finding the district court did not err in reducing attorney travel time by half where the "attorneys generally billed the entire duration of the time spent in transit"); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 6903, 2020 WL 2086368, at *8 (N.D. Cal. Apr. 30, 2020). Here, Class Counsel billed for travel, largely irrespective of any preparation for the settlement conference or work on this case. Counsel also appears to have included time spent during layovers in transit. The Court finds that a reduction of fifty percent of this time is appropriate under the circumstances.

| Name | Date | Task | Rate | Hours | Total |
|------|------|------|------|-------|-------|
| Patrick A. Barthle | 2/4/2020 | Travel to settlement conference | $658 | 6.50 | $4,277 |
| John Yanchunis | 2/5/2020 | Travel to San Francisco to attend mediation | $950 | 11.10 | $10,450 |
| Patrick A. Barthle | 2/5/2020 | Travel to San Francisco for mediation via layover in Seattle and prepare for mediation | $658 | 8.50 | $5,593 |
| John Yanchunis | 2/7/2020 | Travel from San Francisco through Atlanta to Tampa after mediation | $950 | 11.00 | $10,450 |
| Patrick A. Barthle | 2/7/2020 | Return travel from San Francisco via layover in Atlanta | $658 | 10.90 | $7,172 |
| | | | | **TOTAL** | $37,942 |
| | | | | **Reduced by 50%** | $18,971 |

The Court is also concerned with time that appears unrelated to this case or is otherwise due to inattentiveness. For example, there is an entry regarding a hearing on counsel's *pro hac vice* applications, but there was never a hearing on any *pro hac vice* applications. There are also several entries regarding "potential" plaintiffs regarding a breach or identity theft. But this action involved a disruption in Defendant's online banking services, not a data breach. These entries were also notably after the parties had settled this case.

| Name | Date | Task | Rate | Hours | Total |
|------|------|------|------|-------|-------|
| Patrick A. Barthle | 12/12/2019 | Email string with co-counsel re hearing on PHVs | $658 | .30 | $197.40 |
| John Yanchunis | 3/2/2020 | Email exchange with Sean Unger confirming that there is not an in person meeting this Friday | $950 | .30 | $285 |
| John Yanchunis | 12/24/2020 | Review Judge Donato's orders on final judgment | $950 | 2.40 | $2,280 |
| Patrick A. Barthle | 1/18/2021 | Correspond with co-counsel and opposing re pot'l breach/issues with customer ID theft | $658 | .40 | $263.20 |
| Patrick A. Barthle | 1/19/2021 | Correspond with co-counsel re pot'l breach victims | $658 | .1 | $65.80 |
| Patrick A. Barthle | 1/26/2021 | Call pot'l plf S. Johnson and research re same | $658 | .3 | $197.40 |
| John Yanchunis | 3/14/2021 | Email exchanges with consumer regarding | $950 | 1.00 | $950 |

| | | service disruption she is presently experiencing (.5); email to Sean Unger, two emails, regarding news of another service disruption and sending him photos of instant messages with another consumer[] (.5) | | | |
|---|---|---|---|---|---|
| | | | | **TOTAL** | $4,238.80 |

Reducing Plaintiffs' lodestar calculation by the amounts identified above, the Court calculates a revised lodestar of $338,719.56.[5]  Considering the procedural posture of the case, the amount of substantive litigation, the minimal issues in dispute, and the lack of motion practice, the Court finds that an award of this lodestar is reasonable under the circumstances.  The Court also finds that the $8,146.75 in costs that counsel identified is also reasonable.  *See* Yanchunis Decl. at 10; Dkt. No. 49-2, Ex. 2 at 7.  Accordingly, the Court awards attorneys' fees and costs in the total amount of $346,857.31.[6]

### ii. Incentive Awards

Lastly, Class Counsel requests an incentive award of $500 for each of the Named Plaintiffs.  *See* Dkt. No. 49 at 22–24.  District courts have discretion to award incentive fees to named class representatives.  *See In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).  However, the Court shares the Ninth Circuit's concern that "if class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted

[5] The Court first reduced Plaintiffs' proposed lodestar by 5% due to inefficiencies:  $380,968.80 *.95  = $361,920.36.  The Court then subtracted the other inefficient or duplicative time identified above:  $361,920.36 - $18,971 (50% reduction in travel fees) - $4,238.80 (time unrelated to case) = $338,710.56.
[6] $338,719.56 (fees) + $8,146.75 (costs) = 346,857.31.

United States District Court
Northern District of California

to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *See Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003); *Radcliffe v. Experian Information Sols. Inc.*, 715 F.3d 1157, 1163–64 (9th Cir. 2013) (noting that the Ninth Circuit has "expressed disapproval of these incentive agreements" and that "in some cases incentive awards may be proper but . . . awarding them should not become routine practice"). Indeed, the Ninth Circuit has cautioned that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . ." *Radcliffe*, 715 F.3d at 1165 (quotations omitted). This is particularly true where "the proposed service fees greatly exceed the payments to absent class members." *Id.*

The Court has concerns about the requested incentive awards in a case in which the average monetary recovery for each Class Member is $11.94.[7] Thus, if the Court were to grant the named Plaintiffs' request for incentive awards, they would be receiving significantly more money as compared to the other Class Members. The Court further notes that counsel has not provided any detailed discussion of what the named Plaintiffs did to contribute to this litigation or how long they spent doing any particular task. Rather, counsel devotes just two sentences to summarizing at a high level the types of work that the named Plaintiffs performed. *See* Dkt. No. 49 at 23; *see also* Dkt. No. 49-1, Ex. 1 at ¶ 29. The Court accordingly **DENIES** the request for incentive awards in its entirety.

### III. CONCLUSION

Accordingly, the Court **GRANTS** the motion for final approval of class action settlement and **GRANTS IN PART** the motion for attorneys' fees and incentive award. The Court awards attorneys' fees and costs in the amount of $346,857.31, but **DENIES** the request for an incentive award for the named Plaintiffs.

The parties and settlement administrator are directed to implement this Final Order and the settlement agreement in accordance with the terms of the settlement agreement. The parties are further directed to file a short stipulated final judgment of two pages or less within 21 days from

---

[7] $5,960,563.00 (in courtesy payments and transaction credits) + $337,870.32 (under Tiers 1 and 2) / 527,505 records for potential Class Members = $11.94.

the date of this order.  The judgment need not, and should not, repeat the analysis in this order.

**IT IS SO ORDERED.**

Dated:  May 24, 2021

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California